Brandon J. Mark, USB #10439
**Parsons Behle & Latimer**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
bmark@parsonsbehle.com
ecf@parsonsbehle.com

Lynn M. Adam (Admitted Pro Hac Vice)
**Adam Law LLC**
Two Decatur Town Center
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
Telephone: (404) 324-3582
ladam@lynnadamlaw.com

Robert A. Griffith (Admitted Pro Hac Vice)
**Gargiulo / Rudnick, LLP**
766 Falmouth Road, Suite A-6
Mashpee, Massachusetts, 02649
Telephone: (617) 742-3833
Fax: (617) 523-7834
rgriff@grglaw.com

Tejinder Singh (Admitted Pro Hac Vice)
**Goldstein & Russell, P.C.**
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
Telephone: (202) 362-0638
Fax: (866) 574-2033
tsingh@goldsteinrussell.com

*Attorneys for Relator Michael D. Khoury*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF NEVADA *EX REL.* MICHAEL D. KHOURY, M.D., <br><br> Plaintiffs, <br><br> vs. <br><br> INTERMOUNTAIN HEALTHCARE, INC. D/B/A INTERMOUNTAIN HEALTHCARE; IHC HEALTH SERVICES, INC.; MOUNTAIN WEST ANESTHESIA, L.L.C.; DAVID A. DEBENHAM, M.D.; ERIC A. EVAND, M.D.; JOSHUA J. LARSON, M.D.; JOHN E. MINER, M.D.; TYLER W. NELSON, M.D.; AND DOE ANESTHESIOLOGISTS 1 THROUGH 150, <br><br> Defendants. | **FIRST AMENDED COMPLAINT** <br><br><br> Case No. 2:20-CV-00372 <br><br> Judge Daphne A. Oberg |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. JURISDICTION AND VENUE ............................................................11

III. THE PARTIES.....................................................................................12

IV. THE FALSE CLAIMS ACTS ..............................................................16

    A. The Federal False Claims Act .....................................................16

    B. The Nevada False Claims Act .....................................................18

V. FEDERAL HEALTHCARE PROGRAMS.............................................20

    A. Medicare .....................................................................................20

    B. Medicaid .....................................................................................24

    C. TRICARE ...................................................................................29

VI. STANDARDS FOR PROVIDING AND BILLING FOR
ANESTHESIA SERVICES .................................................................30

    A. Anesthesia Services Must Be Provided in a Vigilant Manner,
Without Significant Interruption .................................................30

    B. Federal Healthcare Programs Only Pay for Anesthesia
Services Provided in a Vigilant Manner, Without Significant
Interruption .................................................................................38

    C. Billing Rules For Physician Fees Require Patient Monitoring
And Continuous Anesthesia Care As Conditions of Payment .........39

    D. Hospitals Must Ensure Patient Safety and Maintain Accurate
Records ........................................................................................46

VII. DEFENDANTS KNOWINGLY PRESENTED FALSE OR
FRAUDULENT CLAIMS....................................................................53

    A. Example 1 – Endovascular Aneurysm Repair Surgery ...................59

    B. Example 2 – Carotid Endarterectomy Surgery................................61

    C. Example 3 – Femoral Artery Bypass Surgery .................................62

    D. Examples of False Claims ...............................................................64

4845-5082-1872.v2

VIII.   DEFENDANTS USED FALSE RECORDS MATERIAL TO
        FALSE OR FRAUDULENT CLAIMS .......................................70

IX.     DEFENDANTS ACTED WITH SCIENTER ............................................72

X.      THE VIOLATIONS WERE MATERIAL TO THE
        GOVERNMENT'S PAYMENT DECISIONS............................................77

XI.     DEFENDANTS CONSPIRED TO VIOLATE THE LAW .......................81

XII.    DEFENDANTS AVOIDED THEIR OBLIGATION TO RETURN
        OVERPAYMENTS ...................................................................83

XIII.   INTERMOUNTAIN HEALTHCARE IS LIABLE ...................................85

        Count One ................................................................................87

        Count Two..................................................................................90

        Count Three.................................................................................91

        Count Four ..................................................................................92

        Count Five...................................................................................93

XIV.    REQUEST FOR TRIAL BY JURY ...........................................................95

XV.     PRAYER FOR RELIEF .............................................................................95

4845-5082-1872.v2

# I.     Introduction

Michael D. Khoury, M.D., on behalf of the United States of America and the State of Nevada, brings this action pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b), and the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.040, and respectfully pleads as follows:

1.     This action seeks to recover damages and civil penalties from Defendants – Intermountain Healthcare, Mountain West Anesthesia, and related entities and individuals – based upon false claims for payment for anesthesia services that Defendants have knowingly submitted, caused to be submitted, and conspired to submit to federal healthcare programs, including Medicare, Medicaid, and TRICARE for over ten years.[1]

2.     In a nutshell, since 2007 and continuing today, the Defendant Anesthesiologists[2] have improperly billed the government for anesthesia services they did not render as claimed.  They did so by falsely representing that they were

---

[1] No claims are brought on behalf of the State of Utah only because Utah law does not provide for a *qui tam* cause of action; Defendants knowingly submitted false claims for payment to the Utah Medicaid program, and all such false claims violated the federal False Claims Act, 31 U.S.C. § 3729.  Claims brought on behalf of the State of Nevada relate to false claims for payment submitted by Defendants to the Nevada Medicaid program for anesthesia services provided to Nevada Medicaid beneficiaries at Defendants' facilities in Utah.

[2] This term is defined in paragraphs 31–33, below.

personally providing continuous, uninterrupted anesthesia care during surgeries, when in fact they spent the vast majority of their time in the operating room engrossed in their smartphones, tablets, and laptops – known as personal electronic devices (PEDs).  When they were supposed to be taking care of their patients, the Defendant Anesthesiologists were instead immersed in the Internet – surfing the web, reading and posting on social media, sending messages, shopping, paying bills, watching football, planning vacations, and even managing a moonlighting disc jockey business.  They indulged in these dangerous distractions knowing that no other anesthesia provider was monitoring their patients during surgery.

3.      To say that this was substandard medical care is to understate the matter. Vigilance is central to an anesthesiologist's role.  That is why the American Society of Anesthesiology (ASA) in 1932 adopted the word "VIGILANCE" as its motto, placing it at the center of its official seal.  And the society's logo is a lighthouse with stars overhead, which "represent constant and



4845-5082-1872.v2

eternal vigilance" against the "sea of doubt and clouds of terror" that surround a sedated patient.[3]

4.      Consistent with that long-established professional norm of vigilance, the ASA instructs its members, which include the Defendant Anesthesiologists, to "eliminate distractions" that reduce attention to the sedated patient, including distractions coming from PEDs.[4]  Multiple authoritative professional societies, including the ASA, the American Association of Nurse Anesthetists, the American College of Surgeons, and the Association of Surgical Technologists have issued statements finding that distractions in the operating room pose a threat to patient safety – and no professional society has voiced the contrary view.  The issue has been discussed in medical literature, where commentators largely agree that PEDs pose particularly significant concerns.  Distracted anesthesiologists have also been sued for medical malpractice after their patients suffered injury or death during surgery.  Many health systems in the United States accordingly prohibit the use of PEDs for non-patient care during surgery.

---

[3]     *See* American Society of Anesthesiologists, *About ASA*, https://www.asahq.org/about-asa (last visited May 28, 2021).

[4] ASA Statement on Distractions (Oct. 28, 2015, last amended on Dec. 13, 2020).

5.      This substandard medical practice turned into actionable fraud when Defendants billed the government for it.  As the U.S. Court of Appeals for the Tenth Circuit has held, "[f]or a claim to be reimbursable, it must meet the government's definition of 'reasonable and necessary.'"  *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742 (10th Cir. 2018).  To meet that definition, a service must be "[s]afe and effective," "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition," and "[f]urnished in a setting appropriate to the patient's medical needs and condition," among other requirements.  *Id*. at 742-43.

6.      Defendants violated the "reasonable and necessary" requirement by furnishing anesthesia services in a way that was unsafe and that deviated substantially from accepted standards of medical practice, and then by billing the government for that care.

7.      Indeed, Defendants' unsafe anesthesia practices not only undermined the reasonableness of the anesthesiologist's service, but also of the entire surgery the anesthesia care was intended to facilitate.  The hospitals were equally responsible for furnishing a safe anesthesia service and for fully informing their patients of the conditions of surgery before obtaining their consent.  Defendants' unsafe and

4

undisclosed anesthesia practices rendered the entire claim for inpatient care by the hospitals false, as well.

8.     In addition to this over-arching "reasonable and necessary" requirement, the government imposes additional conditions for payment on anesthesia services.     Anesthesia billing regulations expressly require patient monitoring and "continuous anesthesia care" as conditions of payment for anesthesia services and anesthesia time.  *See* 42 C.F.R. § 414.46(a)(1), (a)(3).

9.     To get paid under these regulations, anesthesiologists describe the anesthesia service and record the amount of "anesthesia time" they spend providing continuous (*i.e.*, uninterrupted) anesthesia care to their patients.  *See* 42 C.F.R. § 414.46(b)(1).  The more time the anesthesiologist bills, the more money he makes. But Medicare expressly instructs anesthesiologists that "[a]ny interrupted time is removed from total time of service" when reporting "anesthesia time" on a claim for payment submitted to Medicare, and both anesthesia time and "time spent away" from the patient, if any, must be documented in the intraoperative report in the patient's medical record.[5]

---

[5]  Noridian Healthcare Solutions (Medicare Administrative Contractor for Defendants), instructions for "Anesthesia and Pain Management," *available at* https://med.noridianmedicare.com/web/jeb/specialties/anesthesia-pain-management  (last visited May 28, 2021); *see* 42 C.F.R. § 414.46(a)(3).

10.    In this case, the Defendant Anesthesiologists reported that entire surgeries (sometimes three or four hours of time) were "anesthesia time," even when they spent the vast majority of the surgery ignoring the sedated patient to focus on their PEDs.  To make matters worse, the Defendant Anesthesiologists billed using a modifier code to indicate services were "personally performed" by an anesthesiologist rather than a nurse – a billing modifier that results in the highest payments – even though the main thing the Defendant Anesthesiologists were "personally" doing was ignoring their patients.  By billing the government for time spent goofing off, the Defendant Anesthesiologists defrauded the government.

11.    Independently, federal healthcare programs have a litany of rules designed to ensure that the medical care provided to their beneficiaries is provided in a safe and reasonable manner, and that patients have the ability to consent to the level of care they receive.  Defendants failed to live up to these standards. Instead, the distracted anesthesiologists were "asleep at the wheel," like a reckless motorist absorbed in texting while driving – a crime in almost every U.S. jurisdiction.[6]  They

---

[6] *See* National Conference of State Legislatures, summary of state texting while driving laws, http://www.ncsl.org/research/transportation/cellular-phone-use-and-texting-while-driving-laws.aspx

nevertheless charged the government for monitoring services they failed to perform for their unwitting patients.

12.    The liability in this case is not limited to the Defendant Anesthesiologists.  The physician practice group they work for and the hospitals where they practice were aware of the Defendant Anesthesiologists' improper conduct, but they all either knowingly or recklessly submitted bills to the government for those services, and failed to correct them afterward.

13.    This complaint is accompanied by signed declarations from two experts confirming the violations.  The first is Dr. Peter Papadakos, who is Director of Critical Care, and a Professor of Anesthesiology, Surgery, Neurology, and Neurosurgery at the University of Rochester Medical Center.  *See* Exhibit 1.  Dr. Papadakos is one of the nation's foremost authorities on the dangerous effects of distractions in the operating room – specifically for anesthesiologists.

14.    He explains that the "professional standard of care for anesthesiology demands that providers make every reasonable effort to eliminate distractions, including digital distractions, from the operating room."  Ex. 1, at 1. "While the use of electronic devices is sometimes tolerated (*e.g.*, to look up patient records), nobody thinks that it is acceptable to use a personal device on personal tasks during surgery." *Id*. at 2.  Specifically, "[i]t is not enough for the anesthesiologist to merely be

7

physically present, or available to respond if somebody else calls for the anesthesiologist's attention," because "[t]hat would be outsourcing the task of vigilance—which is the anesthesiologist's core duty—to others who have their own distinct jobs." *Ibid*. "It is also not enough to passively listen for alarms because there is a robust literature that a process of alarm fatigue occurs," and because alarms do not identify "trends of changes in the vital signs," which may require action "prior to reaching alarm trigger points." *Ibid*. The behaviors "described in [this] complaint deviate clearly from the standard of care" because the Defendant Anesthesiologists "were not merely distracted as a matter of chance by circumstances beyond their control. Instead, they prioritized the use of personal technology, focusing on their own entertainment and gratification instead of their patients." *Ibid*. "They were violating the central belief of the field of anesthesiology, which is vigilance and focus on the patient." *Id*. at 3. Dr. Papadakos opines "without reservation that individuals engaged in the activities described in this complaint were not truly engaged in the care of the patient," and thus "cannot be reimbursed for the anesthesia services." *Ibid*.

15. The second expert is Rebecca M.S. Busch, the principal of Medical Business Associates, Inc., a healthcare auditing firm. Exhibit 2, at 2. Ms. Busch likewise declares that the conduct described in this complaint constitutes "failure to

provide a complete anesthesia service." *Id*. at 3 of Report.  Consequently, "[a]ny CPT code, 'AA' modifier, and time units the anesthesiologists reported on their claims for payment misrepresented the services they provided because they failed to actively monitor their patients." *Ibid*.  Ms. Busch confirms that in order to bill for personally provided anesthesia services, "[i]t is not enough for an anesthesiologist to be physically present and available." *Ibid*.  Instead "[w]hen the anesthesiologist is the only anesthesia practitioner attending to a patient (as alleged in this case), he or she is responsible for personally and continuously monitoring the patient, to satisfy the conditions of payment." *Ibid*.  "Physical presence of a distracted anesthesiologist is not the same as active and continuous engagement with the patient's condition and anesthetic level." *Id*. at 4 of Report.  Moreover, the Defendants Anesthesiologists' lapses compromised the quality of the surgery as a whole, "elevat[ing] the risk to the patient of an adverse surgical outcome." *Ibid*. Ms. Busch thus opines that the claims for payment in this case were false, and also that the hospital violated "the hospital conditions of payment for anesthesia services and duty to maintain an effective compliance program." *Id*. 8 of Report.

