Brandon J. Mark, USB #10439
Hannah Ector, USB #17980
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
bmark@parsonsbehle.com
HEctor@parsonsbehle.com
ecf@parsonsbehle.com

Lynn M. Adam (Admitted Pro Hac Vice)
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Ave, Suite 225
Decatur, Georgia 30030
Telephone: (404) 324-3582
ladam@lynnadamlaw.com

Robert A. Griffith (Admitted Pro Hac Vice)
75 State Street, Suite 100, PMB 5890
Boston, MA 02109
Telephone: (617) 752-3807
robert@ragriffithlaw.com

Tejinder Singh (Admitted Pro Hac Vice)
SPARACINO PLLC
1920 L Street NW, Suite 825
Washington, DC 20036
Telephone: (202) 629-3530
Facsimile: (202) 629.3658
tejinder.singh@sparacinopllc.com

*Attorneys for Relator Michael D. Khoury*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF NEVADA *EX REL.* MICHAEL D. KHOURY, M.D., <br><br> Plaintiffs, <br><br> vs. <br><br> MOUNTAIN WEST ANESTHESIA, LLC; DAVID A. DEBENHAM, M.D.; ERIC A. EVANS, M.D.; JOSHUA J. LARSON, M.D.; JOHN E. MINER, M.D.; TYLER W. NELSON, M.D.; AND DOE ANESTHESIOLOGISTS 1 THROUGH 150, <br><br> Defendants. | **RELATOR MICHAEL D. KHOURY'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THOMAS DAWSON** <br><br> Case No. 2:20-CV-00372 <br><br> Judge Tena Campbell <br><br> Magistrate Judge Cecilia M. Romero |

Relator Dr. Khoury submits the following response to Defendants' motion to exclude the testimony of Thomas Dawson.

## **INTRODUCTION**

Mr. Dawson's unexpected testimony during his deposition on July 21, 2025, that he had used artificial intelligence as part of the process of drafting his report, which apparently resulted in the creation of at least one quotation ascribed to another witness, justifies dismissal of Mr. Dawson as an expert witness in this case. Dr. Khoury and his counsel were stunned by Mr. Dawson's admissions. The appropriate remedy is for Dr. Khoury to withdraw Mr. Dawson as an expert witness. Accordingly, Defendants' motion to exclude him (ECF 282) is moot.

Based on his resume, Mr. Dawson appeared to be a highly qualified expert in the relevant subject matter—Medicare and Medicaid reimbursement policies and processes. Dr. Khoury retained Mr. Dawson to provide an objective opinion about whether the medical services at issue—assuming the underlying factual allegations are proven—met the binding conditions of payment that govern coverage by Medicare and Medicaid programs and about CMS's related processes.

As part of his investigation, Mr. Dawson was asked to conduct an independent review of certain materials from the case, as well as research other potential sources of relevant information. To avoid any inappropriate influence, Dr. Khoury and his counsel did not instruct Mr. Dawson how to carry out his work.

Ultimately, Dr. Khoury asked Mr. Dawson to prepare a report of his findings. Mr. Dawson claimed to have spent the equivalent of a whole month (over 165 hours)

2

researching, reviewing, and drafting his report. None of Mr. Dawson's billed time entries suggested he had used artificial intelligence, and he never told Dr. Khoury's counsel he had used it either. Dr. Khoury's counsel reviewed Mr. Dawson's report for clarity, but, consistent with ethical guidelines, did not seek to influence the content or substance of it. Nothing on the face of the report raised obvious red flags about its veracity.

Dr. Khoury and his counsel first learned that Mr. Dawson had used generative artificial intelligence as part of his report drafting process at the same time as Defendants—when he admitted doing so during his deposition. Because Mr. Dawson's conduct is not consistent with this Court's truth-seeking mission, Dr. Khoury agrees that Mr. Dawson should be excluded as a witness from this Court and has withdrawn him.

However, because counsel was unaware of Mr. Dawson's conduct, had no reason to suspect it, and had a reasonable basis to believe that Mr. Dawson was a qualified, experienced expert witness without a history of such problems, it would be inappropriate and unjust for the Court to penalize Dr. Khoury or his counsel for the expert's undisclosed conduct.

