Matthew M. Curley (*admitted PHV*)
Scott D. Gallisdorfer (*admitted PHV*)
BASS, BERRY & SIMS PLC
21 Platform Way South, Suite 3500
Nashville, Tennessee 37203
Telephone: (615) 742-6200
mcurley@bassberry.com
scott.gallisdorfer@bassberry.com

Stephen T. Hester (#9981)
COHNE KINGHORN, P.C.
111 E. Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
shester@cohnekinghorn.com

*Attorneys for Defendants Mountain West
Anesthesia, LLC, David A. Debenham,
M.D., Eric A. Evans, M.D., Joshua J.
Larson, M.D., and Tyler W. Nelson, M.D.*

Rodney R. Parker (#4110)
Richard Van Wagoner (#4690)
SPENCER FANE LLP
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rrparker@spencerfane.com
rvanwagoner@spencerfane.com

*Attorneys for Defendant John E.
Miner, M.D.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF NEVADA *ex rel.* MICHAEL D. KHOURY, M.D.,<br><br>Plaintiffs,<br>v.<br><br>MOUNTAIN WEST ANESTHESIA, LLC; DAVID A. DEBENHAM, M.D.; ERIC A. EVANS, M.D.; JOSHUA J. LARSON, M.D.; JOHN E. MINER, M.D.; TYLER W. NELSON, M.D.; and DOE ANESTHESIOLOGISTS 1 through 150,<br><br>Defendants. | **DEFENDANTS' MOTION FOR SANCTIONS**<br><br>Civil Case No. 2:20-cv-372-TC-CMR<br><br>Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................3

ARGUMENT ............................................................................................................6

    I.    Relator's Counsel Should Be Disqualified for Shirking their Professional Obligations and Producing a Fraudulent Expert Report. ...............................6

        A.    Relator's Counsel Failed to Provide Any Credible Explanation Regarding their Role in Mr. Dawson's Fraudulent Report. ..............................7

        B.    The Fabrications in Mr. Dawson's Report Were Readily Apparent. ...............10

        C.    Relator's Response to the Motion to Exclude Mr. Dawson Continues Relator's Counsel's Pattern of Misrepresentations to the Court. ....................12

        D.    Disqualification of Relator's Counsel Is an Appropriate Sanction. ................15

    II.    Relator's Engagement and Disclosure of an Expert in FCA Litigation Who Used ChatGPT to Fabricate CMS Testimony and Quotes from Other Government Documents Requires Disqualification of Relator. ..................................16

    III.    Payment of Reasonable Attorneys' Fees and Costs Should Be Awarded. ..................20

CONCLUSION.......................................................................................................20

ii

Defendants respectfully file this motion for sanctions, which seeks disqualification of Relator and his counsel, among other relief, because of the conduct associated with the expert report of Relator's designated expert Thomas Dawson, III, J.D.

## PRELIMINARY STATEMENT

Relator and his counsel concede that Mr. Dawson's fraudulent report warrants sanctions. (Dkt. 285 at 9 (offering to pay costs).)  Monetary sanctions, while appropriate, are insufficient to address the serious issues before the Court.  As a *qui tam* relator pursuing FCA claims on the United States' behalf, Relator and his counsel engaged an unqualified expert and produced a report "on issues relating to pertinent governmental standards and practices."  That report was created with ChatGPT and contains fabricated testimony from a federal agency, fabricated quotations from government agency manuals, and numerous other falsehoods.  Exacerbating matters, that federal agency, CMS, is the very agency responsible for administering and setting payment policy for the government healthcare programs allegedly harmed.  Such unprecedented conduct renders Relator and his counsel unfit to pursue claims on behalf of the United States, and they must be disqualified.

These recent events do not stand in isolation.  More than two years ago, Defendants deposed CMS, and CMS's testimony entirely undermined Relator's FCA liability theory. Defendants, therefore, moved for summary judgment.  (Dkt. 126.)  Opposing that motion, Relator sought more time for discovery, insisting he needed a second chance to depose CMS.  But, in doing so, Relator's counsel acknowledged that "if CMS's testimony doesn't change, *[he] will almost certainly lose this case*."  (Dkt. 163, Tr. at 54:13-18 (emphasis supplied).)

The Court granted Relator's request, and a second CMS deposition occurred in March 2025.  But CMS's testimony *did not change*.  (Capehart Dep. at 95:7-13 ("Q: And just to be clear,

none of your testimony here today on behalf of CMS … is intended to change or recant any of your testimony that you provided in May of 2023, correct? [Objection] A: That is correct.")) (excerpt attached as Ex. A).)  Faced with that stubborn reality, Relator and Relator's counsel now admit that they "***faced a dilemma***."  (Dkt. 285 at 5 (emphasis supplied).)  So, they turned to Mr. Dawson to opine on government standards.  He then outsourced his work to ChatGPT, which simply fabricated new CMS testimony.  Mr. Dawson incorporated that fake testimony into his report, alongside a litany of fake quotations from government documents, false citations, and made-up publications—all verified under ***penalty of perjury***—in support of his opinion that Defendants "are not ultimately entitled to payment" for anesthesia services.  (Dkt. 282-3 at 5.)

Relator and his counsel then produced the fraudulent report to Defendants without any effort to verify its integrity.  They were not idle bystanders, guilty only of passive indifference. Rather, Relator's counsel, namely Messrs. Griffith and Mark, engaged Mr. Dawson, even though he had no experience concerning the FCA or payment for anesthesia services and had never opined as an expert on government standards.  They also reviewed drafts of his report and conferred with him during preparation of his final report in which he used ChatGPT.  (Dkt. 282-4, Dawson Dep. at 129-30.)  As to the fabricated CMS testimony, they noticed and attended that deposition, and Mr. Griffith examined CMS.  (Capehart Dep. at 5, 45 (excerpt attached as Ex. A).)