16.     The plaintiff-relator who brings this action is Dr. Michael D. Khoury, M.D.  Dr. Khoury served for more than ten years as the only vascular surgeon at Dixie Regional Medical Center ("Dixie Regional"), a hospital in Saint George, Utah,

that is part of the Intermountain Healthcare system.[7]   As a vascular surgeon, Dr. Khoury performed hundreds of complex surgeries requiring general anesthesia, the highest level of sedation.

17.     Dr. Khoury's patients typically were the sickest patients in the hospital; they were mostly elderly, frail, and suffering from multiple, serious health conditions.   They trusted their physicians.   None of them consented to submit to anesthesia care from a distracted anesthesiologist.   Yet during his tenure at Dixie Regional, Dr. Khoury personally observed the conduct described above and met resistance when he tried to correct it.   During critical phases of a surgery, Dr. Khoury often was forced to call out an anesthesiologist's name multiple times to steer the anesthesiologist's attention away from the internet and back to the patient in need. He sometimes had to ask a nurse to physically shake the anesthesiologist because he was wearing headphones and could not hear Dr. Khoury.   Dr. Khoury also observed the false time entries, seeing the Defendant Anesthesiologists record all of their personal time as "anesthesia time" in patient medical records. Such fraudulent entries were incorporated into claims for payment submitted by Defendants.

---

[7] Effective January 1, 2021, Intermountain Healthcare changed the hospital's name from Dixie Regional Medical Center to St. George Regional Hospital – River Road.

4845-5082-1872.v2

18.     Dr. Khoury first tried to address the problem internally, adding the topic to the agenda of the Surgical Staff meeting, raising his concerns about the Defendant Anesthesiologists' reckless conduct with hospital administrators, anesthesiologists, and physician leaders on the medical staff, and warning that the pervasive use of PEDs during surgery posed a grave risk to patient safety.  Those employees and agents of Defendants dismissed Dr. Khoury's concerns out of hand, and Defendants' use of PEDs during surgery only increased over time.  Indeed, the Defendant Anesthesiologists' habitual practice of using their PEDs during surgery continues today.

## II.     Jurisdiction and Venue

19.     As required by 31 U.S.C. § 3730(b)(2) and the Nevada False Claims Act, Dr. Khoury served the government with his complaint and a written disclosure of substantially all material evidence and information he possessed regarding Defendants' conspiracy and fraudulent billing scheme.  The government declined to intervene in this action, giving Dr. Khoury the right to conduct the action under 31 U.S.C. § 3730(c)(3).

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

11

21.     The Court has jurisdiction over Dr. Khoury's claims under the Nevada False Claims Act pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1395(a), and 31 U.S.C. § 3732(a), since one or more of the following has occurred in this District: Defendants are found, have an agent or agents, have contacts or had contacts, or transact or have transacted business and their affairs in this judicial District; at least one of the acts or omissions complained of herein occurred in this District; Defendants prepared and submitted false claims to federal healthcare programs, including Medicare, Medicaid, and TRICARE in and from this District; and Defendants conduct substantial business within the jurisdiction of this Court.

### III.    The Parties

23.     Relator Michael D. Khoury, M.D has been a vascular surgeon for nearly thirty years.  He is certified by the American Board of Surgery, and he is a Fellow of the American College of Surgeons (FACS).  Dr. Khoury served as the only Board-certified vascular surgeon at Dixie Regional from 2007 through early 2018.  During his tenure there, Dr. Khoury personally observed the improper practices described in this Complaint, that is, the Defendant Anesthesiologists' failure to monitor patients and flagrant falsification of anesthesia records to count the time when they

were engaged in personal matters on electronic devices while patients were sedated. Before joining Dixie Regional, Dr. Khoury held other significant positions, including sixteen years of service as a vascular surgeon on the staff of a large health system in Detroit, Michigan.  Dr. Khoury is a resident of St. George, Utah and he currently serves as a vascular surgeon for the U.S. Department of Veterans Affairs (VA) Southern Nevada Healthcare System.

24.    Defendant Intermountain Health Care, Inc. is a Utah domestic non-profit corporation doing business in this District as Intermountain Healthcare. Intermountain Healthcare is the sole corporate member of Defendant IHC Health Services, Inc.  The Utah Secretary of State entity number for Intermountain Healthcare is 616169-0140. It may be served with process through its registered agent, Anne D. Armstrong, 36 South State Street, Suite 2200, Salt Lake City, Utah 84111.

25.    Defendant IHC Health Services, Inc. is a Utah domestic corporation doing business in this District.  IHC Health Services owns and manages 24 hospitals, as well as outpatient surgery centers, clinics, and other health-related operations, principally in Utah.

26.    Dixie Regional Medical Center, now known as St. George Regional Hospital – River Road ("St. George Regional Hospital"), where Dr. Khoury was

employed, is owned by IHC Health Services. St. George Regional Hospital is located at 1380 E Medical Center Drive, St. George, Utah.  IHC Health Services, Inc. may be served with process through its registered agent, Anne D. Armstrong, 36 South State Street, Suite 2200, Salt Lake City, Utah, 84111.[8]

27.     Defendant IHC Health Services, Inc. and Defendant Intermountain Health Care, Inc. are collectively referred to as "Intermountain" in this Complaint.

28.     Intermountain publicly declares on its website (intermountainhealthcare.org) that Dixie Regional provides care to citizens in southern Utah, northwestern Arizona, and southeastern Nevada.  Intermountain's large network of hospitals and surgery centers serve residents throughout the State of Utah and beyond.

29.     Defendant Mountain West Anesthesia, L.L.C. is a domestic limited liability company that is located and does business in this District.  Mountain West Anesthesia employs over 150 physician anesthesiologists in various parts of Utah including St. George, Provo, and Salt Lake City.  Mountain West Anesthesia contracts with Intermountain to provide anesthesia services for patients of Intermountain's hospitals and surgical centers. Mountain West Anesthesia may be

---

[8] The Complaint refers to "Dixie Regional" because that was the name of the hospital while Dr. Khoury was employed there.

served with process through its registered agent, Langdon Owen, 111 East Broadway, 11th Floor, Salt Lake City, UT 84111.

30.   Mountain West Anesthesia employs the anesthesiologists named as Defendants:  David A. Debenham, M.D.; Eric A. Evans, M.D.; Joshua J. Larson, M.D.; John E. Miner, M.D.; and Tyler W. Nelson, M.D.

31.   These individual Defendants are referred to as "the Defendant Anesthesiologists" in this Complaint.  They are physicians with a specialty in anesthesiology who perform services at Dixie Regional (now known as St. George Regional Hospital) and other hospitals and surgery centers owned and managed by IHC Health Services, all of which are held out to the public as "Intermountain Healthcare" facilities.

32.   Each of the Defendant Anesthesiologists resides and does business in this federal District.  They may be served with process at their residence or at St. George Regional Hospital where they regularly perform anesthesia services.

33.   Defendants Doe Anesthesiologists 1 through 150 (the "Doe Defendants") are anesthesiologists employed by Mountain West Anesthesia who committed acts and omissions similar to those of the Defendant Anesthesiologists. Relator is informed, believes, and thereon alleges, that each defendant designated as a Doe is legally responsible for violations of the False Claims Act or other laws, or

otherwise causing injury and damages to federal health programs for the reasons set forth herein.  Mountain West and Intermountain have the ability to identify the Doe Defendants.

### IV.    The False Claims Acts

**A.    The Federal False Claims Act**

34.    Defendants violated the federal False Claims Act, 31 U.S.C. §§ 3729-33, a statute that "covers all fraudulent attempts to cause the government to pay out sums of money." *Polukoff*, 895 F.3d at 734 (citations omitted).

35.    The False Claims Act imposes civil liability on any person or organization that commits one of the following acts  –

A.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

C.    conspires to commit a violation of [the False Claims Act; or]

G.    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A)-(C), (G).

36.    The statutory terms "knowing" and "knowingly":

(A)    mean that a person, with respect to information--

16

(i)      has actual knowledge of the information;

(ii)     acts in deliberate ignorance of the truth or falsity of the information; or

(iii)    acts in reckless disregard of the truth or falsity of the information;

and

(B)     require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

37.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

38.     A person or an organization that violates the False Claims Act is liable to the United States Government for a civil penalty for each violation, plus three times the amount of damages the Government sustains because of the violation. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (Civil Monetary Penalties Inflation Adjustment).[9]

---

[9] For civil penalties assessed after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil monetary penalties range from a minimum of $11,181 to a maximum of $22,363 for each violation of the False Claims Act. *See* 28 C.F.R. § 85.5. For violations occurring on or before November 2, 2015, the civil penalty ranges from $5,500 to $11,000 for each violation. *See* 28 C.F.R. § 85.3(a)(9).

39.    The False Claims Act allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government, and to share in any recovery. *See* 31 U.S.C. § 3730(b)-(d).  The person bringing the action is known as the relator.  Dr. Khoury is the relator in this action.

## B.    The Nevada False Claims Act

40.    Defendants also violated the False Claims Act of the State of Nevada, *see* Nev. Rev. Stat. § 357.040(1).[10]

41.    Dixie Regional and the Defendant Anesthesiologists are enrolled as contracted providers in the Nevada Medicaid program.  They submitted false claims for payment to the Nevada Medicaid program for anesthesia services they purportedly delivered at Dixie Regional and other Intermountain facilities to residents of Nevada who were beneficiaries of Nevada Medicaid.

42.    The Nevada Medicaid program is a federal healthcare program that is funded by federal and state taxpayers. *See* 42 U.S.C. § 1396; 42 U.S.C. § 1320a-7(b)(f).

---

[10]  While the fraudulent conduct described in this Complaint took place in Utah, and the Utah Medicaid Program paid false claims as a result, the State of Utah does not have its own False Claims Act; thus, Utah is not identified as a Plaintiff in this case.

43.     Knowingly submitting a false claim for payment to the Nevada Medicaid program is a violation of both the federal False Claims Act and its Nevada counterpart.

44.     Specifically, Nevada law provides for liability for the "Submission of False Claims to State or Local Government," referred to herein as the Nevada False Claims Act. *See* Nev. Rev. Stat. § 357.040(1).

45.     The Nevada False Claims Act creates liability for any person who, among other things:

(a)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(b)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.

….

(f)     Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision.

(g)     Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

(h)     Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the State or political subdivision within a reasonable time. [or]

(i)     Conspires to commit any of the acts set forth in this subsection.

Nev. Rev. Stat. § 357.040(1).

46.     A person or an organization that violates the Nevada False Claims Act is liable to the State of Nevada for a civil penalty for each violation, plus three times the amount of damages the State sustains because of the violation.  *See* Nev. Rev. Stat. Ann. § 357.040.

## V.     Federal Healthcare Programs

47.     Defendants are participating providers in federal healthcare programs, including Medicare, the Medicaid programs of Utah and Nevada, and TRICARE. As such, Defendants certify compliance with the conditions of participation for those programs, and they certify that their claims for payment are accurate and satisfy the conditions of payment established by those programs for anesthesia and other medical services.

48.     Medicare, Medicaid, and TRICARE are referred to in this Complaint as "federal healthcare programs."

## A.     Medicare

49.     Congress created the Medicare Program in 1965 with the passage of Title XVIII of the Social Security Act, *see* 42 U.S.C. §§ 401, 426, 426-1. Medicare offers health insurance benefits for people 65 years and older, people with end stage renal disease, and certain people who are disabled.  *See id*.

50.    The Medicare Program is administered by the Centers for Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services.

51.    To administer traditional Medicare benefits, CMS contracts with commercial insurance companies to serve as Medicare Administrative Contractors which process and pay claims submitted to  Medicare Parts A and B.  In Utah and Nevada, the Medicare Administrative Contractor is Noridian Healthcare Solutions, LLC (Noridian), which administered claims submitted by Defendants for payment by Medicare Parts A and B.

52.    Hospital services are covered by Medicare Part A, which is funded entirely by the federal Government as a benefit for eligible participants, including people 65 years and older.

53.    Part B of the Medicare Program provides insurance benefits for physician services including anesthesiology, medical supplies, laboratory services, and other defined benefits. *See* 42 U.S.C. § 1395j to § 1395w-6.   Medicare Part B is a voluntary insurance program that is subsidized by federal funds.

54.    Medicare Part C is an alternative to traditional Medicare that makes managed care plans, known as Medicare Advantage Plans (or Medicare Choice Plans), available to Medicare beneficiaries.  *See* 42 U.S.C. § 1395w-21 to § 1395w-

21

29.  Medicare Part C is a voluntary insurance program that is subsidized by federal funds.  Approximately one-third of Medicare beneficiaries choose to enroll in Medicare Part C.  When selected, Medicare Part C takes the place of Medicare Part A (hospital insurance) and Medicare Part B (physician and other services).

55.    Medicare Advantage Plans are administered by commercial insurance companies under contracts with CMS.  The Plans cover medically necessary services that are covered by traditional Medicare, and many offer prescription drug coverage and additional benefits as well. *See* 42 C.F.R. § 422.100(a).

56.    CMS pays federal funds to Medicare Advantage Plans based on a capitated rate that varies in part based upon the number and types of claims covered and paid by the Plans.

57.    Claims for payment submitted to Medicare through its contractors for payment of goods and services under Medicare Parts A, B, and C are claims submitted to the federal Government within the meaning of the False Claims Act.