Mr. Dawson's testimony was never necessary to Dr. Khoury's case. If required, Dr. Khoury could have called a CMS witness at trial to testify about these issues. Dr. Khoury had originally planned to use CMS's deposition testimony instead so that a CMS employee would not need to testify in person during trial. But after the Court unexpectedly reversed its previous ruling and limited Dr. Khoury's Rule 30(b)(6)

4914-0384-1873.v2

deposition of CMS's witness to only a portion of CMS's role, Dr. Khoury determined that an alternative to calling a CMS witness at trial would be to use an expert witness for the same task.

Although Defendants would like to shift the focus away from their own misconduct and fraudulent billing, the Court should not lose sight that Mr. Dawson's testimony had nothing to do with the factual merits of the case. To the contrary, the personal electronic device (PED) data has definitively established that the Defendant Anesthesiologists paid to care for the nation's most vulnerable patients were instead diligently working on side hustles (e.g., DJ gigs, ketamine clinics, stock trading), social events (e.g., party and graduation planning), and numerous other personal activities that had nothing to do with patient care during complex surgeries where they were the only anesthesia providers. And these distractions *were not sporadic or minor*—the patterns of use revealed by the PED data were worse than alleged (or imagined). Defendants' PED use significantly and dangerously deviated from accepted standards of medical practice, but CMS could not have known that because Defendants' claims falsely certified compliance with government rules.

Accordingly, while withdrawing Mr. Dawson is appropriate, the reasons are attributable solely to Mr. Dawson. Neither Dr. Khoury nor the taxpayers on whose behalf he is bringing this suit should suffer consequences for Mr. Dawson's choices.

### FACTUAL AND PROCEDURAL BACKGROUND

In December 2023, the Court said that the topics ultimately addressed by Mr. Dawson's expert report could be covered by a Rule 30(b)(6) deposition of CMS. (ECF

4

No. 166.) A year later, the Magistrate Judge substantially changed the scope of that deposition, limiting it to topics focused on only one part of CMS's processes—those performed by Medicare Administrative Contractors ("MAC"). (ECF No. 253.)

CMS enforces coverage standards not only when a MAC processes claims for payment but also when fraud comes to light after claims are paid. But CMS's designated witness was employed by a MAC, which is not involved in CMS's post-payment processes. (*See, e.g.*, 2025 Capehart Dep. Tr. 12:16–18, 101:20-23 (regarding PED use by anesthesiologists, "we do not have any way of looking at that. . . . [T]hat's not something that's on a claim form and Noridian looks at the claim."), excerpts at Ex A to Mark Decl.) In particular, the new limitations on the CMS deposition excluded questions about processes when fraud is detected after a Medicare claim has been paid, including about, for example, the roles of Supplemental Medical Review Contractors and Unified Program Integrity Contractors in investigating fraud and recouping payments.

Dr. Khoury faced a dilemma: the jury should be educated not just about what MACs do, but also about the other CMS processes, as well as other regulatory issues more generally that bear on CMS's payment decisions and enforcement of coverage rules. While Dr. Khoury could call a CMS witness at trial to do so,[1] Dr. Khoury is

---

[1] "Under the FCA, the Court can compel attendance at trial of any witness subpoenaed and served within the United States . . . ." *United States ex rel. Griffis v. EOD Tech., Inc.*, No. 3:10-CV-204, 2024 WL 4920598, at *2 (E.D. Tenn. Sept. 13, 2024) (citing 31 U.S.C. § 3731(a)).

mindful of his obligation to "avoid imposing undue burden or expense on a person subject to [a] subpoena," Fed. R. Civ. P. 45(d)(1), particularly where CMS was already deposed twice at Defendants' insistence (ECF No. 124).

Instead, shortly after the Court confirmed the more limited scope of the second CMS Rule 30(b)(6) deposition, Dr. Khoury engaged an expert to testify about such topics at trial. Dr. Khoury's counsel identified Mr. Dawson as a candidate based in part on his professional career spanning "over 23 years in healthcare policy," including specifically the "Medicaid and Medicare" programs. (Dawson Expert Advertisement, Ex. B to Mark Decl.) Mr. Dawson's resume included time as "Health Care Counsel to the U.S. House of Representatives Committee on Small Business," where "he provided guidance on," among other things, "Medicare and Medicaid reimbursement policy." (*Id*.) Mr. Dawson's background also included several other healthcare-focused positions. (*Id*.)