The production of Mr. Dawson's report was an extraordinary perversion of federal court litigation and of the FCA itself, and a total abdication of the professional obligations of Relator's counsel.  It should not be lost on the Court that Mr. Dawson was offering opinions on legal principles and quoting a transcript and other readily available government documents.  He was not undertaking complex mathematical calculations or opining on arcane matters of science or

engineering.  Even **minimal** effort would have revealed the readily apparent fabrications.  This conduct warrants a substantial sanction—including disqualification of Relator, Messrs. Griffith and Mark, and their respective firms from further participation in this matter.[1]  Just as one dealing with the government "must turn square corners," *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920), so too should a *qui tam* relator and his counsel when standing in its shoes.

## BACKGROUND

***Relator's* Qui Tam *Action.***  Relator asserts that Defendants defrauded government healthcare programs administered by CMS by using their personal electronic devices ("PEDs") while providing anesthesia services and billing Medicare and Medicaid for those services.  As required by the FCA, the United States investigated Relator's allegations, but declined to intervene, leaving Relator to pursue his claims on behalf of the United States.  (Dkt. 19.)

***Discovery in this Action.***  During discovery, CMS testified that an anesthesiologist's PED use while providing anesthesia services ***does not impact Medicare's payment of claims for anesthesia services*** and was not considered a "***transgression***" of any "***aspect of Medicare policy***." (Capehart Dep. (Dkt. 126-7) at 86:13-18, 110:4-14.)  Citing that testimony, Defendants moved for summary judgment more than two years ago.  (Dkt. 126.)  The impact of that testimony was not lost on Relator's counsel, who acknowledged that if CMS's testimony did not change, Relator would "almost certainly lose this case."  (Dkt. 163, Tr. at 54:13-18.)

To forestall summary judgment, Relator's counsel told the Court that they needed another CMS deposition (having chosen not to ask a single question during the first) and needed data from

---

[1] Defendants do not seek disqualification of Relator's counsel Adam Law LLC or Sparacino PLLC or the attorneys from those respective firms.

Defendants' PEDs to take that deposition, because they were supposedly going to show that PED data to CMS. In declarations, Messrs. Griffith and Mark represented that DOJ had agreed to a second CMS deposition. (*See* Dkt. 147-3 (Griffith Dec. ¶ 5); Dkt. 147-4 (Mark Dec. ¶ 8).) In yet another declaration, Mr. Mark reiterated this supposed agreement and quoted ***part*** of an email between himself and AUSA Sandra Steinvoort as evidence of that agreement. (Dkt. 177-1 (Mark Dec. ¶ 8).) Put most charitably, those representations were half-truths at best. When Relator finally produced the ***full*** email, it was revealed that the government stated that it would consider a second CMS deposition only on non-duplicative topics. (Dkt. 205-1.)

With the full email exposed, Mr. Mark "***promised and guaranteed***" that a second CMS deposition would be on different topics. (Dkt. 208, Tr. at 17.) Mr. Mark's representation was short-lived. When they noticed the second CMS deposition, Relator's counsel noticed topics that were largely duplicative of those from the first CMS deposition (with some topics copied almost *verbatim*), and the Magistrate Judge rejected the duplicative topics. (Dkt. 253 (Mem. & Order); Dkt. 261 (overruling Relator's objections).) When the second deposition went forward on new topics only, Messrs. Griffith and Mark attended that second CMS deposition, and Mr. Griffith questioned CMS. Of note, CMS made clear that it had not changed its testimony from the first deposition (Capehart Dep. at 95:7-13 (Ex. A)), and Mr. Griffith did not ask one question on the substance of the PED data—contrary to what Relator's counsel repeatedly told the Court they would do (*see, e.g.*, Dkt. 129 at 4; Dkt. 147 at 5; Dkt. 163 at 43:16-44:1, 47:1-22; Dkt. 177 at 8).

***Mr. Dawson's Expert Disclosure and Report.*** After fact discovery, Relator's counsel turned to Mr. Dawson, as "an expert on issues relating to pertinent governmental standards and practices, among others." (Dkt. 266.) Mr. Dawson, although a licensed attorney, was totally

unqualified to opine as an expert in this matter, as he has never served as an expert on the topics that form the substance of his report and none of his professional experience related to such matters.   (Dkt. 282 at 9-10 (detailing why Mr. Dawson was unqualified as an expert).) Nevertheless, he "declare[d] under penalty of perjury" that his report addressing payment for the anesthesia services at issue was "true and correct."   (Dkt. 282-3 at 25.)   He drafted that report, however, with ChatGPT and his opinions relied on fabricated testimony, fake quotes from CMS manuals and other documents, and numerous false citations.  (Dkt. 282 at 2-7.)

*Mr. Dawson's Deposition Testimony.*   Mr. Dawson worked with Messrs. Griffith and Mark in drafting his report, which they reviewed, and along with them, Mr. Dawson decided to combine three drafts reports into one.  (Dkt. 282-4 at 129:8-130:8.)   After initially lying in his deposition, Mr. Dawson backtracked and admitted to using "artificial intelligence to help me do research" (*id.* at 60:15-61:4) and to draft the report's abstract (*id.* 144:1-5).  Mr. Dawson failed to preserve any of the prompts or inputs used with respect to ChatGPT.  (*Id.* at 62:24-63:3.)