58.    The Medicare Program and Medicare contractors are collectively referred to as "Medicare" in this Complaint.

59.    Claims submitted to Medicare for payment for goods and services must comply with the False Claims Act, federal healthcare laws, Medicare regulations, and coverage rules described herein.

22

60.     A healthcare provider that participates in the Medicare program makes certain express and implied certifications of compliance with healthcare laws, Medicare regulations, and coverage rules that are a material condition of coverage upon which Medicare and other federal healthcare programs rely in making payment decisions.

61.     For example, the Medicare Act states that "no payment may be made . . . for any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

62.     Any services that do not meet this standard are not eligible for payment. The Tenth Circuit has held that this requirement is not met if a service is not "[s]afe and effective," or is not "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member." *Polukoff*, 895 F.3d at 742-43.

63.     Medicare regulations further define the conditions of participation in the program and conditions of payment for items and services that are considered "reasonable and necessary." For example, a condition of participation is that providers must "protect and promote each patient's rights" and provide care in a "safe setting." 42 C.F.R. § 482.13 (conditions of participation: patients' rights in

23

hospitals); *see also id*. § 416.50 (patients' rights in ambulatory surgery centers). Each patient also has "a right to make informed decisions regarding his or her care." 42 C.F.R. § 482.13(b)(2); *see also id*. § 416.50(e)(1) (patient has a right to be "fully informed" before surgery in an ambulatory surgery center). And of course, as set forth in greater detail below, providers must be honest with the government when seeking payment for services they purport to deliver to beneficiaries of government programs.

64.     Other federal healthcare programs, including Medicaid and TRICARE (discussed below), generally follow the conditions of payment established by Medicare.

**B.     Medicaid**

65.     Medicaid serves as the nation's primary source of health insurance coverage for low-income people. The Social Security Amendments of 1965 created the Medicaid program by adding Title XIX to the Social Security Act, 42 U.S.C. §§ 1396, *et seq*. Under the program, the federal government provides funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements including income limits.

66.     CMS provides regulatory oversight and financing for the Medicaid program in partnership with each State.  States must comply with federal Medicaid laws.

67.     Each state establishes and administers its own Medicaid program, and determines the type, amount, duration and scope of services covered within broad federal guidelines.

68.     **Utah**.   The Utah Department of Health, Division of Medicaid and Health Financing, oversees the Utah Medicaid program which serves low-income parents, children and other needy individuals.

69.     Federal support for Utah's Medicaid program varies from year to year and typically accounts for approximately 70% of the cost of the program.  Because the United States Government funds a portion of the Utah Medicaid program, claims submitted to the program must comply with the federal False Claims Act.  *See* U.S.C. § 3729(b)(2)(A)(ii) (defining "claim").

70.     While the Utah Medicaid program provides traditional benefits on a fee-for-service basis for some beneficiaries, it also contracts with managed care

4845-5082-1872.v2

plans to provide Medicaid benefits to eligible residents of Utah.[11]   Most Utah Medicaid recipients are enrolled in a Medicaid Managed Care Plan.

71.   Defendants are enrolled in and submit claims for payment to the Utah Medicaid program.

72.   A healthcare provider enrolls by completing the Medicaid Provider Application and signing a Provider Agreement.   Enrolled providers including Defendants certify that as to each claim for payment submitted to the Utah Medicaid program, the "medical services for which payment is claimed were actually furnished to the person identified as the patient at the time and in the manner stated." The provider also certifies, by filing a claim, that the information on the claim is "true, accurate and complete."   Utah Medicaid Provider Manual, Section I – General Information, at p. 24 (Feb. 2020).

73.   Each enrolled provider also "agrees to comply with all laws, rules, and regulations governing the Medicaid Program," *id*., and to "[b]e aware of and comply with policies and procedures in the provider manual." *Id*. at 8. "Enrollment as a Medicaid provider is contingent upon the provider satisfying all rules and

---

[11] https://medicaid.utah.gov/Documents/pdfs/medicalprograms.pdf

requirements for provider participation as specified in the applicable Section of [the] Provider Manual and state and federal law." *Id.* at 23-24.

74.   **<u>Nevada</u>**.   The Nevada Department of Health and Human Services, Division of Health Care Financing and Policy, administers the Medicaid program in Nevada.

75.   Federal support for Nevada's Medicaid program varies from year to year and accounts for approximately 65% of the cost of the program.

76.   Its program provides optional health insurance to low-income individuals and families who are residents of Nevada.

77.   Nevada Medicaid contracts with three managed care plans – Anthem Blue Cross and Blue Shield Healthcare Solutions, Health Plan of Nevada,  and SilverSummit Healthplan.   These Plans provide Medicaid benefits for eligible recipients in Washoe and urban Clark counties.   Most other Medicaid beneficiaries in Nevada receive benefits on a fee-for-service basis, meaning providers submit claims for payment directly to the Nevada Division of Health Care Financing and Policy.

78.   As noted, Defendants are enrolled in and submit claims for payment to the Nevada Medicaid program.   Healthcare providers who enroll in the Nevada Medicaid program acknowledge that it will pay only for services "properly

authorized, timely claimed, and actually and properly rendered by Provider in accordance with federal and state law and the state policies and procedures." Provider Contract, Nevada Division Of Health Care Financing And Policy, § 2.1. Moreover, the provider "is responsible for the validity and accuracy of claims" for payment submitted to Nevada Medicaid. *Id*. § 2.2.

79.    Some of Dr. Khoury's patients were beneficiaries of the Nevada Medicaid Program admitted to Dixie Regional Medical Center, and anesthesiologists from Mountain West Anesthesia were assigned to provide their anesthesia service during surgery. Other Intermountain facilities likewise permitted Defendant Anesthesiologists to perform services for Nevada Medicaid beneficiaries who underwent surgeries in those facilities. Defendants' improper practices during surgery, as described in this Complaint, tainted the claims they submitted to the Nevada Medicaid Program, which would not have paid the claims if it had known of those improper practices.

80.    Claims for payment submitted to the Utah and Nevada Medicaid programs, whether directly to a state agency or through contracted managed care plans, are claims submitted to a federal healthcare program.

## C.    TRICARE

81.    Congress created TRICARE, formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), to pay for healthcare benefits for active and retired members the uniformed services and their families. *See* 10 U.S.C. §§ 1072, 1079, 10864.

82.    TRICARE is a federal program administered by the United States Department of Defense.

83.    Defendants are enrolled as contracted providers in the TRICARE program.

84.    TRICARE funds a managed care option that covers benefits for beneficiaries who are treated by civilian providers. The Government has contracted with Health Net Federal Services, LLC (HNFS), a subsidiary of Centene Corporation, to manage the TRICARE West Region which includes the states of Arizona, Nevada, and Utah.  *See* 10 U.S.C. § 1079.

85.    Health Net Federal Services, LLC generally pays individual healthcare providers in accordance with the same reimbursement rules that apply to the Medicare program. *See* 10 U.S.C. § 1079(h)(1); 32 C.F.R. § 199.14(j).

86.     Claims for payment that are submitted to Health Net Federal Services, or its agents for claims processing, are claims submitted to a federal healthcare program within the meaning of the False Claims Act.

## VI.     Standards for Providing and Billing for Anesthesia Services

### A.     Anesthesia Services Must Be Provided in a Vigilant Manner, Without Significant Interruption

87.     An anesthesiologist is a physician with specialized training in safe pain management while preserving vital life functions.  The claims in this case relate to surgeries requiring general anesthesia, the deepest level of sedation.[12]  In such cases, the patient loses consciousness, literally placing his or her life in the hands of the anesthesiologist.

88.     During the surgeries in this case, the anesthesiologist was the only anesthesia provider in the operating room.  Defendants elected to "personally" perform anesthesia services instead of relying on the assistance of a nurse anesthetist or medical resident.  Maintaining vigilance during surgery was all the more important for the Defendant Anesthesiologists, because no other anesthesia provider was present to perform essential monitoring activities during surgery.

---

[12] See American Society of Anesthesiologists, Continuum of Depth of Sedation: Definition of General Anesthesia and Levels of Sedation/Analgesia (last amended October 23, 2019).

89.    The anesthesiologist's role does not end when the patient loses consciousness.  Instead, the anesthesiologist remains a key member of the surgical team, responsible for the "protection and maintenance of life functions and vital organs (*e.g.*, brain, heart, lungs, kidneys, liver, endocrine, skin integrity, nerve [sensory and muscular]) under the stress of anesthetic, surgical and other medical procedures."[13]  To do so, the anesthesiologist must maintain a constant state of situational awareness.  At a minimum, the anesthesiologist must continuously monitor the unconscious patient, scanning for the rapid changes that can occur during surgery, including sudden signs of distress or adverse reactions.

90.    Machines and alarms are not capable of standing in for the anesthesia professional; some conditions are simply not monitored by machines.  Especially during a vascular surgery, it is critical for the anesthesiologist personally to monitor the patient for excessive loss of blood or fluids.  This requires closely watching the patient, checking the number of soaked sponges during the procedure, and staying tuned in to the progress of the surgery.  Excess blood and fluid loss are managed more effectively if caught soon enough.  The anesthesiologist also must personally

---

[13] American Society of Anesthesiologists, *Guidelines for Patient Care in Anesthesiology*, Section I.B (last amended on October 26, 2016).

monitor urine output, and keep tabs on whether the patient is moving on the table due to insufficient anesthesia.

91.    Monitoring thus means more than simply being present in the room. The anesthesiologist personally must monitor the patient, anticipate potential issues, and take proactive steps to protect the patient from foreseeable risks.

92.    The anesthesiologist is expected to continually evaluate the patient's oxygenation, ventilation, circulation, temperature, kidney function, heart rhythm, and other vital functions.[14]   According to the ASA, "[e]very patient receiving general anesthesia shall have the adequacy of ventilation continually evaluated."[15]   Many need a breathing tube or other breathing assistance.  Every patient must "have arterial blood pressure and heart rate determined and evaluated *at least every five minutes*."[16]   Likewise, the patient's "circulatory function [must be] continually evaluated."[17]

93.    The patient's age and other diseases, and the complexity and length of the operation, are factors contributing to the intensity of monitoring necessary to maintain the life functions of an anesthetized patient.  Older patients having long,

---

[14] *See* American Society of Anesthesiologists, *Standards For Basic Anesthetic Monitoring*, Standard II (last affirmed Oct. 28, 2015).

[15] *Id.* Standard 3.2.

[16] *Id.* Standard 4.2.2 (emphasis added).

[17] *Id*. Standard 4.2.3.

32

complicated operations, or operations associated with blood loss, are at increased risk for acute renal failure.  The anesthesiologist must be focused on the progress of the operation, be aware of blood loss, and anticipate and prepare the patient at critical stages of the procedure.  Continuously monitoring kidney function through blood chemistry and urine output is essential to mitigate acute renal failure.  During heart surgery, abnormal blood chemistries could impact cardiac function or cardiac rhythm and must be carefully monitored by the anesthesiologist while the surgeon focuses on the procedure.

94.    It should go without saying, but for the sake of clarity, we will say it plainly:  Being distracted by personal matters during surgery is flatly inconsistent with an anesthesiologist's professional obligation to exercise vigilance in the monitoring of patients under sedation.  Simply being present in the room and listening with one ear for beeps and blips from the monitoring machines is not enough.  *See* ASA Standards For Basic Anesthetic Monitoring, Standard 1.1 ("[Q]ualified anesthesia personnel shall be continuously present *to monitor the patient and provide anesthesia care*") (emphasis added).

95.    Consistent with that rule, the ASA and other professional organizations have spoken to the risk of digital distractions in the operating room.  In 2015, the ASA strongly cautioned its members to "eliminate distractions":

> Anesthesiologists have the responsibility to maintain their ***utmost vigilance*** in order to place their patient's interests foremost and protect their patients from exposure to undue risk. Part of patient care includes managing the working environment to control and when possible ***eliminate distractions*** that reduce appropriate attention to the patient within the anesthesia care environment.
>
> ***Distractions have the potential to jeopardize patient safety.*** Attention and vigilance are a complex issue that can be compromised by an infinite variety of possible sources of distraction. These distractions can be directly created by the anesthesiologist, by other personnel involved in the patient's care, or any piece of equipment where care is provided.
>
> Anesthesiologists have a professional ***obligation to minimize the risks of avoidable or unavoidable distractions diverting their attention from the care of their patients***. . . .

ASA Statement on Distractions (Oct. 28, 2015) (emphasis added).

96.     In 2020, the ASA amended its statement to further address PEDs, noting that these technologies "can become a direct and indirect source of occupational distraction and potentially contribute to patient harm." The ASA accordingly admonished anesthesiologists, "as leaders of the anesthesia care team," to "defer nonessential activities such as social media, personal email, and other non-context relevant web searches" until after surgery. ASA Statement on Distractions (Dec. 13, 2020).

97.     Likewise, a 2015 position statement published by the American Association of Nurse Anesthetists (AANA) emphasized that "continuous clinical observation and vigilance are the foundation of safe anesthesia care" and stated:

34

> The use of mobile technology and wireless connectivity provides opportunity for distraction by giving users instant Internet access and linking users to email, e-magazines, e-books, television shows, social media, blogs, games, and thousands of nonclinical mobile apps. ***Any inattentive behavior during a procedure, such as reading, texting, gaming, using certain device accessories (e.g., head phones), or using a mobile device to access nonclinical content, should be considered a potential patient safety issue***.

AANA Position Statement on Mobile Information Technology, at 2-3 (2015) (emphasis added).

98.     The American College of Surgeons issued a Statement on Distractions in the Operating Room in 2016, recognizing that the "undisciplined use of smartphones in the [operating room]—whether for voice, e-mail, or data communication, and whether by the surgeon or by other members of the surgical team—may pose a distraction and may compromise patient care."