Additionally, Mr. Dawson holds a law degree from George Washington University, together with a Master of Public Health and a Master of Art in Philosophy with a focus on medical ethics. (*Id*.) Dr. Khoury's counsel's review of Mr. Dawson's history as an expert witness through electronic databases raised no red flags about Mr. Dawson's prior testimony or expert reports.

Mr. Dawson was asked to investigate the relevant Medicare and Medicaid laws, regulations, rules, contracts, enrollment forms, and other program materials and to prepare a report summarizing his investigation and opinions. Mr. Dawson was given certain case-related materials, including some deposition transcripts and documents

6

produced in the case. Apart from these case materials, Mr. Dawson conducted his investigation independent of Dr. Khoury's counsel, who played no role in drafting Mr. Dawson's expert report or influencing its content. (Dawson Dep. Tr. 18:5-9, excerpts at Ex. E to Mark Decl.)

According to Mr. Dawson's invoices, he spent more than 27 hours conducting "[i]ndependent regulatory/legal research" regarding "Medicare/Medicaid/ASA standards" and similar tasks (March 6, 7, 11, 13; April 17, 20, 21, 22, 30). (Dawson Invoices, Exs. C and D to Mark Decl.) Following his investigation, Mr. Dawson billed over 101 hours drafting different parts of his report, initially creating three separate reports before ultimately combining them into a single report (March 17, 18, 20, 24, 25; April 4, 9, 10, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27, 28, 29). (*See also* Dawson Dep. Tr. 129:8–23 ("So I had three different documents that I had worked and developed, and I tried to pull them all together to make a smaller document . . . .").)

Additionally, Mr. Dawson billed more than 23 hours for "[e]diting and revis[ing]" his draft report, including specifically for "citation insertions" and "documentation language" (March 26; April 6, 8, 11, 25). This included spending seven-and-a-half hours on "QA [Quality Assurance] on all 3 reports" (April 11).

Dr. Khoury's counsel reviewed Mr. Dawson's report for clarity and readability but did not seek to influence its substantive content, leaving it to Mr. Dawson to decide what to include in his own judgment. On May 12, 2025, Mr. Dawson submitted his final expert report, which voluntarily included an "Expert Declaration" from Mr. Dawson stating

7

> under penalty of perjury under the laws of the United States of America that the foregoing report is true and correct to the best of my knowledge, and that all opinions expressed herein are based on my professional expertise in federal and state healthcare program regulation, reimbursement policy, and public payer compliance standards.

(Dawson Expert Report p. 25, ECF No. Document 282-3 at 29.) Dr. Khoury's counsel served Mr. Dawson's report, together with reports from three other expert witnesses, on the May 15th deadline.

In total, Mr. Dawson billed more than 165 hours (in excess of $91,000) over the course of two months conducting his independent investigation, drafting his report, and revising his report into its final form. (*See* Dawson Invoices.)

Mr. Dawson never disclosed his use of generative artificial intelligence programs as part of any work he performed on this matter, including his use of ChatGPT, to Dr. Khoury's counsel. (Dawson Dep. Tr. 65:16–21 ("I didn't think to" tell Dr. Khoury's attorneys about ChatGPT use).) None of Mr. Dawson's time entries suggested that he used artificial intelligence programs to conduct any research, drafting, or revision of his report. (*Compare* Dawson Invoices, e.g., April 21 ("Expanded Utah and Nevada sections with direct citations to manuals and contracts.") *with* Dawson Dep. Tr. 129:16–17 ("I certainly used the ChatGPT to help me pull my documents together.").) Instead, Mr. Dawson's invoice descriptions all suggested that he personally performed every task. (*See* Dawson Invoices (reference to "T. Dawson" performing services).) In short, when Dr. Khoury's counsel served Mr.