Mr. Dawson knows that CMS is responsible for establishing payment policy for Medicare and Medicaid (*id.* at 50:3-7), and cited CMS testimony for the "key points that [he was] making in [his] report" (*id.* at 52:22-25).  He admits that the evidentiary foundation of his opinions included deposition testimony from CMS that did not exist, quotes from State Medicaid manuals that did not exist, erroneous citations to regulations, and quotes from Medicare manuals that did not exist. (*Id.* at 140:12-21.)  He also understood: (1) the significance of declaring under "penalty of perjury" that his report was "true and correct"; and (2) the significance of using citations and quotation marks and what those represented to a reader of his report.  (*Id.* at 20:13-15, 142:2-19.)

*Defendants' Motion to Exclude and Relator's Response.*   Four days after taking Mr.

Dawson's deposition, Defendants moved to exclude his report and his testimony primarily based on the serious nature of a *qui tam* relator retaining an expert who used ChatGPT to draft a report that resulted in the fabrication of deposition testimony from a federal agency, fabricated quotes from government documents, and numerous other falsehoods—all made under the penalty of perjury.[2]  Relator and his counsel took nearly two weeks to respond to that motion.

Despite agreeing that Mr. Dawson's report and testimony should be excluded (Dkt. 285 at 3), Relator and his counsel purported to "withdraw" his report in their Response.  Their Response was also noteworthy for its attempt to deflect any and all blame for recent events concerning Mr. Dawson.  Neither Relator nor any of his counsel submitted any substantive declaration to explain their own conduct relative to Mr. Dawson, notwithstanding his uncontroverted testimony regarding the role Relator's counsel played in preparing and reviewing his report.

## ARGUMENT

"[D]istrict courts enjoy very broad discretion to use sanctions where necessary to insure … that lawyers and parties … fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial."  *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011) (internal quotation marks omitted).  "To deter frivolous and abusive litigation and promote justice and judicial efficiency," courts may impose sanctions by their "inherent right to manage their own proceedings." *Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987).

### I. Relator's Counsel Should Be Disqualified for Shirking their Professional Obligations and Producing a Fraudulent Expert Report.

---

[2] Full detail of the fabrications in the report are included in the Appendix to the Motion to Exclude. (Dkt. 282-1.)  Defendants also moved to exclude Mr. Dawson based on his lack of qualifications and that his report improperly attempted to dictate the meaning of laws and regulations.  (Dkt. 282 at 7-10.)  Relator provided no response to those arguments and apparently concedes those points.

To hear them tell it, Relator's counsel were the victims of an elaborate hoax perpetrated by Mr. Dawson, with Defendants, CMS, and even the Court as willing accomplices. (*See* Dkt. 286 at 9 ("Dr. Khoury's counsel fell victim to the immense power of technology like ChatGPT…"); Dkt. 285 at 5 ("A year later, the Magistrate Judge substantially changed the scope of that deposition, limiting it to topics focused on only one part of CMS's processes…"); *id.* (claiming CMS designated the wrong witness); *id.* at 6 (asserting "CMS was already deposed twice at Defendants' insistence"). Of course, none of that is true. Relator's counsel's conduct, including the engagement of Mr. Dawson, the drafting and disclosure of his report, and their response to the Court following his deposition and Defendants' Motion to Exclude, warrants disqualification.

### A. Relator's Counsel Failed to Provide Any Credible Explanation Regarding their Role in Mr. Dawson's Fraudulent Report.

Given full opportunity, Relator's counsel offered the Court no credible explanation of their role in engaging Mr. Dawson, reviewing his draft reports, or preparing him to be deposed, other than to express their dismay at what transpired. They claim to have watched this unfold from the sidelines, professing no reason to have checked any of his citations, the fabricated testimony, the fabricated document quotes, or the numerous other falsehoods forming the basis of Mr. Dawson's opinions, all of which were readily apparent on the face of the report. Yet, they claim—without any adequate explanation—that "[n]othing on the face of the report raised obvious red flags about its veracity." (Dkt. 285 at 3.) That simply cannot be true.

Faced with the motion to exclude Mr. Dawson, Messrs. Griffith and Mark did not provide the Court with substantive declarations to explain their roles. In nearly every other case involving fabrications resulting from AI platforms, counsel has been quick to provide fulsome, under oath accounts of what transpired with full transparency (and courts have rightly demanded as much).

Here, by contrast, Relator's counsel waited nearly two weeks to file a response, yet offered no substantive declaration to support any of the assertions made in Relator's response or to explain their role in Mr. Dawson's engagement, review of his draft report, or his deposition preparation.[3]

Mr. Dawson's uncontroverted testimony on the role of Relator's counsel evidences that their failures were not passive in nature. Rather, they were actively involved in the engagement of Mr. Dawson, preparation of his report, and his deposition preparation. Mr. Dawson consulted with Messrs. Griffith and Mark while drafting his report, and counsel ultimately reviewed his drafts. (Dkt. 282-4, Dawson Dep. at 129:8-130:8.) Mr. Dawson and Relator's counsel also met for "a total of between seven and ten hours" to prepare for his deposition, meaning they had more than ample time to identify the numerous defects in his report. (*Id.* at 11:17-20.) Simply stated, Relator's counsel's fingerprints are all over this regardless of their protests to the contrary.