99.     The Association of Surgical Technologists in 2015 issued Standards of Practice including lengthy findings on the safety risks of "distracted doctoring" and strongly denouncing the use of personal electronic devices in OR:

> ***OR personnel should never access a cell phone*** either directly or using a wireless headset during perioperative care of the patient. Additionally, OR personnel should never use the OR computer for personal use, *e.g.*, browsing through Internet sites, checking and/or posting on social networking sites. The activities of ***OR personnel should be solely focused on the perioperative care of the patient*** in order to avoid medical errors. OR personnel who are focused on a device's screen rather than focused on the patient may miss indications

of the patient's condition and/or indications of an impending medical emergency, *e.g.* cardiac arrest during surgery.

AST Standards of Practice for Use of Mobile Information Technology in the Operating Room, Standard of Practice II (Oct. 10, 2015) (emphasis added).

100.    There are *no* professional organizations that defend the use of digital devices for personal business during surgery, for the obvious reason that the devices are engrossing – even addictive – and their use jeopardizes patient care.

101.   The dangers associated with digital distractions – especially for anesthesiologists – were known even before these statements were issued.  In April, 2011, a case arose in which a patient died after her anesthesiologist was surfing the Internet during surgery, prompting a lawsuit.[18] Later that year, the New York Times published an article in which Dr. Peter Papadakos warned that "lives are in danger" from distracted doctoring.[19]   Dr. Papadakos had himself published an article in

---

[18] Eric Nicholson, *Dallas Anesthesiologist Being Sued Over Deadly Surgery Admits to Texting, Reading iPad During Procedures*, Dallas Observer (Apr. 1, 2014), https://www.dallasobserver.com/news/dallas-anesthesiologist-being-sued-over-deadly-surgery-admits-to-texting-reading-ipad-during-procedures-7134970.

[19] Matt Richtel, *As Doctors Use More Devices, Potential for Distraction Grows*, N.Y. Times (Dec. 14, 2011), https://www.nytimes.com/2011/12/15/health/as-doctors-use-more-devices-potential-for-distraction-grows.html.

Anesthesiology News, a popular trade publication, about the issue.[20]   And Dr. Papadakos has signed a declaration, appended to this complaint, explaining that "nobody thinks that it is acceptable to use a personal device on personal tasks during surgery," and that such conduct "deviate[s] clearly from the standard of care." Exhibit 1, at 2.

102.   Of course, even without these media reports, anybody who has ever become engrossed in a smartphone or other PED knows that the potential for distraction – and therefore patient harm – is real.   That is why Dr. Khoury raised concerns about the Defendant Anesthesiologists' practices as early as 2007.

103.   For similar reasons, texting while driving is a criminal offense in Utah and similarly prohibited in 47 other states, the District of Columbia, Puerto Rico, Guam and the U.S. Virgin Islands.   *See* Utah Code 41-6a-1716.   In the United States, about nine people are killed every day due to car crashes involving a distracted driver.   According to research by the National Highway Traffic Safety Administration, this number reached 3,166 people in 2017.

---

[20] Peter J. Papadakos, *Electronic Distraction: An Unmeasured Variable in Modern Medicine*, Anesthesiology News (Nov. 10, 2011), https://www.anesthesiologynews.com/Commentary/Article/11-11/Electronic-Distraction-An-Unmeasured-Variable-in-Modern-Medicine/19643.

104.   Managing a patient under general anesthesia requires at least the level of vigilance expected of drivers.

105.   Consistent with professional standards, and to protect their patients, numerous health systems in the United States prohibit the use of personal electronic devices for non-patient care during surgery.  Defendants did not do so.

**B.    Federal Healthcare Programs Only Pay for Anesthesia Services Provided in a Vigilant Manner, Without Significant Interruption**

106.   Federal healthcare programs only reimburse for anesthesia services that are provided in a vigilant manner – especially when, as here, the physician claims to have "personally provided" the services in question.  In billing the government for anesthesia services, Defendants explicitly and implicitly certified that they complied with this requirement.  The requirement itself has several sources.

107.   First, as explained above, the Medicare Act provides that a service is only eligible for payment if it is "reasonable and necessary," *i.e.*, "safe and effective" and "[f]urnished in accordance with accepted standards of medical practice." *Polukoff*, 895 F.3d at 742.  Those standards demand the utmost vigilance from anesthesiologists personally providing care to patients.

108.   Second, CMS adopted anesthesia CPT codes that require monitoring, and anesthesia billing regulations make appropriate patient monitoring and accurate timekeeping express conditions of payment for anesthesia services.  *See* 42 C.F.R. §

38

414.46 ("Additional rules for payment of anesthesia services). The regulation specifically states that "monitoring services" are a component of every anesthesia service, and it requires physicians to report – down to the minute – the time they spend providing continuous – *i.e.*, uninterrupted – anesthesia care to a patient. 42 C.F.R. § 414.46(a)(1), (3).

109.   These regulations are discussed in greater detail below.

110.   Third, and also explained above, it is a condition of participation that care must be provided in a safe setting, and that patients must have informed consent about the services they will receive. Those requirements contemplate that physicians will provide services in a safe manner, or at a minimum obtain informed consent before deviating from ordinary medical practice.

## C.   Billing Rules For Physician Fees Require Patient Monitoring And Continuous Anesthesia Care As Conditions of Payment

111.   To bill a government healthcare program for anesthesia services after a surgery is complete, a physician submits a claim form detailing (1) a uniform billing code under the Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Technology (CPT) that corresponds to the anesthesia service in question; (2) the duration of the anesthesia service in minutes; and (3) the physician's level of involvement. Each of these variables influences how much money the government pays for services.

112.   First, the billing code for the anesthesia service determines the value of the "base unit," which includes "the value for each anesthesia code that reflects all activities other than anesthesia time." 42 C.F.R. § 414.46(a)(1).   Anesthesia CPT codes range from 00100 to 01999; they are assigned based on the anatomical region undergoing surgery.   For example, anesthesia for surgery on the neck is assigned to a CPT code in the range 00300 to 00352. CMS assigns a base unit of 3 to 20 units to each CPT code to reflect the difficulty and risks of the procedure.

113.   Payment for the base units compensates the anesthesiologist for appropriate patient monitoring and other activities during the anesthesia service, irrespective of duration.  *See* 42 C.F.R. § 414.46(a)(1).

114.   Second, the provider must identify the amount of "anesthesia time." This is defined as "the time during which an anesthesia practitioner is present with the patient." 42 C.F.R. § 414.46(a)(3).   "Anesthesia time is a continuous time period from the start of anesthesia to the end of an anesthesia service."  *Id.*

115.   Anesthesia time may not include interruptions in the anesthesia services for the patient.  Specifically, federal regulations provide,

> In counting anesthesia time, the anesthesia practitioner can add blocks of anesthesia time ***around an interruption*** in anesthesia time as long as the anesthesia practitioner is furnishing ***continuous anesthesia care*** within the time periods around the interruption.

40

42 C.F.R. § 414.46(a)(3) (emphasis added); *see also* Medicare Claims Processing Manual, Chapter 12 - Physicians/Nonphysician Practitioners, § 50.G.

116.   The term "continuous" means "means ***prolonged without any interruption at any time***."   ASA, Standards For Basic Anesthetic Monitoring, at 4 (Oct. 28, 2015) (emphasis added).   Similarly, the Merriam-Webster Dictionary defines "continuous" as "marked by ***uninterrupted*** extension in space, time, or sequence." (emphasis added).

117.   Noridian, the Medicare Part B contractor that processed and paid claims submitted by Defendants, similarly instructs providers that "[a]ny interrupted time is removed from total time of service" when reporting "anesthesia time" on a claim for payment submitted to Medicare, and any "discontinuance of services" must be noted when recording anesthesia time in the intraoperative report in the patient's medical record.   Noridian Healthcare Solutions (Medicare Administrative Contractor for Defendants), billing instructions for "Anesthesia and Pain Management," *available at* https://med.noridianmedicare.com/web/jeb/specialties/ anesthesia-pain-management (last visited February 4, 2020).

118.   The government takes the obligation to deduct interruptions seriously. "Actual anesthesia time in minutes is reported on the claim." Medicare Claims Processing Manual, Chapter 12 - Physicians/Nonphysician Practitioners, § 50(G).

Medicare instructs physicians to "[c]onvert hours into minutes and enter the total minutes required for this procedure" on the claim for payment. *See* Medicare Claims Processing Manual, Pub. 100-04, Chapter 26 - Completing and Processing Form CMS-1500 Data Set, § 10.4 (describing Item 24G); 42 C.F.R. § 414.46(c)(2).

119.    The Medicare claims processing contractor converts anesthesia minutes into 15-minute time units for purposes of payment.   As an example: When an anesthesiologist attended the patient for 35 minutes, the Medicare contractor converts the minutes to 2.3 units, representing two 15-minute periods, plus 1/3 of a 15-minute period.  *See* Medicare Claims Processing Manual, Pub. 100-04, Chapter 26 - Completing and Processing Form CMS-1500 Data Set, § 10.9.

120.   Third,   the   provider   must   note   the   level   of   involvement   of   the anesthesiologist in the service.  Medicare recognizes four categories of anesthesia service and pays the highest reimbursement for the first –

1)    Services "personally performed" by the anesthesiologist;

2)    Services that are "medically directed" by the anesthesiologist but performed by others in up to four concurrent cases;

3)    Services that are "medically supervised" by the anesthesiologist but performed by others in more than four concurrent cases; and

4)    Services that are performed by a certified registered nurse anesthetist (CRNA) that are "not medically directed" by a physician.

42

42 C.F.R. § 414.46(c), (d), (f); *see also* 42 C.F.R. § 414.60(a)(2) (CRNA services); 42 C.F.R. § 415.110 (additional conditions for medically directed services).

121.   Personally performed services are designated with a modifier "AA" attached to the billing code on claim forms.   *See* Medicare Claims Processing Manual, Chapter 12 - Physicians/Nonphysician Practitioners, § 50(I).  To be eligible for this level of payment, the anesthesiologist must perform "the entire service alone." 42 C.F.R. § 414.46(c)(1)(i) (noting alternatives not applicable here).  The payment rate for personally performed services is roughly *double* the rate when the anesthesiologist merely directs other providers such as nurse anesthetists who deliver anesthesia services.  *See id.*, § 50(C); 42 U.S.C. § 1395w-4(a)(4).[21]

122.   These variables come together in a formula, which is: (Base Unit + Anesthesia Time Units) x Anesthesia Conversion Factor x Modifier Code = Allowance. Thus, the base unit code (which expressly includes monitoring services) is included in every claim for reimbursement. The time units (which describe continuous care) are included in every claim for reimbursement. And the modifier

---

[21] Even when an anesthesiologist directs multiple concurrent procedures performed by anesthetists, payment for the anesthesiologist is made only when he or she "personally participates in the most demanding aspects of the anesthesia plan," monitors the patient "at frequent intervals," and remains "physically present" for diagnosis or emergencies, among other conditions.  42 C.F.R. § 415.10 (Conditions of payment: medically directed anesthesia services).

code, which describes the physician's level of personal involvement, is included in every claim for reimbursement.

123.   Healthcare providers like Mountain West Anesthesia submit these claims to the government on a CMS Form 1500 claim form via an electronic data file (ASC X12 837P, also known as an "837P File") to federal healthcare programs for services delivered to beneficiaries of those programs.  *See* 42 C.F.R. § 424.32 (describing claim form).

124.   CMS Form 1500 is a universal claim format used by all federal healthcare programs to identify the physician services for which payment is requested.  *See* Exhibit 3.  According to 42 C.F.R. § 424.32(b), the CMS Form 1500 is submitted to the appropriate Medicare contractor by physicians to request payment for medical services.   The rendering physician's name, a unique identification number known as a National Provider Identifier (NPI), the type of service, the duration of service, and other information material to payment of the claim are stated on the CMS Form 1500 or the equivalent electronic file (837P File).

125.   Accordingly, Mountain West Anesthesia submitted claims for payment for the physician anesthesia services described in this Complaint on CMS Form 1500 claim forms (in paper or electronic format) to the Medicare Part B contractor for Utah (Noridian), as well as to Medicare Advantage Plans (Medicare Part C), the

Nevada Medicaid and Utah Medicaid programs, to TRICARE, among other federal healthcare programs.[22]

126. CMS Form 1500 requires providers to make the following representations:

In submitting this claim for payment from federal funds, I certify that:

1) *the information on this form is true, accurate and complete*;

2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision;

4) *this claim*, whether submitted by me or on my behalf by my designated billing company, *complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions* for payment . . .;

5) *the services on this form were medically necessary and personally furnished by me*.

*See* Exhibit 3, CMS Form 1500 (emphasis added).

---

[22] On February 1, 2019, the Nevada Division of Health Care Financing and Policy implemented a new Medicaid Management Information System, whereby all claims, claim appeals, prior authorizations and provider enrollment/revalidation applications are submitted electronically. Before then, they were submitted in paper format. *See* Web Announcement 1829, *Modernization: Attention Providers Using Outsourced Billing Agencies/Vendors*, Medicaid.nv.gov, https://www.medicaid.nv.gov/Downloads/provider/web_announcement_1829_201 90129.pdf (last visited September 16, 2019).

127. Physicians must comply with these conditions to be eligible for payment by Medicare. *See* 42 C.F.R. § 424.516(a) (providers must certify compliance to maintain active enrollment status).

128. Unless the CMS Form 1500 with the attending physician's signature or an electronic equivalent providing such a certification is submitted, no federal funds will be paid. 42 C.F.R. § 424.33(b). *See also* 42 C.F.R. § 424.32 ("No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations.").

129. Providers seeking payment must present "sufficient information" for CMS "to determine whether payment [was] due and the amount of payment." 42 C.F.R. § 424.5(a)(6) (basic conditions for payment of a claim). Claims for payment that contain false or misleading information are not eligible for payment (also known as reimbursement) by federal healthcare programs.