8

Dawson's report, they had no reason to suspect that Mr. Dawson had used artificial intelligence to prepare it.

Upon learning of Mr. Dawson's use of artificial intelligence and fully understanding the errors it caused, Dr. Khoury's counsel contacted Defendants' counsel and offered to voluntarily withdraw Mr. Dawson and substitute a different expert, including an offer to cover Defendants' costs associated with Mr. Dawson. Defendants rejected that offer.

## ARGUMENT

**I.   COUNSEL MUST BE CAREFUL NOT TO UNDULY INFLUENCE AN EXPERT'S REPORT AND IS ENTITLED TO RELY ON AN OTHERWISE QUALIFIED EXPERT'S WORK-PRODUCT.**

**A.   Attorneys are prohibited from influencing the substance of expert reports and must be scrupulous to avoid unduly influencing the opinions, bases, or reasons expressed in a report.**

"Rule 26 requires that . . . an expert report . . . must be '**prepared and signed** by the witness.'" *Rodgers v. Beechcraft Corp.*, No. 15-CV-129-CVE-PJC, 2016 WL 7888002, at *3 (N.D. Okla. Oct. 27, 2016) (emphasis in original). As courts have warned, "the phrase 'prepared by' in Rule 26 requires that the expert had an exclusive or primary role in creating the report." *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, 608 F. Supp. 3d 1184, 1188 (M.D. Fla. 2022); *see also James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, No. CIV.A. 5:11-374, 2014 WL 1744848, at *6 (E.D. Ky. Apr. 30, 2014).

Because courts have excluded experts where counsel's participation in the report drafting process was deemed excessive, *see, e.g.*, *id.*, counsel must be mindful

9

about usurping the expert's role. The safest course of action is to have as little role in the drafting process as possible. As with all Dr. Khoury's other experts, Dr. Khoury's counsel focused their review of Mr. Dawson's report on areas courts have deemed permissible—"grammatical or stylistic" issues that "do not alter the substance of the report." *Marek v. Moore*, 171 F.R.D. 298, 300 (D. Kan. 1997); *Rodgers*, 2016 WL 7888002, at *4 (N.D. Okla. Oct. 27, 2016) (noting that attorneys should do nothing more than "merely 'fine-tune'" an expert's disclosure to "ensure compliance with Rule 26"); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("An integral part of an expert's specialized skill at analyzing information is an understanding of what information is relevant to reaching a conclusion.").

Any changes suggested by an attorney to the "substance of the expert opinions and conclusions, as well as their underlying bases and reasons" risk "closer scrutiny" by a court and potentially the exclusion of the expert and his report. *Marek*, 171 F.R.D. at 300. Dr. Khoury and his counsel conscientiously avoided second-guessing the substance, bases, or reasons expressed in the experts' reports, focusing their review for compliance with Rule 26 and general clarity and grammar. *Hendricks*, 70 F.3d at 1039 ("[F]orcing lawyers to second-guess their experts . . . would effectively eliminate the legitimate role experts play in guiding and narrowing an attorney's investigation.").

### B. Parties and counsel are entitled to rely on the expert report of a qualified expert witness.

Although the facts revealed during Mr. Dawson's deposition show that such trust was misplaced, Dr. Khoury and his counsel reasonably relied on Mr. Dawson to

conduct the work he claimed to have performed and the results of that work, including his expert report.

As the Tenth Circuit Court of Appeals has held, "[a]s long as reliance is reasonable under the circumstances, the court must allow parties and their attorneys to rely on their experts without fear of punishment for any errors in judgment made by the expert." *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993). The Ninth Circuit has echoed such sentiments, noting that "[i]f an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous." *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995).

A district court in an adjacent state recently explained that "[t]he starting point for the analysis is the principle that '[a]ttorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts.'" *Ellison v. Thornell*, 721 F. Supp. 3d 820, 951 (D. Ariz. 2024) (quoting *Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010)). Here, Mr. Dawson was "properly selected, adequately informed and well-qualified."

First, Mr. Dawson's past work, including his work for congressional committees, exposed him directly to the issues his report would address. Similarly, his extensive experience as an expert witness suggested that he was sufficiently qualified and experienced to help the jury understand the regulatory matters and CMS processes at issue. Fed. R. Evid. 702. He was therefore "properly selected" and "well-qualified."