Instead of providing substantive declarations detailing their roles, Relator's counsel chose to blame Mr. Dawson and nearly everyone else involved in the proceedings, including Defendants, CMS, and even the Court itself. If that were not enough, they would hide behind inapposite caselaw supposedly standing for the proposition that they had no duties or obligations whatsoever with respect to the fraudulent report. For example, they claim that they "conscientiously avoided second-guessing the substance, bases, or reasons expressed in the experts' reports, focusing their review for compliance with Rule 26 and general clarity and grammar." (Dkt. 285 at 10.) They then plead for immunity from any scrutiny by the Court, claiming that "[a]s long as reliance is

---

[3] Relator's counsel claims "[u]pon learning of Mr. Dawson's use of artificial intelligence and the serious errors it created, Dr. Khoury's counsel promptly elected to withdraw him as an expert witness." (Dkt. 285 at 13.) Not so. All they "promptly" did was say "Mr. Dawson *will be issuing a revised report quite shortly*" (Dkt. 282-4 at 306:3-8 (emphasis supplied)), but then took nearly three weeks to get their story straight, withdrawing him only *after* Defendants moved to exclude.

reasonable under the circumstances, the court must allow parties and their attorneys to rely on their experts without fear of punishment for any errors in judgment made by the expert." (Dkt. 285 at 11 (quoting *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993).)[4]

The cases cited in their response, of course, do not absolve Relator's counsel of their professional responsibility for the fabrications and falsehoods in Mr. Dawson's fraudulent report. In *Coffey*, for example, the Tenth Circuit explained that it is reasonable for attorneys to rely on an expert "where the attorney does not have the necessary knowledge" such that "involvement of the specialized knowledge of an expert is necessary." 1 F.3d at 1104. It would seem, then, Relator's counsel, as licensed attorneys, are claiming that they somehow did not have the "specialized knowledge" necessary to check another attorney's citations to deposition testimony, regulations, and government and industry documents. If that were true, there may be other issues to address. *See* UCJA Rule 13-1.01 (Competence), 13-3.4(b) (Fairness to Opposing Party and Counsel).

Finally, as to the substantive content of Mr. Dawson's report, it was unreasonable for Relator's counsel to rely on Mr. Dawson. Mr. Dawson was not "properly selected, adequately informed and well-qualified," as Relator's counsel claims. (Dkt. 285 at 11.) As detailed fully in Defendants' Motion to Exclude (Dkt. 282 at 9-10), he had no relevant professional experience, no relevant professional publications or speaking engagements, and had never testified on the topics for which he was designated. (*See* Dkt. 282-4 at 272:25-290:13.) Mr. Dawson did not include a resume or CV with his report or a list of any of his publications, likely because doing so would have further exposed his lack of qualifications. After all, if Mr. Dawson were qualified, he would

---

[4] Even such statements are dubious. Mr. Dawson's report did not include a listing of his publications authored in the previous ten years as required by Rule 26(a)(2)(B)(iv). (Dkt. 282-4 at 289:22-290:13.) His report also contains numerous grammatical and stylistic errors.

not have resorted to artificial intelligence to draft his fraudulent report.[5]

### B.  The Fabrications in Mr. Dawson's Report Were Readily Apparent.

Notwithstanding their role in the preparation of Mr. Dawson's report and for his deposition, Relator's counsel claims that they "had no reason to suspect" that Mr. Dawson fabricated his report.  (Dkt. 285 at 3.)  But the fabrications were readily apparent to anyone who took more than a passing glance at the report.  Relator's counsel asserts that "Dr. Khoury and his counsel first learned that Mr. Dawson had used generative artificial intelligence as part of his report drafting process at the same time as Defendants—when he admitted doing so in his deposition."  (*Id*.)  But Defendants identified the myriad fabricated quotations and sources upon initial reviews of the report and concluded that Mr. Dawson likely used AI to draft it.  (*See* M. Curley Dec. ¶¶ 3-5 (attached as Ex. B).)  The record shows each fabrication was plainly apparent.

***Fabricated CMS Testimony.***  Relator's counsel must have known the CMS testimony was fabricated.  Relator's counsel has repeatedly stressed the importance of the second CMS deposition since opposing Defendants' motion for summary judgment and were intimately involved in that deposition.  Messrs. Griffith and Mark negotiated the topics for the deposition with CMS, and Mr. Mark signed the notice of the CMS deposition and accompanying subpoena. (Dkt. 228-1.)  Both personally attended the CMS deposition in March 2025, ***which occurred only two months before Relator's counsel produced Mr. Dawson's report***.  And Mr. Griffith questioned CMS during the exact part of the transcript from which Mr. Dawson conjured the fabricated testimony.

Upon receipt of Mr. Dawson's report, Defendants' counsel recognized that the quoted

---

[5] Relator's counsel also falsely state they considered what "Mr. Dawson's resume included…." (Dkt. 285 at 6.)  What Relator's counsel considered was an "advertisement" (Dkt. 285-2, ¶ 6 (referencing "expert advertisement" considered) & Ex. B), which is decidedly not a resume or CV.

CMS testimony was not in the transcript, particularly given the importance Relator's counsel had placed on the CMS deposition.  Defendants sought to depose Mr. Dawson first amongst Relator's experts to promptly obtain the full story.  (Curley Dec. ¶¶ 3-7.)  Relator's counsel's excuse for failing to identify the fabrication is only that: "Mr. Dawson's erroneous quotation … was not obviously wrong … [and] did not stand out as a false statement" (Dkt. 285-1, App'x at 1), as if they had not attended the deposition and had no access to the transcript.