**D.   Hospitals Must Ensure Patient Safety and Maintain Accurate Records**

130. The process for hospital billing works slightly differently. Before any billing can occur, a hospital or ambulatory surgical center must confirm its compliance with the conditions of participation, and all applicable laws and regulations.

131.    On behalf of each Intermountain facility that enrolled in the Medicare program, Defendant IHC Health Services made this certification.  Specifically, an official acting on behalf of IHC Health Services signed a "Certification Statement" on the Medicare Enrollment Application (CMS Form 855A) for each hospital, which stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

132.    These laws and regulations include specific rules relating to anesthesia. *See* 42 C.F.R. § 482.52.  That is, each hospital expressly assumed responsibility "for all anesthesia administered in the hospital," and agreed to furnish anesthesia services in "a well-organized manner." 42 C.F.R. § 482.52; *see also* 42 C.F.R. § 416.50 (conditions of coverage for services in an ambulatory surgery center).

133.    Providers like Intermountain were therefore expressly responsible for the quality of care furnished by the Defendant Anesthesiologists in Intermountain's facilities, including the proper delivery of anesthesia services and the protection of patients' rights.   *See* 42 C.F.R. § 482.13; 42 C.F.R. § 482.52.

47

134.   As such, each hospital was required to appoint a qualified physician to oversee the anesthesia program and to implement specific *policies* to ensure each patient received a pre-anesthesia evaluation, an "intraoperative anesthesia record," and post-anesthesia evaluation. 42 C.F.R. § 482.52(b).

135.   Maintaining an "intraoperative anesthesia record" means hospital policies had to require accuracy in recording anesthesia time (without interruptions) in the intraoperative anesthesia record.   That record became the basis of each hospital's claims for payment for hospital anesthesia services submitted to Medicare and other federal programs.

136.   By granting privileges to anesthesiologists, the hospitals extended to those physicians the privilege of becoming members of their "Medical Staff" such that they were trusted to furnish anesthesia services for hospital patients.   *See* 42 C.F.R. § 482.22.   Each hospital must adopt and enforce Medical Staff bylaws which govern the conduct of physicians who are granted privileges at the hospital. Intermountain's bylaws required strict adherence to professional society guidelines for the practice of medicine, *e.g.*, the standards of the American Society of Anesthesiologists.

137.   It is also a condition of participation in federal healthcare programs that hospitals "must protect and promote each patient's rights."   42 C.F.R. § 483.13.

These include "the right to receive care in a safe setting," and "the right to make informed decisions regarding [the patient's] care." *Id.* § 483.13(b)(2), (c)(2).

138.   Having undertaken these obligations, Defendant IHC Health Services submitted claims for payment on behalf of each of the hospitals and ambulatory surgery centers in the Intermountain system.  On each claim, IHC Health Services identified the facility where services were rendered by listing its National Provider Number (NPI).   For example, Dixie Regional was assigned NPI number 1366452880.  IHC Health Services has NPI number 1114025491.

139.   Federal healthcare programs require hospitals and surgery centers to identify anesthesia services when billing for services provided to patients who are treated on an inpatient basis (Medicare Part A) or an outpatient basis (Medicare Part B).

140.   Hospitals and surgery centers are reimbursed for their facility costs associated with delivering anesthesia care, such as the use of the operating room, anesthesia drugs, and the supplies and equipment for administering and monitoring anesthesia.  *See, e.g.*, 42 C.F.R. § 409.10 (hospital inpatient); 42 C.F.R. § 419.2(b) (hospital outpatient); 42 C.F.R. § 416.120(c) (ambulatory surgery center).

141.   Hospitals use a universal claim format, CMS Form 1450, to request payment for inpatient and outpatient care from federal healthcare programs.  *See* Exhibit 4.

142.   The claim form requires the hospital to describe the services rendered using CPT billing codes (as described above for physician services) and the required information is transmitted via an electronic data file (ASC X12 837I, or "837I File") to request payment from federal healthcare programs for services delivered to beneficiaries of those programs.  *See* 42 C.F.R. § 424.32.

143.   With each claim for payment, the hospital makes the following express certifications:

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s).

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is ***true, accurate and complete***. That the submitter did not knowingly or recklessly disregard or ***misrepresent or conceal material facts***.

*See* Exhibit 4, CMS-1450 (emphasis added).

144.   The certifications are material to the payment decisions of Government programs, which count on hospitals to submit accurate claim information – including the description of anesthesia service and anesthesia time units – because that

information is essential to payment rates calculated under hospital prospective payment systems.

145.   Medicare and other federal healthcare programs generally reimbursed Intermountain hospitals and ambulatory surgery centers based on a lump sum payment for each patient visit or admission.

146.   For inpatient surgeries, the Hospital Inpatient Prospective Payment System typically assigns a Diagnosis-Related Group (DRG) based on the patient's principal diagnosis and other factors identified on the claim for payment.  *See* 42 C.F.R. § 412.60; 42 C.F.R. § 412.2 (basis of hospital payment).  The DRG determines the hospital's lump sum payment for the patient's inpatient admission, including the cost of any surgeries and anesthesia service.  *See* 42 C.F.R. § 412.2(c).

147.   CMS revises inpatient payment rates annually to reflect the costs of various services, including anesthesia services, based on data from past claims submitted by hospitals.  *See* 42 C.F.R. § 412.60(e); 42 C.F.R. § 412.10.  Hence, the anesthesia service is a material component of Medicare payment rates for inpatient services.

148.   For outpatient surgeries, the Hospital Outpatient Prospective Payment System assigns one or more surgical Ambulatory Payment Classification (APC) codes based on the type of surgery reported on the hospital's claim form.  All

51

services associated with an outpatient surgery – such as "[s]upplies and equipment for administering and monitoring anesthesia" – are packaged within a lump sum payment for the APCs assigned to the claim.  42 C.F.R. § 419.2(b)(5) (hospital payments); *see also* 42 C.F.R. § 416.167(b) (APCs are also the basis of payment for ambulatory surgery centers).

149.  CMS determines outpatient payment rates based on the hospital resources, including anesthesia services, that are needed for various types of surgeries.  This information is derived from claims submitted by hospitals; hence, the anesthesia service is a material component of Medicare payment rates.  *See* 42 C.F.R. § 419.31 (hospital APC payments); *see also* 42 C.F.R. § 416.167 (APC payments for surgery centers).

150.  As relevant here, Intermountain identified anesthesia charges on its hospital claims with Revenue Code 037X, an anesthesia procedure code, a modifier "AA" to reflect services "personally performed" by a Defendant Anesthesiologist, anesthesia time units as recorded by a Defendant Anesthesiologist in the intraoperative report in the patient's medical record, and hospital charges for anesthesia and related supplies and equipment.

4845-5082-1872.v2

## VII.   Defendants Knowingly Presented False or Fraudulent Claims

151.   The False Claims Act creates liability for anybody who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  A claim is false when it seeks "reimbursement for services or costs that either are not reimbursable or were not rendered as claimed." *United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.,* 433 F.3d 1349, 1356 (11th Cir. 2005).

152.   The core factual allegation in this Complaint is that the Defendant Anesthesiologists spent the majority of their time in the operating room ignoring their patients and engrossed in their smartphones, tablets, and laptops.  Among other diversions, they surfed the web, browsed Facebook, watched football, planned their vacations, checked stock prices, paid their bills, and made playlists for parties they were going to DJ – all while patients who depended on these doctors' vigilance were sedated before them, unaware of their activities.  The Defendant Anesthesiologists then had the audacity to bill the government for the time they spent on personal matters – and to bill using the most expensive billing code, for services "personally provided."

153.   The Defendant Anesthesiologists did all of this even though they knew better.  As physicians, they knew or recklessly disregarded the dangers of distracted doctoring – especially for elderly patients on Medicare, whose health would tend to

be more fragile. As members of the ASA, the Defendant Anesthesiologists knew about the society's guidance condemning the use of PEDs in the operating room – not to mention the guidance of every other professional organization that has weighed in on the subject. As providers submitting claims to federal healthcare programs, they knew that these programs never would have paid claims for anesthesia services if the programs had known the anesthesiologists were not appropriately monitoring patients under general anesthesia and were counting substantial blocks of personal time in the total anesthesia minutes reported on claims for payment. But they did it anyway. Like drivers who pull out their phones to text on the highway, convinced that they are somehow exceptional, the Defendant Anesthesiologists knowingly risked their patients' safety, and knowingly billed the government for time during which they were not providing the claimed services.

154. The institutional defendants, Mountain West Anesthesia and Intermountain, facilitated this fraud. Despite being told, including by Dr. Khoury, that the Defendant Anesthesiologists were routinely using their PEDs for personal matters during surgeries, these Defendants did nothing to stop it, and instead profited from the inflated medical bills submitted by the anesthesiologists. They are accordingly just as culpable for the resulting harm to the government.

155. Below, this Complaint identifies representative examples of Defendants' false claims. These are representative examples only. On information and belief, acquired through conversations with the Defendant Anesthesiologists and with other physicians at Intermountain hospitals, Defendants' use of PEDs during surgeries was ubiquitous, and continues today. Additional examples, as well as evidence of Defendants' knowledge, are in Defendants' exclusive possession and control.

156. Dr. Khoury recalls the following specific examples, which are representative of the types of activity that Mountain West anesthesiologists routinely engaged in during surgery.

|     | **Defendant Anesthesiologist** | **Examples of Personal Activity For Extended Periods During Surgery** |
| --- | --- | --- |
| 1. | Debenham | Disputing personal bill from power company during lengthy cell phone call |
| 2. | Evans | Online shopping and reading news websites |
| 3. | Larson | Extensive vacation planning for trip to Lake Powell |
| 4. | Miner | Watching and listening on headphones to football games and other sports; reading social media |
| 5. | Nelson | Preparing for gigs as a disc jockey, including selecting music and coordinating DJ gigs |

157. <u>Debenham</u>. Dr. Khoury observed Defendant Debenham in surgery on a regular basis (5 to 10 surgeries a month) from 2007 through 2017. He regularly turned to his smartphone immediately following induction of anesthesia and surfed

55

the Internet or talked on the phone for over 90% of the surgery time. On one occasion, Dr. Khoury was performing a carotid operation on a patient's neck while Debenham engaged in a heated conversation on his smartphone with a utility company over a bill. After approximately 30 minutes, Dr. Khoury told Debenham he was distracting the surgery team, and Debenham left the room. He returned some time later, and at the end of surgery, Debenham recorded the entire surgery time as anesthesia time in the patient's medical record. This was typical behavior.

158. <u>Evans</u>. Dr. Khoury frequently observed Defendant Evans in surgery (2 to 5 surgeries a month) from 2008 through 2017. He regularly turned to his smartphone, or sometimes a personal computer, immediately following induction of anesthesia and surfed the Internet for over 90% of the surgery time. The flow of surgery was often interrupted because the OR team had to get Evans to pay attention to the patient's needs. Dr. Evans on one occasion described in great detail his family vacation in Holland while displaying photos on his smartphone, all while the OR team was performing surgery. Evans often spent time online shopping and reading the news during surgery. Evans recorded the entire surgery time as anesthesia time in the patient's medical record.

159. <u>Larson</u>. Dr. Khoury frequently observed Defendant Larson in surgery (2 to 5 surgeries a month) from 2008 through 2017. He regularly turned to his

smartphone, or sometimes a personal computer, immediately following induction of anesthesia and surfed the Internet for over 90% of the surgery time.  Dr. Larson had a habit of reading unusual news stories aloud.  He liked to shop during surgery.  On one occasion, Larson was consumed by planning a family vacation to Lake Powell and spent the entire surgery making phone calls and online reservations to rent a houseboat and schedule travel. Larson recorded the entire surgery time as anesthesia time in the patient's medical record.

160.  <u>Miner</u>.  Dr. Khoury personally observed Defendant Miner in numerous surgeries in 2007 and from time to time thereafter through 2017.  After anesthetizing the patient, Defendant Miner immediately turned to his smartphone to watch videos or sports, and he typically used headphones.  He spent more than 90% of surgery time on his smartphone. As a result, Miner was neither watching the patient nor listening to monitoring machines while the patient was unconscious.  Dr. Khoury and nurses had to call out to Miner to prompt him to check vital signs and administer IV medication. Surgery time often had to be extended specifically because of the time wasted when a nurse had to physically rouse Miner – sometimes actually shaking him – to re-direct his attention to the patient.  On one occasion, Dr. Khoury had to suspend surgery due to Miner's disruptions.  He was watching a football game when another physician (a friend of Miner's who was not a member of the operating

team) entered the operating suite.  Together Miner and the physician huddled over Miner's smartphone to watch and cheer on their football team with the audio so loud the entire surgery team was distracted.  Dr. Khoury ordered them to stop and resumed the surgery.  Dr. Khoury was gravely concerned for his patients and requested that Miner be assigned his surgeries only if no other anesthesiologist was available.

161.  <u>Nelson</u>.  Dr. Khoury observed Defendant Nelson in surgery on a regular basis (5 to 10 surgeries a month) from 2007 through 2017.  Dr. Nelson's practice was to roll a luggage cart into the operating suite.  In it, Nelson carried a smartphone, two personal computers, and personal documents.  Before induction of anesthesia, Nelson methodically set up a personal workstation in the OR, placing his computer on top of an anesthesia work cart.   After induction, while the patient was unconscious, Nelson immediately turned his back to the patient and the surgery team and toward his workstation.  He was engrossed on the Internet and in personal affairs for more than 90% of the surgery time.  Dr. Nelson read the news and conducted a disc jockey business from the operating room.  He focused on the patient only when Dr. Khoury asked specific questions of him, such as patient vital signs.  Nelson routinely recorded the entire surgery time as anesthesia time in the patient's medical record.

162.   As illustrated by the following examples of specific operations, Defendants routinely engaged in such personal matters for substantial portions of operating room time, causing significant disruptions in patient care.