11

Second, Dr. Khoury's counsel furnished pertinent case-related materials but otherwise permitted Mr. Dawson to conduct whatever research and investigation he deemed necessary, resulting in Mr. Dawson spending more than 27 hours conducting "[i]ndependent regulatory/legal research" and nearly 140 more drafting, revising, and proofreading his report. Thus, Mr. Dawson was also "adequately informed."

Finally, the substance of Mr. Dawson's report appeared consistent with various regulatory standards and raised no obvious red flags. In reviewing his report for clarity and grammar, nothing jumped out as evidently erroneous or outlandish. In particular, nothing on the face of his report (or in his invoice time entries) suggested that Mr. Dawson had used generative artificial intelligence to help create it.

## II.     THE ERRORS IN MR. DAWSON'S EXPERT REPORT WERE NOT OBVIOUS IN CONTEXT.

Because attorneys are forbidden from influencing the substance, bases, or reasons set forth in an expert report and should limit their review to clarity, grammar, and style, counsels' review of Mr. Dawson's report did not identify the sporadic and diverse errors it contained. ChatGPT is a technology designed to create content that appears to be plausible—content that looks, sounds, and "feels" genuine—but that is, in fact, entirely made up. Since Mr. Dawson had not disclosed his use of ChatGPT, Dr. Khoury's counsel were not on guard to look out for plausible, but ultimately fake, quotations and citations—the kinds of "hallucinations" such technology has become infamous for.

Although Dr. Khoury acknowledges that the errors in his report require Mr. Dawson to be withdrawn, Dr. Khoury has prepared an appendix (Appendix A) to provide important context for the errors in Mr. Dawson's report and explain why they did not appear obvious to Dr. Khoury's counsel. Not only was the substance plausible, but ChatGPT's ability to "mimic" the citation style of Medicare program materials and depositions, for example, raised no red flags.

Mr. Dawson's undisclosed use of artificial intelligence technology as part of his drafting process was a serious "error in judgment," but it was done without the knowledge or participation of Dr. Khoury and his counsel. *Coffey*, 1 F.3d at 1104. Upon learning of Mr. Dawson's use of artificial intelligence and the serious errors it created, Dr. Khoury's counsel promptly elected to withdraw him as an expert witness. Accordingly, Dr. Khoury and his counsel should not be punished for the sins of their expert.

## **CONCLUSION**

For the foregoing reasons, Dr. Khoury withdraws Mr. Dawson as an expert witness. The Motion should be denied as moot on that basis.

Respectfully submitted this 6th day of August 2025.

*/s/ Brandon J. Mark\**
Brandon J. Mark (10439)
Hannah J. Ector (17980)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
BMark@parsonsbehle.com
HEctor@parsonsbehle.com

Robert A. Griffith (Admitted Pro Hac Vice)
75 State Street, Suite 100, PMB 5890
Boston, MA 02109
Telephone: (617) 752-3807
robert@ragriffithlaw.com

Lynn M. Adam (Admitted Pro Hac Vice)
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Ave, Suite 225
Decatur, Georgia 30030
Telephone: (404) 324-3582
ladam@lynnadamlaw.com

Tejinder Singh (Admitted Pro Hac Vice)
SPARACINO PLLC
1920 L Street NW, Suite 825
Washington, DC 20036
Telephone: (202) 629-3530
Facsimile: (202) 629.3658
tejinder.singh@sparacinopllc.com

*Attorneys for Relator Michael D. Khoury, M.D.*

\* I, Brandon J. Mark, certify that this document contains 3,033 words and complies with DUCivR 7-1(a)(4).

4914-0384-1873.v2

## CERTIFICATE OF SERVICE

On this 6th day of August 2025, I hereby certify that I electronically filed the foregoing **RELATOR MICHAEL D. KHOURY'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THOMAS DAWSON** with the Clerk of Court using the CM/ECF system that will send an electronic notification to counsel of record for all of the parties.

/s/ Brandon J. Mark

4914-0384-1873.v2