*Fabricated Quotes from Government Documents.*  Mr. Dawson also fabricated quotes from numerous government manuals and simply invented other manuals out of thin air, which Relator's counsel must have known.  He was not running tests in a laboratory with specialized knowledge that Relator's counsel could not have verified or replicated.  Yet, Relator's counsel offers no explanation for why they did not lift a finger to check those quotes or verify whether the sources even existed.  Their remarkable response is only to downplay the significance of the fabrications, claiming, for example, that "Mr. Dawson should have paraphrased the [Medicare Program Integrity Manual] rather than using AI to generate a summary."  (Dkt. 285-1, App'x at 2.)  But Mr. Dawson did not use "AI to generate a summary," as Relator's counsel well knows; he fabricated quotes from these Manuals and, in the case of the so-called "Nevada Medicare Provider Manual," invented a government document that simply does not exist.

*Fabricated Industry Publications.*  As to fabricated quotes and titles from industry publications, Relator's counsel has cited the real publications in numerous pleadings filed with the Court.  Relator's Complaint cites and quotes from the ASA's Statement on Distractions (Dkt. 52 ¶ 4 & n.4, ¶ 95, ¶ 96), and Relator's counsel knows it was not a "joint statement" issued with the APSF, and that the title does not include "**and PED Use,**" as Mr. Dawson made up (*see also id. ¶*

92 (quoting ASA Standards for Basic Anesthetic Monitoring). Yet, they would now have us believe they had no idea Mr. Dawson had fabricated quotations from these documents (and the title of one of them), despite their being among the most frequently cited documents in the case.[6]

In sum, the evidence shows that Messrs. Griffith and Mark knowingly abdicated their own professional responsibilities by failing to take any steps to ensure that the quotations from testimony and documents upon which Mr. Dawson based his opinions were accurate or even real, despite their active involvement in preparing and reviewing Mr. Dawson's report.

### C. Relator's Response to the Motion to Exclude Mr. Dawson Continues Relator's Counsel's Pattern of Misrepresentations to the Court.

Relator's Response and his Motion for Leave to Substitute are both chock full of their own misrepresentations—in the form of both affirmative statements and material omissions.

Relator's counsel claims that "they had no reason to suspect that Mr. Dawson had used artificial intelligence to prepare [his report]," and that his report "raised no obvious red flags" (Dkt. 285 at 9, 12.) But those claims ring hollow, given the myriad reasons to suspect just that, as discussed. Those reasons led Defendants to question Mr. Dawson about AI use early in his deposition and to challenge his denials of doing so. Yet Relator's counsel pleads ignorance.

They also repeatedly misrepresent the nature of the fabrications in Mr. Dawson's report, particularly in the Response's Appendix. For example, they state the fabricated CMS testimony "*was not obviously wrong*," and it "is a *correct statement* of CMS's expectations and legal

---

[6] For example, Mr. Mark or another attorney from his firm introduced the ASA Statement on Distractions as an exhibit in *all but one* of Defendants' depositions (six times in total), which took place just weeks before Relator's counsel submitted Mr. Dawson's report. Mr. Mark referred to the statement repeatedly in the depositions, and never once referred to it as a "joint" ASA and APSF statement or suggested that its title included the words "PED use." (*See* Curley Dec. ¶ 10.)

authorities." (Dkt. 285-1, App'x at 1 (emphasis supplied).) Of course, fabricated testimony of a federal agency cannot be a "correct statement" of anything. *See Johnson v. Dunn*, 2025 WL 2086116, at \*16 (N.D. Ala. July 23, 2025) ("[T]he court rejects the invitation to consider that actual authorities stand for the proposition that the bogus authorities were offered to support."). They also misleadingly state that Mr. Dawson used ChatGPT "to generate a summary" of Chapter 15 of the Medicare Program Integrity Manual. (Dkt. 282, App'x A-1 at 2.) His report contained a fabricated quote from Chapter 15, but Chapter 15 **contains no content whatsoever**. (*Id.*)

Relator's counsel also falsely claims that "Mr. Dawson's testimony had nothing to do with the factual merits of the case." (Dkt. 285 at 4.) Nothing could be further from the truth. The entire point of his report was to try to show that CMS should not have paid Defendants' claims because their services "would fail the binding conditions of payment" under CMS's requirements. (Dkt. 282-3 (Dawson Report).) That goes *directly* to the "merits of the case."

In one of their most brazen and bizarre statements, Relator's counsel would lay blame on the Court, accusing the Court of "unexpectedly revers[ing] its previous ruling," "substantially chang[ing] the scope of" and imposing "new limitations" on a second CMS deposition, and "limiting it to topics focused on only one part of CMS's processes—those performed by Medicare Administrative Contractors." (Dkt. 285 at 3-5.) Again, not true.[7] Relator's counsel "promised and guaranteed" that they would seek to depose CMS only on topics that were not duplicative of the first CMS deposition. (Dkt. 208, Tr. at 17.) When Relator's counsel broke that promise and guarantee, the Magistrate Judge held Relator's counsel to account by simply striking the

---

[7] When Relator's counsel previously made a similar claim, the Court *itself* stated that they had "mischaracterize[d] this court's prior holding." (Dkt. 261 at 7.) Yet, seeking to somehow again blame the Court for their conduct, they have now doubled down on that mischaracterization.

duplicative topics—and the Court affirmed that order.  (Dkt. 253; Dkt. 261.)[8]

Relator's counsel also omit large swaths of material information from their Response, particularly related to their role in engaging Mr. Dawson and the production of his report.[9]  For example, they provide no explanation as to: (1) who provided Mr. Dawson with what materials; (2) who told him to combine three draft reports into one report; (3) what counsel reviewed his report(s); (4) how much time counsel spent reviewing his report(s); (5) whether counsel made edits or revisions to the report(s); and/or (6) why Mr. Dawson failed to preserve any evidence of his ChatGPT usage.  They provide none of their communications with Mr. Dawson as evidence to support their assertions, but only submit his cryptic invoices for March and April 2025 (and not May 2025).  In short, they portray their role as limited to checking for "clarity and grammar."