A.   **Example 1 – Endovascular Aneurysm Repair Surgery**

163.   Dr. Khoury performs a surgery called Endovascular Aneurysm Repair (EVAR) that often lasts longer than four hours. The surgery team inserts a stent graft (a fabric tube) into the patient's aorta (an abdominal artery) to treat an aneurysm, a bulging segment of a weak artery wall.  An aneurysm that bursts is life-threatening because it causes significant internal bleeding.  The surgery to repair an aneurysm in an elderly patient is complex and fraught with the potential for unexpected, sudden changes in the patient's condition.

164.   On February 3, 2016, Dr. Khoury performed an Endovascular Aneurysm Repair on a 78-year old man (initials M.S.) who is a Medicare beneficiary.  The total operating room time was approximately 236 minutes (almost four hours).

165.   Throughout the four-hour surgery, the anesthesiologist was consumed by the Internet.  Dr. Khoury was forced repeatedly to redirect the anesthesiologist's attention to the patient for urgent needs – to monitor critical urine output, to attend to ventilation while the patient's breathing was briefly suspended, and to reduce

blood pressure at a critical stage of the surgery when the stent graft was inserted in the aorta.  The anesthesiologist undertook these basic responsibilities only when prompted by Dr. Khoury.

166.   During the surgery, M.S. began to move his legs.  His anesthesia was insufficient, but the anesthesiologist was unaware of the change in the patient's condition because he was completely engrossed in his PED for personal matters unrelated to patient care.

167.   Dr. Khoury called out several times to rouse the anesthesiologist from his device and request additional anesthesia for the patient.

168.   Dr. Khoury estimates that the anesthesiologist was engaged in personal business on his PED for over 70% of the total time the patient was under anesthesia; yet he improperly counted all of the time in surgery time as "anesthesia time."  The anesthesiologist improperly entered a total of 236 minutes of anesthesia time in M.S.'s medical record which he knew would be transferred to the corresponding claims for payment for anesthesia services submitted to Medicare by both Dixie Regional and Mountain West Anesthesia.

169.   Dixie Regional and Mountain West Anesthesia later submitted separate bills to Medicare for anesthesia service allegedly furnished by the hospital and physician, respectively, for patient M.S.

170.   They used billing codes to describe the aneurysm repair surgery (CPT code 34803) and anesthesia service (CPT code 00790).  The CPT code for the anesthesia service represents the bundle of customary anesthesia services – including patient monitoring – during surgery.  Defendants also included anesthesia time on their claims, inaccurately identifying 236 minutes (15.7 time units) of continuous patient care by the anesthesiologist.

171.   As a result of these knowing misrepresentations, the claims for M.S.'s anesthesia services were false claims, and Defendants were not entitled to any reimbursement for them.

**B.     Example 2 – Carotid Endarterectomy Surgery**

172.   Dr.   Khoury   frequently   performed   a   procedure   called   Carotid Endarterectomy (CEA) with a typical duration of more than two hours.  Carotid Endarterectomy is a surgery to remove plaque from a carotid artery to improve blood flow to the head and neck and reduce the risk of stroke.

173.   On or about January 12, 2016 and January 14, 2016, Dr. Khoury performed CEA procedures on two Medicare beneficiaries (patient initials E.H. and M.O., respectively).  For substantial portions of each surgery, the anesthesiologist (a physician employed by Mountain West Anesthesia) was engrossed in his personal

device, conducting personal business, rather than monitoring the patient under general anesthesia.

174.   Despite this, the anesthesiologist recorded the entire duration of the surgery as if he had provided continuous anesthesia care in anesthesia operative reports in the patients' medical records, and he improperly included his personal time in the minutes he recorded.

175.   The intraoperative reports formed the basis for claims for payment presented to the government.   Dixie Regional and Mountain West Anesthesia submitted separate bills to Medicare for these anesthesia services.

## C.   Example 3 – Femoral Artery Bypass Surgery

176.   On January 7, 2016, Dr. Khoury performed a femoral artery to tibial artery "in-situ" vein bypass (leg bypass) on patient D.W., an 85-year-old male Medicare patient who was admitted to Dixie Regional Medical Center.   Dr. Khoury performs leg bypass surgery to restore blood flow to the lower extremity (thigh and leg) that is restricted due to a blocked artery.   Bypass surgery refers to using a substitute for the blocked artery, like a vein or plastic tube, to re-route the blood (bypass) around the blocked artery.   In patients with gangrene or non-healing wounds of the foot, restoring normal blood flow to the foot is the perquisite for healing.   These lengthy procedures are often referred to as "limb salvage" operations

because they are done to prevent major leg amputations and preserve a functional leg and foot.

177.   Patients with blocked leg arteries (peripheral artery disease) have a very high risk for other cardiovascular disease, such as coronary artery disease and the risk of heart attack, and cerebrovascular disease and the risk for stroke.  Anesthesia for these patients requires judicious monitoring, an anesthetic that optimizes hemodynamic function, and avoidance of particularly likely complications such as perioperative myocardial ischemia (heart attack), stroke, and bleeding.

178.   Following induction of anesthesia on D.W., the anesthesiologist in this case directed his attention to his personal electronic device and immersed himself in a variety of personal activities unrelated to patient care.  The operation lasted over 6 hours, with the anesthesiologist devoting approximately 80% of the time to his personal pursuits while the patient was on a ventilator under general anesthesia.

179.   Any femoral bypass procedure is associated with continuous blood loss throughout the operation.  On multiple occasions, Dr. Khoury had to call out to the anesthesiologist to redirect his attention to the patient to assess for blood loss, urine output, and changes in patient blood chemistries.

180.   The anesthesiologist's distraction resulted in the administration of vasopressors (medication to maintain blood pressure) which was a major concern

for patient safety and the success of the bypass to save the leg.  Dr. Khoury demanded that the patient receive IV fluids and blood and stop the administration of vasopressor medication.  The vasopressor medication had a negative impact on patient care by constricting the bypass, increasing the chance of thrombosis of the bypass and loss of the leg.  In addition, failing to replace blood and fluid loss appropriately increased the risk of acute renal failure.  Proactive attention to patient care and standard vigilance by the anesthesiologist would have allowed him to recognize the blood loss, avoid the use of vasopressors, and prevent the negative impact on the success of the bypass operation and stress on the kidney.

181.   Despite this, the anesthesiologist recorded the entire duration of the surgery as if he had provided continuous anesthesia care in anesthesia operative reports in the patients' medical records, and he improperly included his personal time in the minutes he recorded.

182.   The intraoperative reports formed the basis for claims for payment presented to the government.  Dixie Regional and Mountain West Anesthesia submitted separate bills to Medicare for these anesthesia services.

**D.     Examples of False Claims**

183.   The following claims are representative examples of Medicare claims for inpatient hospital services (CMS Form 1450; 837I File) submitted by IHC Health

Services on behalf of Dixie Regional (NPI 1366452880) and the corresponding claims for physician services (CMS Form 1500; 837P File) that Defendants submitted or caused to be submitted, knowing they contained false entries pertaining to both the base anesthesia service and anesthesia time units:

| Date of Service | Patient | Sex | Age | Primary Procedure (CPT Code) | Anesthesia Service (CPT Code) |
|---|---|---|---|---|---|
| 1/7/2016 | D.W. | M | 85 | Femoral to tibial bypass In Situ (35585) | Anesthesia for procedures on arteries of lower leg, including bypass graft; embolectomy, direct or catheter (01502) |
| 1/12/2016 | E.H. | M | 78 | CEA (35301) | Anesthesia for procedure on esophagus and neck (00320) |
| 1/14/2016 | M.O. | M | 86 | CEA (35301) | Anesthesia for procedure on esophagus and neck (00320) |
| 2/3/2016 | M.S. | M | 78 | EVAR (34803) | Anesthesia for procedure in upper abdomen including use of an endoscope (00790) |

184.   The foregoing claims relate to services rendered for Dr. Khoury's own patients. Dr. Khoury has personal knowledge of these surgeries, patients, and dates of service. He also has personal knowledge that the patients are beneficiaries of the

Medicare program, they were admitted as inpatients at Dixie Regional Medical Center when Dr. Khoury performed the surgeries, and Mountain West Anesthesia furnished the anesthesia services for these patients.

* * *

185.   These claims – and others like them – were false or fraudulent, within the meaning of the federal and Nevada False Claims Acts, for four reasons.

186.   First, the anesthesia services were provided and billed in violation of the statutory requirement that only "reasonable and necessary" services are eligible for reimbursement because the services were not provided in a safe manner and were not furnished according to professional standards of care.  Exhibit 1, ¶¶ 5, 6, and 20. This is a core Medicare requirement, and is an indispensable condition to payment. 42 U.S.C. § 1395y(a)(1)(A).  Under controlling Tenth Circuit precedent, any claim for payment knowingly submitted in violation of this requirement gives rise to False Claims Act liability.  *See Polukoff*, 895 F.3d at 742.

187.   This basis for factual falsity covers both the itemized bills for anesthesia services and the hospital bills for the inpatient stay because the unsafe anesthesia service compromised the quality of the surgery as a whole by elevating the risk to the patient from the surgical procedure.

66

188.   Second, the claims for payment were factually false because the services were not performed as claimed.  By including an anesthesia CPT code and anesthesia minutes, the claims materially and falsely represented that the anesthesiologists had performed the patient monitoring services and continuous anesthesia care represented by those entries on the claims for payment.

189.   Anesthesia CPT codes, billing modifiers, and anesthesia time reported on claims for payment represent to Medicare and other federal payers that the provider furnished the services corresponding to the codes and modifiers for the stated duration of time.  "The practice of an anesthesiologist initiating induction of general anesthesia, turning away from the patient or leaving the patient's side to use a personal electronic device for a lengthy period during the surgery, and returning to the patient's side only for emergence (awakening) is a failure to provide a complete anesthesia service. There is no CPT code for an incomplete anesthesia service. Any CPT code, 'AA' modifier, and time units the anesthesiologists reported on their claims for payment misrepresented the services they provided because they failed to actively monitor their patients."  Exhibit 2, at 2-3.

190.   Indeed, anybody familiar with anesthesia billing who saw the amount of reported anesthesia time in a claim, and saw the code stating that the anesthesiologist had "personally provided" the service, would have been misled into

67

thinking that the Defendant Anesthesiologists spent all or nearly all of the surgery period actively and personally monitoring the patients.  Certainly, nobody reviewing the claims would have believed that the Defendant Anesthesiologists had spent well more than half of the billed minutes using their PEDs for tasks that were irrelevant to the surgery and threatened to compromise patient care.  Defendants' claims for payment were therefore false.

191.   This basis for factual falsity and therefore liability covers both the itemized bills for anesthesia services and the hospital bills for the surgery because anesthesia is an essential component of the surgical process, and so misrepresentations regarding anesthesia services affected the veracity of the claims for the surgery as a whole.

192.   Third, the claims for payment for anesthesia services were  false because Defendants certified that they had complied with the specific rules governing payment for those services, which require continuous care to bill for anesthesia time, and require anesthesiologists to deduct interruptions in care from anesthesia time.  Defendants knew that they had not complied with those conditions and therefore are liable under the FCA.

193.   Fourth, the anesthesia services, and the related hospital services, were provided and billed in violation of hospital conditions of participation in federal

68

healthcare programs, including that patients have a right to receive care in a "safe setting," that patients have a right to make informed decisions regarding their care, and that hospitals are responsible for the quality of care provided by physicians whom they authorize to treat hospital patients. *See, e.g.,* 42 C.F.R. § 482.13 (conditions of participation: patients' rights in hospitals); *see also id.* § 416.50 (patients' rights in ambulatory surgery centers). A violation of any one of these conditions of participation is sufficient to render a claim false or fraudulent because if an entity cannot even participate in a federal healthcare program, it cannot bill that program for services.

194.   A "safe setting" means, among other things, that the hospital is prepared to deliver appropriate anesthesia monitoring. For example, the hospital must ensure that a qualified anesthesiologist will immediately rescue a patient whose sedation becomes deeper than intended. *See* CMS State Operations Manual, Pub. 100-07, Appendix A - 1000 (describing conditions of participation for anesthesia services including rescue capacity).

195.   To give informed consent to anesthesia care, a patient must be informed of relevant information regarding the risks and benefits of the anesthesia procedure. Every reasonable patient would want to know whether his anesthesiologist was paying attention during the procedure – but the patients at issue in this case were

never told that their doctors were using PEDs during surgery.  This is particularly true here because Intermountain induces patients to trust their hospitals, publicly declaring on its website (intermountainhealthcare.org) that there is "nothing more fundamental to our vision of providing extraordinary care, than honoring the trust our patients and their loved ones place in us. Protecting our patients is our first responsibility in honoring that trust."

196.   Intermountain also violated the hospital conditions of payment by failing to hold the anesthesiologists on the medical staff accountable for the safety of patient care (that is, by condoning rather an prohibiting the anesthesiologists' use of PEDs for personal activities during surgery), to insist on accurate records of anesthesia time, to obtain informed consent from patients, and to notify patients who were subjected to the anesthesiologists' unsafe practices.

## VIII.  Defendants Used False Records Material to False or Fraudulent Claims

197.   In addition to prohibiting the submission of false or fraudulent claims, the relevant statutes prohibit the use of a false record or statement that is material to a false or fraudulent claim.  Defendants violated this prohibition, too.

198.   The anesthesiologist must record all pertinent events during surgery in an intraoperative report stored in the patient's medical record.[23]   The duration of the anesthesia service is documented, and any interruption in anesthesia service must be deducted.   The anesthesia services and time entered in the intraoperative report are transferred to claims for payment.