These misrepresentations build upon a troubling pattern.[10]  At nearly every turn, Relator's

---

[8] Relator's counsel also misrepresents that CMS was "deposed twice at Defendants' insistence." (Dkt. 285 at 6.) This is false. Defendant took CMS's deposition in May 2023, then moved for summary judgment, while repeatedly ***objecting*** to any second CMS deposition.  (*See* Dkt. 160 at 32-35 (arguing Relator should not get a "do-over" deposition of CMS); Dkt. 173 at 6-7 (same); *see also* Dkt. 228 at 2 (arguing "Defendants should not have to bear the costs of preparing and attending another deposition concerning topics on which CMS already testified").)  It was ***solely*** Relator who insisted that the second CMS deposition was necessary.

[9] In *U.S. ex rel. Smith v. Athena Constr. Grp., Inc.*, No. 18-cv-2080 (D.D.C. July 26, 2025), Dkt. 190, the Court issued an order to show cause "why the court should not impose sanctions and make a referral to relevant bar authorities for 'knowingly mak[ing] a false statement of…law to a tribunal or fail[ing] to correct a false statement of…law previously made to the tribunal by the lawyer.'" Following counsel's response, the Court determined that counsel's response was "wholly inadequate" as he failed "to discuss how he used [the] tools to generate the cited cases and the fabricated quotations" and noted that "[t]he court still has no understanding of how a nonexistent case citation and fabricated quotations came to be in the brief."  (*Id.* Minute Order (July 30, 2025).)

[10] There are more misrepresentations in their Motion to Substitute.  They claim Defendants "moved the Court for additional time to complete expert discovery, claiming, among other things, that due to counsel's and witnesses' schedules, additional time for discovery was needed."  (Dkt. 286 at 5.) Defendants sought more time for their expert disclosures solely because Relator's counsel failed to produce materials upon which their experts relied, as required by Rule 26.  (Dkt. 267 at 1.)

counsel has communicated to the Court whatever might be most expedient in advancing their positions in the moment, regardless of the truth.  Examples abound:

- Relator's counsel repeatedly represented to the Court that they needed Defendants' PED data to depose CMS.  (*See, e.g.,* Dkt. 116 at 8; Dkt. 129 at 4; Dkt. 147 at 5; Dkt. 163 at 43:16-44:1, 47:1-22; Dkt. 177 at 8; Dkt. 208 at 18:16-21, 19:9-12.)

  After receiving the PED data (at great financial cost to Defendants), Relator admitted that CMS was unqualified to review Defendants' specific PED Data (Dkt. 249 at 7 n.5), and Relator never questioned CMS about the PED data in the second CMS deposition.

- Relator's counsel repeatedly told the Court that they had reached agreement with CMS for a second deposition, but misleadingly quoted a snippet of an email with DOJ as support for that claim.  (*Supra* at 4; Dkt. 147 at 5; Dkt. 147-3 ¶ 4; Dkt. 147-4 ¶ 8; Dkt. 163 at 47:7-16, 54:22-55:11; Dkt. 177 at 6, Dkt. 177-1 ¶ 8.)

  The full DOJ email stated that CMS would consider a second deposition only on different topics from the first CMS deposition, a limitation Relator's counsel never divulged to the Court until after the full email came to light.  (Dkt. 205-1; *see also* Dkt. 208 at 4:12-19, 7:8-15)

- Relator's counsel then "promised and guaranteed" they would not notice duplicative topics for a second CMS deposition.  (Dkt. 280 at 7:23-8:1, 17:9-13, 19:9-12.)

  They did the opposite.  Both the Magistrate Judge and the Court held that numerous noticed topics were duplicative of topics in the first CMS deposition.  (Dkt. 253, Dkt. 261.)

### D. Disqualification of Relator's Counsel Is an Appropriate Sanction.

Given the record before the Court, disqualification of Messrs. Griffith and Mark and their firms "fits well: lawyers should know that if they make false statements in court proceedings, they will no longer have the professional opportunity to participate in those proceedings."  *Johnson*, 2025 WL 2086116, at *20 (sanctioning and disqualifying counsel for AI-generated fabrications). "[N]o court should be required to allow an attorney responsible for making false statements in the proceedings to continue in the proceedings."  *Id.*  The evidence before the Court shows Relator's counsel knowingly abdicated their professional obligations and that they share responsibility for

15

Mr. Dawson's fraudulent report. They should not be permitted to escape disqualification by distancing themselves from his work or casting blame on everyone but themselves.

## II. Relator's Engagement and Disclosure of an Expert in FCA Litigation Who Used ChatGPT to Fabricate CMS Testimony and Quotes from Other Government Documents Requires Disqualification of Relator.

The engagement of Mr. Dawson and the production of his report to Defendants is of a uniquely serious nature. Lawsuits asserting FCA claims brought by private parties are no ordinary disputes. The FCA is a federal statute that allows private citizens ("relators") to bring suit on behalf of the United States under the FCA's *qui tam* provision for alleged damages to the government resulting from false claims. Relators bring *qui tam* actions "in the name of the Government," 31 U.S.C. § 3730(b)(1), and the United States remains the real party in interest. For this reason, *qui tam* relators stand in the government's shoes in prosecuting the action on its behalf. *See U.S. ex rel. Robinson v. HealthNet, Inc.*, 124 F.4th 511, 514 (7th Cir. 2024).