199.   For over ten years, Dr. Khoury observed the anesthesiologists employed by Mountain West Anesthesia record start and stop times of anesthesia service during surgery in an intraoperative report in the patient's electronic health record.[24]

200.   As a routine practice, the anesthesiologist asked the operating room nurse at the conclusion of each surgery for the patient's "time in" and "time out," or words to that effect.   The anesthesiologist was seen to record those times, representing the entire duration of the surgery, in the operative report.

---

[23] *See* Society of Anesthesiologists, *Guidelines for Patient Care in Anesthesiology*, Section III.D (last amended on October 26, 2016).

[24] Before 2015, Defendants maintained patient medical records in a proprietary electronic health record ("EHR") system known as HELP2.  Starting in or about February 2015, Intermountain transitioned to a commercial EHR platform known as iCentra, a product of Cerner corporation.  By approximately July 2017, iCentra was implemented at Dixie Regional Medical Center as an integrated system that supports billing functions for both physician and hospital services.

201.   The Defendant Anesthesiologists improperly recorded as "anesthesia time" every minute of time from the start of service (preparing the patient for anesthesia) to the end of service (delivering the patient to postoperative care) – including personal time on their devices when they were not furnishing patient services.

202.   "As observed by the Relator, the anesthesia services were not being personally performed continuously. Therefore, the anesthesia services were not complete, and the claims for payment gave the false impression that continuous patient monitoring, along with all other anesthesia activities, had taken place." Exhibit 2, at 4 of Report.

203.   These records were material to false claims because they had a natural tendency to influence the payment of the claims.   Had the reports not been completed, no claims would have been presented.  Had the reports been completed accurately, the claims would have been significantly smaller.

## IX.   Defendants Acted with Scienter

204.   Under the relevant statutes, the scienter element is satisfied if a defendant knows that certain information is false, is deliberately ignorant as to whether the information is true or false, or acts in reckless disregard of whether the

information is true or false.  The statutes expressly provide that specific intent to defraud is not required.

205.   Defendants acted with the requisite scienter.  Anybody submitting claims to government healthcare programs is charged with knowledge of the requirements for reimbursement.  *See Heckler v. Comty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63-64 (1984); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).  Thus, by virtue of the fact that Defendants sought public funds, they should be presumed to know whether their claims are eligible for reimbursement.

206.   In assessing scienter, "a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority."  *Polukoff*, 895 F.3d at 745 n.9 (quotation marks omitted).  Thus, "it suffices that *any* employee, acting within the scope of his or her employment, had knowledge."  *Ibid*.

207.   Here, the Defendant Anesthesiologists either knew that their claims for payment for anesthesia services were not eligible for reimbursement, or were reckless about that fact.  The guidance from the ASA regarding vigilance is clear, as is the language of the regulation that requires anesthesiologists to monitor their patients bill around interruptions, as opposed to including them in anesthesia time. That knowledge is chargeable to the Defendant Anesthesiologists, and to the institutional Defendants, Mountain West Anesthesia and Intermountain, because the

73

Defendant Anesthesiologists acted as agents or employees of those institutional Defendants when performing and billing for the anesthesia services at issue in this case.

208.   Independently, the institutional Defendants, Mountain West Anesthesia and Intermountain, knew what the Defendant Anesthesiologists were doing – but instead of putting an end to the practice, they condoned it and profited from the inflated bills to the government.

209.   Dr. Khoury also has firsthand knowledge of scienter.  In or about 2007, Dr. Khoury first expressed his concerns about the anesthesiologists' pervasive use of PEDs during surgery at a Department of Surgery Monthly meeting held in a conference room in the basement of the hospital .  Approximately eight to ten Mountain West anesthesiologists attended the meeting, along with most of the hospital's surgeons and several hospital administrators.   They included Intermountain Healthcare's Southwest Regional Chief Medical Director, Dr. Steven Van Norman, and then-Chief Executive Officer, Teri Kane.  After serving as CEO at Dixie Regional, Ms. Kane became Associate Chief Operating Officer for Intermountain Healthcare.

210.   At the meeting, Dr. Khoury explained his serious concerns. He was initially met with silence.  None of the anesthesiologists denied engaging in this

74

conduct. Finally, Defendant Nelson, who at the time held the rotating position of Chief of Anesthesiology remarked to the group that using a smartphone is no different than listening to a radio, and that put an end to the discussion. The hospital leaders said nothing. They did not offer to look into the matter. No policies were forthcoming. And Dr. Khoury, new to Dixie Regional, understood that his concerns were not welcome. Thus, Defendants' agents, acting in the scope of their employment, were aware of the Defendant Anesthesiologists' operating room conduct and billing practices.

211. At a subsequent meeting Dr. Khoury raised the subject with Intermountain Healthcare's Southwest Regional Chief Medical Director, Dr. Steven Van Norman, in Dr. Norman's office. Dr. Norman refused to take Dr. Khoury's complaint seriously and would not discuss it further.

212. The Defendant Anesthesiologists continued to indulge in their Internet habits. Dr. Khoury continued over the years, in one-on-one conversations, to raise with anesthesiologists and other hospital personnel the substantial risk of patient harm caused by continued use of personal electronic devices in the operating room.

213. The Defendants dismissed Dr. Khoury's concerns and objections.

214. The Dixie Regional Medical Center Medical Staff Bylaws and Policies create an organizational structure, headed by the CEO and the Medical Director of

the hospital, to monitor the quality of care provided by Medical Staff, to ensure they understand and follow hospital policies, and to discipline physicians, up to and including revocation of privileges. Article 13.20.

Specifically, the Medical Director's job is, among other things:

• To continually review, monitor, assist and report on the quality aspects of care in the professional departments of the hospital including the coordination of credentialing and reappoint of the Medical Staff. Article 6.25(a).

• To take "appropriate action for correcting deficiencies and monitoring to determine attainment and maintenance of desired results. Therefore, s/he is closely involved in assessing and tracing existing or potential physician problems." Article 6.25(d)(3).

215.   Instead of banning PEDs in the operating room like many other health systems, Intermountain recklessly disregarded them.  Indeed, during Dr. Khoury's long tenure as a vascular surgeon in the Intermountain health system, he never heard of a single instance when an anesthesiologist was admonished or otherwise disciplined for using personal devices during surgery, even after Dr. Khoury stated his concerns about these practices.

216.  Instead, PEDs became more and more common among anesthesiologists in Intermountain's operating rooms, but neither Dr. Khoury nor any other clinician performing procedures with him (other than the anesthesiologists) used PEDs during surgery. Based on conversations Dr. Khoury

has had with other surgeons, the Defendant Anesthesiologists' frequently used PEDs during surgeries.  That practice continues to this day.

217.   Based on Dr. Khoury's observations of these consistent practices during surgeries at Dixie Regional, it is believed that the Defendant Anesthesiologists engaged in the same pattern and practice at other hospitals and facilities operated by Intermountain Healthcare where Mountain West Anesthesia anesthesiologists also performed services.

218.   In sum, Defendants knew their claims were not eligible for payment because the Defendant Anesthesiologists did not furnish the anesthesia services they claimed to furnish, they made false certifications regarding compliance with the law and the accuracy of their claims, and they generated false entries in medical records that were material to their claims.

## X.   The Violations Were Material to the Government's Payment Decisions

219.   To the extent the claims in this case sound in implied false certification, they are subject to the False Claims Act's materiality standard, which is satisfied if a reasonable government, knowing the truth, would not have paid the claims – or if the defendant had reason to know that our government would not have paid the claims.  Courts and juries considering materiality assess whether the violation relates to a condition of participation or payment, whether the violation goes to the essence

77

of the bargain, whether the violation is significant (as opposed to minor or insubstantial), and whether the government has continued to pay claims despite actual knowledge of violations.

220.   The materiality factors weigh heavily in favor of a finding of materiality here.   No reasonable government would be happy to pay an anesthesiologist hundreds or thousands of dollars to play with his cell phone while a patient was sedated, when the required alternative is for the anesthesiologist to carefully monitor the patient.   *See* Ex. 1, at 3 ("[N]o patient or insurer would want to reward such conduct by paying for it.").   That is especially the case in light of every major professional organization's admonitions that digital distractions in the operating room pose a grave threat to patient safety.

221.   The anesthesiology billing regulation establishes conditions of payment that confirm that the government also regards patient monitoring and the accurate recording of anesthesia time – and the deduction of interruptions – as essential to payment decisions.   *See* 42 C.F.R. § 414.46.

222.   As explained above, the anesthesia billing regulation – as well as the other regulations cited *supra* – also constitute conditions of either participation or payment.   The statutory requirement that services be reasonable and necessary is

another condition of payment. Such conditions should be presumed material absent strong evidence to the contrary.

223. The violations here also go to the essence of the bargain, and there is no sense in which they are minor or insubstantial. Put simply, Defendants billed for services they did not really provide, and they performed their jobs in a way that endangered the patient beneficiaries of federal healthcare programs. That is grave misconduct that no reasonable government payer would accept.

224. Finally, on information and belief, the affected government payers had no actual knowledge of these violations when they paid the claims, and they would not have paid the claims if they had such knowledge.

225. Regulators show keen interest in enforcing the anesthesia billing rules. In November 2015, the American Society of Anesthesiologists notified its membership that government auditors, specifically the Office of Inspector General (OIG) for the U.S. Department of Health and Human Services, had made anesthesia services a focus of their efforts to combat waste and fraud in the Medicare and Medicaid programs. Specifically, the OIG work plan announced a review of billing for "personally performed" anesthesia services "to determine whether they were supported in accordance with Medicare requirements." The ASA advised, "Issuance

of the OIG Work Plan is a strong reminder that compliance in coding and billing will always be critically important."

226.   In other cases involving overbilling for anesthesia, the government has enforced anesthesia payment rules through actions under the False Claims Act and by exercising other remedies.  For example:

(a)   *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234 (D.P.R. 2000) (Government asserted Defendants reported false anesthesia time on hundreds of claims for payment in violation of the False Claims Act; one sample of claims had "billed for 90,930 minutes of anesthesia time, when the evidence [medical records] . . . only supported 20,987 minutes of anesthesia time, for a difference of 69,943 of overstated, falsely claimed, unsupported, or undocumented anesthesia time.")

(b)   U.S. Department of Justice Press Release dated Oct. 10, 2019 ("Traverse City Practice Pays Over $600,000 To Resolve False Claims Act Allegations Regarding Anesthesia Billing")

(c)   U.S. Department of Justice Press Release dated Apr.4, 2019 ("New Haven Oral Surgeon Pays $252K" to resolve allegations of billing for anesthesia and other services that were not provided)

(d)   U.S. Department of Justice Press Release dated Oct. 3, 2017 ("Anesthesiology Practice Improperly Billed for Moderate Sedation Services")

(e)   Audio Podcast: Anesthesia Services Payments, dated May 8, 2013, by U.S. Department of Health & Human Services, Office of Inspector General (describing $1.2 million dollar settlement over fraudulent anesthesia billing), available at https://oig.hhs.gov/newsroom/podcasts/2013/anesthesia-trans.asp.

227.   These facts, individually and collectively, establish the materiality of Defendants' violations.

## XI.   Defendants Conspired to Violate the Law

228.   Defendants are also liable for conspiracy, which requires an agreement to commit an unlawful act and an overt act in furtherance of the conspiracy.

229.   As explained above, the Defendant Anesthesiologists all engaged in the conduct described in this Complaint.  The institutional Defendants, Mountain West Anesthesia and Intermountain, knew about this conduct and facilitated it to profit from the inflated bills – even after Dr. Khoury brought it to their attention.  That is enough to create conspiracy liability for each Defendant, rendering each liable for the acts and omissions of the others.

230.   Among other overt acts, Intermountain condoned the anesthesiologists' dangerous practices by granting them staff privileges, failing to supervise their clinical conduct and compliance with hospital policies, and refusing to exercise disciplinary procedures under the Medical Staff Bylaws.

231.   As noted, Intermountain hospitals were responsible "for all anesthesia administered in the hospital," as a condition of participation in the Medicare Program.  42 C.F.R. § 482.52; *see also* 42 C.F.R. § 416.50 (conditions of coverage for services in an ambulatory surgery center).

232.   A Central Credentialing Office for Intermountain approved the applications of the Defendant Anesthesiologists to become members of the "medical

staff," meaning the anesthesiologists were granted privileges to furnish services to hospital patients. Selection for the medical staff is a privilege, not a right. Dixie Regional Medical Staff By Laws and Policies, Article 3.10.

233. Intermountain also approved the Medical Staff Bylaws, another condition of participation. 42 C.F.R. § 482.22. Under the Bylaws, the anesthesiologists and all medical staff are "accountable *to the [hospital's] governing body* for the quality of the medical care provided to patients." 42 C.F.R. § 482.22(b) (emphasis added).

234. The hospital's governing body has an express regulatory duty to "ensure that the medical staff is accountable to the governing body for the quality of care provided to patients." 42 C.F.R. § 482.12 (Condition of participation: Governing body).

235. The Medical Staff Bylaws contain a structure for monitoring and disciplining physicians, including termination of privileges, based on violations of clinical practice standards or hospital policy. Those provisions were not invoked here.

236. Intermountain thus had the responsibility and ample authority to curb the Defendant Anesthesiologists' improper conduct through the process set forth in the Medical Staff Bylaws, but Intermountain instead turned a blind eye, condoned

the misconduct, and approved it through acquiescence, antipathy, and undue deference.

237.   The Intermountain entities are liable as co-conspirators.

## XII.   Defendants Avoided Their Obligation to Return Overpayments

238.   The False Claims Act also creates liability when a defendant knowingly and improperly avoids an obligation to return money to the United States. 31 U.S.C. § 3729(a)(1)(G).

239.   As providers in federal healthcare programs, Defendants had an affirmative duty to ensure their claims for payment were accurate and eligible for payment.