With that context, it would be hard to imagine more serious misconduct by a *qui tam* relator than what has occurred here. Relator, standing in the government's shoes and asserting claims on its behalf, designated Mr. Dawson as an expert "on issues relating to pertinent ***governmental standards and practices***." (Dkt. 266 (emphasis supplied).) Mr. Dawson then authored a report ***under the penalty of perjury*** that fabricated government testimony and fabricated quotations from government manuals to illustrate the key points on "the pertinent governmental standards and practices" on which he purported to opine. Those fabrications would be bad enough in any case. But here, CMS is the very federal agency responsible for determining Medicare and Medicaid payment policy, and the very federal agency allegedly harmed. By disclosing and relying on Mr. Dawson's fraudulent report, Relator has grossly perverted the FCA's *qui tam* provision. And, by

disclosing and relying on an expert who would fabricate testimony from a federal agency and fabricate quotes from that agency's manuals and other source materials, Relator should be deemed to have forfeited his right to represent that same government agency's interests under the FCA.

That Mr. Dawson used ChatGPT on Relator's behalf to prepare his fraudulent report only compounds the seriousness of the conduct at issue. Courts have increasingly expressed grave concerns with respect to the misuse of AI tools such as ChatGPT in litigation, noting the serious harm associated with submission of fake citations and AI hallucinations. *See, e.g.*, *Johnson*, 2025 WL 2086116, at *11 (collecting cases). The consequences resulting from the use of AI in litigation are playing out in real time, including in FCA litigation. *See, e.g.*, *Athena Constr. Grp., Inc.*, No. 18-cv-2080 (D.D.C. July 26, 2025), Dkt. 190 (Order quoted *supra* fn. 9); *cf. Johnson*, 2025 WL 2086116, at *19-20 (imposing sanctions of public reprimand, disqualification of counsel, and referral of attorneys to licensing authorities to address fabricated citations made on behalf of defendant). Courts have correctly concluded that monetary sanctions are insufficient to deter fabrications in legal proceedings derived from AI platforms like ChatGPT. *See Johnson*, 2025 WL 2086116 at *20 (disqualifying counsel and concluding that "a fine would not rectify the egregious misconduct in this case," and "[i]f fines and public embarrassment were effective deterrents, there would not be so many cases to cite").[11]

---

[11] *See also Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 493, 498 (D. Wyo. 2025) (sanctioning attorneys for filing brief with fictitious cases from AI hallucinations—even though they did not draft brief); *Dehghani v. Castro*, 2025 WL 988009, at *4-5 (D.N.M. Apr. 2, 2025) (sanctioning attorney for filing brief with fictitious cases where attorney admitted he "did not read the case law or verify the cases used"), *aff'd*, 2025 WL 1361765 (D.N.M. May 9, 2025); *Garner v. Kadince, Inc.*, 571 P.3d 812, 815 (Utah Ct. App. 2025) (relying on *Wadsworth* to sanction attorneys for citing fictious cases, as "counsel fell short of their gatekeeping responsibilities as members of the Utah State Bar when they submitted a petition that contained fake precedent generated by ChatGPT").

Even with the emergence of such cases, Defendants are unaware of any matters in which AI was used by an expert on behalf of a *qui tam* relator to fabricate testimony of a federal agency and to fabricate quotes from federal agency manuals and other sources in an FCA action. Defendants are likewise unaware of any instances in which the fabricated testimony and quotations were verified as true and correct under penalty of perjury on a *qui tam* relator's behalf. Simply stated, this fraudulent conduct is unprecedented.

That Relator disclosed Mr. Dawson's report in federal court litigation should be reason enough to disqualify Relator. It is also appropriate because Relator should not be permitted to continue to represent the United States as a result of the conduct. *See, e.g.*, *U.S. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, 2023 WL 8480085, at *1 (N.D. Ohio Dec. 7, 2023) (expressing "serious concerns as to whether the Relator should continue to act as a representative for the U.S. in this lawsuit" because of relator's lack of credibility), *aff'd*, 2025 WL 1009012 (6th Cir. Mar. 31, 2025). The severity of the conduct and the substantial harm to the very government interests Relator is purporting to vindicate warrant Relator's disqualification.

Standing in the United States' shoes, Relator's conduct has harmed the government's interests and the public. Conclusions reached by the Court in this case impacted by this conduct may very well have preclusive effective relative to the United States. *See, e.g.*, *U.S. ex rel. Schwartz v. TRW, Inc.*, 118 F. Supp. 2d 991, 995 (C.D. Cal. 2000) ("The United States as the real party in interest in this matter will be bound to whatever final judgement [relator] is able to obtain. It is for this reason that the Second Circuit held that 'the person prosecuting the suit must be subject to the standards of ability, responsibility, liability and accountability required of members of the bar, as officers of the court and by the Code of Professional Responsibility.'" (citation omitted)).

The United States is saddled with a *qui tam* relator whose expert fabricated CMS testimony and quotes from government documents and other sources and used ChatGPT to do so. And another of Relator's experts, Dr. Papadakos, quoted Mr. Dawson's fraudulent report, such that Dr. Papadakos's expert report and opinions are also tainted. (*See* Curley Dec. ¶¶ 13-15.)