240.   Defendants also were obligated to report and return any payments in excess of amounts they were entitled to receive from federal healthcare programs. *See* 42 U.S.C. § 1320a-7k(d)(4); 42 C.F.R. § 401.305. The deadline to report and return overpayments is the later of 60 days after the date on which the overpayment was "identified" or the date that "any corresponding cost report is due." 42 U.S.C. §§ 1320a-7k(d)(2)(A)-(B). Overpayments retained beyond the 60 days are an "obligation" under the FCA and a provider/supplier violates the FCA when it "knowingly conceals" or "knowingly and improperly avoids" returning an overpayment that has ripened into an obligation. 42 U.S.C. §§ 1320a-7k(d)(2)-(3).

241.  As explained above, Defendants knew that their claims for payment for anesthesia services (and related surgeries) were not eligible for payment.

242.  Dr. Khoury further cautioned Defendants that the use of PEDs during surgery was a dangerous distraction.  As stated in ¶ I.18, and in Part IX, *supra*, Dr. Khoury raised his concerns internally to Defendants' leadership as early as 2007, and again thereafter.  In response, the Defendant Anesthesiologists did not deny using personal electronic devices during surgery. As a result, hospital administrators and leaders and Mountain West Anesthesia had knowledge of the conduct. Defendants continued these practices while improperly billing federal healthcare programs for their services.

243.  Because Defendants received credible information about potential overpayments (in the form of Dr. Khoury's complaints, the substance of which was not denied), they had duty to exercise "reasonable diligence" to determine whether they had received overpayments. 42 C.F.R. § 401.305(a)(2).

244.  Reasonable diligence would have involved further inquiry of the anesthesiologists, the staff in the surgical rooms, examination of surgery room cameras and other relevant electronic data including the anesthesiologists' personal electronic devices, the invoices submitted, the amount of time declared for "continuous monitoring," and other relevant information, documents, and/or

84

devices.   Such diligence would have confirmed the allegations made in this complaint and the resulting overpayments, which would, in turn have obligated Defendants to return the money.

245.   Defendants knowingly or recklessly disregarded an obligation to return the money paid to them by the federal healthcare programs, and did not return the overpayments.  This obligation is continuing.

## XIII.  Intermountain Healthcare Is Liable

246.   Defendant Intermountain Healthcare is vicariously liable for the acts and omissions of Defendant IHC Health Services, which Intermountain Healthcare controls as its sole corporate member. Intermountain Healthcare exercises a controlling influence over the branding, policies, business operations, compliance programs, and leadership and staff of IHC Health Services and its facilities.

247.   Defendant IHC Health Services is directly liable for the acts and omissions of the approximately twenty-four (24) hospitals and outpatient surgery facilities it owns, as they have no separate corporate form.

248.   IHC Health Services exercised centralized command and control over billing, medical staff credentialing, and other core operations across the Intermountain health system, including Dixie Regional.

249.   IHC Health Services operates a centralized billing department for Intermountain hospitals.

250.   Intermountain hospitals employ an integrated EHR system – formerly HELP2 and currently iCentra – for medical records and revenue cycle management, including preparation of claims and billing functions. Intermountain Healthcare publicly declares that "iCentra is the fully integrated electronic health record, practice management, and revenue cycle system Intermountain Healthcare has been configuring with Cerner."

251.   IHC Health Services also publishes uniform policies and procedures that govern all hospitals and other facilities within the Intermountain system.  One example is the company's "Information Access and Use Policy and Procedure" concerning patient consent and the privacy of patient health information.

252.   Intermountain Healthcare Risk Management is the central office that oversees policies and procedures relating to professional liability insurance required of each member of the medical staff across all Intermountain facilities.

253.   Accordingly, in addition to co-conspirator liability, Intermountain is also directly and vicariously liable for the fraudulent acts and omissions surrounding the false claims described in this Complaint.

4845-5082-1872.v2

## COUNT ONE
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**(False Claims for Payment)**

254.   Relator repeats and realleges the allegations above as if fully set forth herein.

255.   For at least ten years, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment for hospital and physician anesthesia services to Medicare, Utah Medicaid, Nevada Medicaid, TRICARE, and other federal healthcare programs.

256.   Claims for anesthesia services allegedly furnished by the Defendant Anesthesiologists while they were focused on their PEDs during surgery were false claims because, as Defendants well knew, the claims sought payment for services that were not rendered, that is, for continuous patient monitoring throughout the anesthesia service and anesthesia time reported on the claims for payment.

257.   Claims seeking payment for items or services that were not provided are not eligible for payment by federal healthcare programs.   *See* 42 U.S.C. § 1395y(a)(1)(A).

258.   Defendants' claims were also false because they contained misleading half-truths. Defendants knowingly submitted, or caused to be submitted, claims that described, using medical procedure codes (CPT codes) and time units, the anesthesia

87

services they purportedly performed, but failed to disclose that such services were not delivered for "a continuous time period from the start of anesthesia to the end of an anesthesia service," an essential and material component of the service for which payment was sought.  42 C.F.R. § 414.46(a)(3).

259.   For physician claims submitted by Mountain West Anesthesia, the false claim information was found on the CMS Form 1500 (or the equivalent electronic file, 837P File) in Block 24D (CPT billing codes and Modifier "AA" for personally performed anesthesia services), Block 24F (charges), and Block 24G (anesthesia time units).   Each unit represents 15 minutes of alleged anesthesia time.   The information in these blocks was false, misleading, and material.

260.   For institutional claims submitted by IHC Health Services, the false claim information was found on the CMS Form 1450 (or the equivalent electronic file, 837I File) in Blocks 43 and 44 (description of anesthesia service, CPT billing code, and "AA" modifier), 46 (anesthesia time units), 47 (charges), and 80 (start and stop time of anesthesia, as well as total minutes of anesthesia time).  The information in these blocks was false, misleading, and material.

261.   Defendants' anesthesia claims were also false because they improperly certified the accuracy and completeness of the information stated on the claims for payments.  On the CMS Form 1500 (837P File), the physician's certification is found

in Block 31 ("I certify that the statements on the reverse apply to this bill and are made a part thereof."). Likewise, the institutional claim form, CMS Form 1450 (837I File), states, "The certifications on the reverse apply to this bill and are made a part hereof." These certifications were both false and material as to the claims described in this Complaint.

262. Defendants knew their express and implied representations about the anesthesia services described on their claims were false. Defendants thereby fraudulently induced federal healthcare programs to pay claims that were ineligible for payment, all in violation of the False Claims Act.

263. Defendants had actual knowledge that the claims for anesthesia services were false, or they acted with reckless disregard or deliberate indifference as to whether they were false.

264. These falsehoods rendered each and every claim for payment false in its entirety.

265. By virtue of the false claims Defendants presented or caused to be presented to federal healthcare programs, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

4845-5082-1872.v2

## <u>COUNT TWO</u>
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### (False Records and Statements Material to False Claims)

266.   Relator repeats and realleges the allegations above as if fully set forth herein.

267.   As set forth above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to false or fraudulent claims in connection with their claims to reimbursement to federal healthcare programs.

268.   Defendants made or caused to be made numerous false records and statements, including false entries in intraoperative anesthesia records contained in patient medical records; false certifications of compliance with conditions of participation and federal healthcare laws and regulations; and similar false certifications of compliance in participating provider agreements with the Utah and Nevada Medicaid programs and other federal programs.  By making and using such false records and statements, Defendants caused false claims for payment to be submitted to federal healthcare programs and fraudulently induced those programs to pay Defendants' false claims.

269.   The United States paid such false or fraudulent claims because of the acts and conduct of Defendants.

270.   By reason of these false records or statements, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

## COUNT THREE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)
### (Conspiracy)

271.   Relator repeats and realleges the allegations above as if fully set forth herein.

272.   Defendants entered into one or more conspiracies to violate the False Claims Act.

273.   Specifically the Intermountain Healthcare Defendants conspired with Defendant Mountain West Anesthesia and the Defendant Anesthesiologists to present or cause to be presented false or fraudulent claims for payment to the Medicare, Medicaid, and TRICARE programs, as described herein.

274.   Defendants also conspired to violate the False Claims Act in that they agreed to and did make, use, and cause to be made and used false records or statements material to false claims for payment submitted to federal healthcare programs.

275.   Each Defendant performed acts in furtherance of these conspiracies, by among other things, coordinating to enter inflated anesthesia time units in patient

medical records, permitting the unrestrained use of PEDs in the operating room, and otherwise causing and condoning the making and use of false records and statements material to false claims.

276.   By reason of these unlawful conspiracies, the acts and omissions of each individual Defendant is imputed to the others.

277.   The United States has suffered damages as a foreseeable result of Defendants' conspiracies to violate the False Claims Act, and is entitled to recover damages in an amount to be determined at trial and treble damages plus a civil penalty for each false claim.

### COUNT FOUR
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)
### (Retention of Overpayments)

278.   Relator repeats and realleges the allegations in the Complaint as if fully set forth herein.

279.   As set forth above, Defendants knowingly retained overpayments from Medicare, Medicaid, and TRICARE.

280.   Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government

92

281.   Defendants knew their claims for anesthesia services were not eligible for payment because the services were not  "reasonable and necessary," and the claims contained false and misleading information.

282.   The payments that Defendants received from federal healthcare programs for their anesthesia services and hospital inpatient services were overpayments that Defendants were not entitled to retain.

283.   Defendants nonetheless improperly retained all such overpayments with actual knowledge of the legal obligation to return the funds to federal programs, or with reckless disregard or deliberate ignorance of the legal obligation to return the funds to federal taxpayers.

284.   By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

## COUNT FIVE
### Violations of the Nevada False Claims Act
### Nev. Rev. Stat. Ann. § 357.040

285.   Relator repeats and realleges the allegations above as if fully set forth herein.

286.   In violation of the Nevada False Claims Act,

93

a.    Defendants knowingly submitted and caused to be submitted false claims to Nevada Medicaid, as set forth in Count One above and elsewhere in this Complaint; Defendants knew such claims were not eligible for payment by the Nevada Medicaid program;

b.    Defendants knowingly made, used, and caused to be made and used, false records and statements --  including false medical records and false certifications of compliance -- material to false or fraudulent claims in connection with their claims for reimbursement submitted to Nevada Medicaid, as set forth in Count Two above and elsewhere in this Complaint; Defendants knew such claims were not eligible for payment by the Nevada Medicaid program;

c.    The Intermountain Healthcare Defendants knowingly conspired with Defendant Mountain West Anesthesia and the Defendant Anesthesiologists to commit violations of the Nevada False Claims Act, as set forth in Count Three above and elsewhere in this Complaint; Defendants knew such claims were not eligible for payment by the Nevada Medicaid program; and

d.    Defendants knowingly and improperly retained overpayments received from the Nevada Medicaid program, as set forth in Count Four above and elsewhere in this Complaint; Defendants knew they had an affirmative obligation to return such overpayments to the Nevada Medicaid program and that retaining them

94

was a violation of the Nevada False Medicaid Claims Act.

287.   The Nevada Medicaid Program relies upon a healthcare provider's truthful statements on its claims for payment as well as its compliance with the conditions of coverage when making payment decisions, and such compliance is material to the decision whether to pay claims.

288.   Defendants knowingly concealed from the Nevada Medicaid Program material facts relating to the claims for payment, as set forth herein, and fraudulently induced Nevada Medicaid to pay such claims.

289.   By virtue of the false claims, records and statements Defendants presented and caused to be presented, Nevada has suffered actual damages and is entitled to recover treble damages plus a civil penalty for each false claim, record, and statement.

## XIV.  Request for Trial by Jury

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

## XV.   Prayer for Relief

**WHEREFORE**, Relator Michael D. Khoury, M.D., respectfully prays for the entry of judgment awarding the following relief:

For the United States of America

(a)     Three times the amount of damages the United States sustains because of each violation of the False Claims Act; and

(b)     A civil penalty for each false claim or false statement;

For the State of Nevada

(a)     Three times the amount of damages the State of Nevada Medicaid Program sustains because of each violation of the Nevada False Claims Act; and

(b)     A civil penalty for each false claim or false statement;

For the Relator

(a)     An award of 30% of the judgment amount, settlement, or other remedy arising from this action; and

(b)     An assessment against Defendants under the False Claims Act, and the Nevada False Medicaid Claims Act, of litigation costs and reasonable attorneys' fees; and

Such other and further relief as the Court may deem just and proper.

Respectfully submitted, this 2nd day of July, 2021.


/s/ Brandon J. Mark
_____

Brandon J. Mark                          Lynn M. Adam
Utah Bar Number 10439                    *Admitted Pro Hac*
Parsons Behle & Latimer                  Adam Law LLC
201 South Main Street, Suite 1800        Two Decatur Town Center
Salt Lake City, Utah 84111               125 Clairemont Avenue, Suite 380
Tel: (801) 532-1234                      Decatur, Georgia 30030
Fax: (801) 536-6111                      Tel: (404) 324-3582
BMark@parsonsbehle.com                   ladam@lynnadamlaw.com


Robert A. Griffith                       Tejinder Singh
*Admitted Pro Hac*                       *Admitted Pro Hac*
Gargiulo / Rudnick, LLP                  Goldstein & Russell, P.C.
Attorneys at Law                         7475 Wisconsin Avenue
766 Falmouth Road, Suite A-6             Suite 850
Mashpee, Massachusetts, 02649            Bethesda, Maryland 20814
Tel: (617) 742-3833                      Tel: (202) 362-0638
Fax: (617) 523-7834                      Fax: (866) 574-2033
rgriff@grglaw.com                        tsingh@goldsteinrussell.com


**Attorneys for Relator Michael D. Khoury, M.D.**

## <u>CERTIFICATE OF SERVICE</u>

On  this 2nd day  of  July 2021,  I  hereby  certify  that  I  electronically  filed theforegoing **FIRST AMENDED COMPLAINT** with the Clerk of Court using theCM/ECF system that will send an electronic notification to counsel of record for allof the parties.

/s/ Brandon J. Mark

4845-5082-1872.v2