The consequences of this conduct would likewise be devastating for Relator, and therefore the government's interests, at summary judgment and if this case were to proceed to trial. Though supposedly his report has been "withdrawn," Mr. Dawson's fraudulent report was made under penalty of perjury (and therefore admissible as evidence), and neither his report nor his testimony has been excluded, as the Court denied Defendants' Motion to Exclude as moot. (Dkt. 287.) Mr. Dawson also remains Relator's designated expert on the Court's docket. Defendants expect to subject Relator, Dr. Papadakos, and CMS-affiliated witnesses to cross-examination with evidence of Mr. Dawson's fraudulent report, as such evidence goes to the credibility of those witnesses, as well as FCA elements that Relator must establish at trial, including falsity and materiality.

"The FCA is not designed to serve the parochial interests of relators, but to vindicate civic interests in avoiding fraud against public monies." *U.S. ex rel. Doyle v. Health Possibilities, P.S.C.*, 207 F.3d 335, 340 (6th Cir. 2000). It would be hard to envision more extreme misconduct than a *qui tam* relator engaging an attorney as an expert whose opinions rely on ChatGPT-generated fabricated testimony and fabricated quotes from documents of the very federal agency whose interests the *qui tam* relator seeks to vindicate. That the fabrications were readily apparent, and yet neither Relator nor his counsel took any steps to confirm the substance of the most basic information quoted in that report, must also be considered as evidence of the conduct at issue.

Finally, disqualification is a far *less* serious sanction than dismissal of Relator's claims,

which would also be an available sanction. Relator is not seeking to redress his own injury; rather, he seeks to vindicate alleged harm to the public fisc. The United States is the real party in interest, retains control over the litigation, can intervene for "good cause" to litigate Relator's claims itself, and could seek to redress any harm it viewed Defendants to have caused even if Relator were disqualified. *See* 31 U.S.C. § 3730(b), (c)(3); *id.* § 3730(c)(5) ("[T]he Government may elect to pursue its claim through any alternate remedy....").[12] The claims belong to the United States and not Relator, and disqualification of Relator would not harm the government's interests. *See U.S. ex rel. FLPA v. Quest Diagnostics, Inc.*, 734 F.3d 154, 167 (2d Cir. 2013) ("[D]isqualification of [the relator] does not significantly impair the federal interests embodied in the FCA.").

### III. Payment of Reasonable Attorneys' Fees and Costs Should Be Awarded.

Given their offer to pay costs, Relator and his counsel acknowledge that monetary sanctions are warranted. The record shows Defendants should be awarded reasonable attorneys' fees and costs associated with Mr. Dawson's deposition and the motion to exclude his report.

### CONCLUSION

Defendants respectfully request disqualification of Messrs. Griffith and Mark, their respective firms, and Relator, along with payment of Defendants' reasonable attorneys' fees and costs, and any other appropriate relief.

Dated this 13th day of August 2025.

---

[12] In *USN4U*, the district court invited the United States to state whether it would intervene or move to dismiss the litigation following defendant's motion to disqualify the relator. The United States moved to intervene and dismiss the litigation, which the district court granted, 2023 WL 8480085, at *1-3, and the Sixth Circuit affirmed, 2025 WL 1009012 (6th Cir. Mar. 31, 2025). Such an approach would be appropriate for the Court to consider here. *Cf.* Gov't Mot. to Dismiss at 21, *U.S. ex rel. Polansky v. EHR, Inc.*, No. 12-cv-04239 (E.D. Pa. Aug. 20, 2019), Dkt. 526 (government motion to dismiss *qui tam* lawsuit because, in part, "the United States [was] concerned about relator's credibility in light of relator's actions in this case").

Respectfully submitted:

COHNE KINGHORN, P.C.

/s/ Stephen T. Hester
Stephen T. Hester (#9981)
111 E. Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
shester@cohnekinghorn.com

BASS BERRY & SIMS PLC

/s/ Matthew M. Curley
Matthew M. Curley (*admitted PHV*)
Scott D. Gallisdorfer (*admitted PHV*)
21 Platform Way South, Suite 3500
Nashville, Tennessee 37203
Telephone: (615) 742-6200
mcurley@bassberry.com
scott.gallisdorfer@bassberry.com

*Attorneys for Defendants Mountain West
Anesthesia, LLC, David A. Debenham,
M.D., Eric A. Evans, M.D., Joshua J.
Larson, M.D., and Tyler W. Nelson, M.D.*

SPENCER FANE LLP

/s/ Rodney R. Parker
Rodney R. Parker (#4110)
Richard Van Wagoner (#4690)
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rrparker@spencerfane.com
rvanwagoner@spencerfane.com

*Attorneys for Defendant John E. Miner,
M.D.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Joel A. Ferre
UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF UTAH
111 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
joel.ferre@usdoj.gov

Brandon J. Mark
Hannah J. Ector
PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
bmark@parsonsbehle.com
hector@parsonsbehle.com

Lynn M. Adam
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Avenue, Suite 225
Decatur, Georgia 30030
ladam@lynnadamlaw.com

Robert A. Griffith
75 State Street, Suite 100
Boston, Massachusetts 02109
robert@ragriffithlaw.com

Tejinder Singh
SPARACINO PLLC
1920 L Street NW, Suite 835
Washington, District of Columbia 20036
tejinder.singh@sparacinopllc.com

Rodney R. Parker
Richard Van Wagoner
SPENCER FANE LLP
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
rrparker@spencerfane.com
rvanwagoner@spencerfane.com

/s/ Matthew M. Curley