Brandon J. Mark, USB #10439
Hannah Ector, USB #17980
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
bmark@parsonsbehle.com
HEctor@parsonsbehle.com
ecf@parsonsbehle.com

Lynn M. Adam (Admitted Pro Hac Vice)
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Ave, Suite 225
Decatur, Georgia 30030
Telephone: (404) 324-3582
ladam@lynnadamlaw.com

Robert A. Griffith (Admitted Pro Hac Vice)
75 State Street, Suite 100, PMB 5890
Boston, MA 02109
Telephone: (617) 752-3807
robert@ragriffithlaw.com

Tejinder Singh (Admitted Pro Hac Vice)
SPARACINO PLLC
1920 L Street NW, Suite 825
Washington, DC 20036
Telephone: (202) 629-3530
Facsimile: (202) 629.3658
tejinder.singh@sparacinopllc.com

*Attorneys for Relator Michael D. Khoury*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF NEVADA *EX REL.* MICHAEL D. KHOURY, M.D.,<br><br>Plaintiffs,<br><br>vs.<br><br>MOUNTAIN WEST ANESTHESIA, LLC; DAVID A. DEBENHAM, M.D.; ERIC A. EVANS, M.D.; JOSHUA J. LARSON, M.D.; JOHN E. MINER, M.D.; TYLER W. NELSON, M.D.; AND DOE ANESTHESIOLOGISTS 1 THROUGH 150,<br><br>Defendants. | **RELATOR MICHAEL D. KHOURY'S RESPONSE TO MOTION FOR SANCTIONS**<br><br>Case No. 2:20-CV-00372<br><br>Judge Tena Campbell<br><br>Magistrate Judge Cecilia M. Romero |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1
PROCEDURAL AND FACTUAL BACKGROUND .................................................... 2
ARGUMENT ........................................................................................ 9
I. DISQUALIFICATION IS A DRASTIC REMEDY. ............................................ 9
A. Defendants have failed to establish an egregious violation of an ethical rule. ........................................................................................ 10
1. Defendants have failed to identify a specific ethical rule Dr. Khoury's counsel has violated. ...................................................... 10
2. Even if Dr. Khoury's counsel violated an ethical standard, they did so inadvertently, briefly, and immediately corrected the problem. ........................................................................................ 13
B. Prejudice to Defendants can be largely mitigated. ..................................... 14
C. Dr. Khoury's counsel are no less effective because of Mr. Dawson's poor judgment. ........................................................................................ 15
D. Dr. Khoury will face substantial hardship if he is forced to find new counsel. ........................................................................................ 16
E. The proceedings are at an advanced stage. ............................................... 17
II. DEFENDANTS' MOTION IS UNTIMELY. ..................................................... 18
CONCLUSION ........................................................................................ 19

## INTRODUCTION

In any multi-year litigation, some mistakes are inevitable. Here, one of Dr. Khoury's expert witnesses prepared a report containing errors, likely caused by generative artificial intelligence (AI) that fabricated plausible but fictitious misstatements. It is undisputed that neither the plaintiff-relator, Dr. Khoury, nor his attorneys caused those errors or knew about them before the report was served. Indeed, the expert never even informed Dr. Khoury's attorneys that he was using AI. It is also undisputed that, in a perfect world, Dr. Khoury's attorneys would have caught the errors and required the witness to correct them. And it is further undisputed that after Defendants moved to exclude the expert, Dr. Khoury's attorneys offered to withdraw the report and cover the costs related to Defendants' response. Altogether, the picture is clear: Dr. Khoury's attorneys made a mistake by failing to review the report more carefully, and they offered in good faith to correct it by voluntarily withdrawing the report and compensating Defendants.

Defendants nevertheless seek to disqualify both Dr. Khoury and his attorneys, effectively scuttling this case after five years of litigation with trial around the corner. Defendants seek this extraordinarily harsh remedy despite the manifest absence of bad faith—and indeed, the absence of *any* active misconduct whatsoever by Dr. Khoury or his attorneys, and even though Defendants cannot identify a Rule of Professional Conduct or any other rule that Dr. Khoury's counsel supposedly violated. For the reasons explained below, the punishment Defendants ask this Court to impose is grossly disproportional to the mistake, and Defendants' motion should be denied.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. Dr. Khoury's counsel engaged Mr. Dawson, an experienced and qualified expert witness, to avoid calling another CMS witness to trial.

After the Court's ruling on scope of the second Rule 30(b)(6) deposition of CMS (ECF 253), Dr. Khoury's counsel looked at options to requiring a CMS witness to testify at trial about issues that CMS's designated deposition witness could not. (Mark Decl., ECF 295–2, ¶ 5.)[1] Since the case also involved Medicaid, Dr. Khoury's counsel sought an expert witness with experience in both Medicare and Medicaid, which proved "more challenging." (*Id.* ¶ 6.)

Mr. Dawson's qualifications included a professional career spanning "over 23 years in healthcare policy," including both the "Medicaid and Medicare" programs. (ECF 285-2, Ex. B.) He also holds a law degree from George Washington University, a Master of Public Health, and a Master of Art in Philosophy with a focus on medical ethics. (*Id.*; ECF 295–2, ¶ 8.) Mr. Dawson stood out from other candidates due in part to his "unique legislative policymaking perspective that witnesses with a strictly administrative background lacked" from his time serving as Health Care Counsel to the U.S. House of Representatives Committee on Small Business. (ECF 285-2, Ex. B; ECF 295–2, ¶ 7.)[2]

---

[1] Defendants suggest that Dr. Khoury's counsel has "blame[d] the Court" through their explanation of why they engaged Mr. Dawson when they did. (ECF 291 at 13.) Dr. Khoury's counsel has only offered this context to explain the timing of their engagement of Mr. Dawson and related issues—no blame was intended.

[2] Defendants argue that Mr. Dawson lacked certain experience to make him qualified. But as Dr. Khoury has argued elsewhere, Defendants do not genuinely contend that given Mr. Dawson's background, he could not be reasonably expected to be able to review a deposition transcript or administrative materials and quote accurately from those sources. Stated alternatively, whatever qualifications Defendants believe Mr. Dawson lacked, such shortcomings suggest nothing that would lead Dr. Khoury's counsel to suspect Mr. Dawson would later use AI to prepare his report and not disclose that fact.

Dr. Khoury's counsel interviewed Mr. Dawson to confirm "he was knowledgeable about the subjects in the case—particularly the general requirement that all billed services must be medically reasonable and necessary and how that requirement is applied by CMS and Medicaid programs." (ECF 295–2, ¶¶ 9–10.) During that interview, Mr. Dawson identified several past and current positions that exposed him to those issues. (*Id.*)

### B. Mr. Dawson researched the issues independently, including reviewing case-related materials, and spent ample time writing and checking his draft report.

Mr. Dawson was given case-related materials, including some pertinent deposition transcripts and documents produced in the case. (Griffith Decl., ECF 295–1, ¶¶ 7, 9; ECF 295–2, ¶ 19.) Apart from this, Mr. Dawson conducted his investigation independently of Dr. Khoury's counsel, who played no role in drafting Mr. Dawson's expert report. (Dawson Dep. Tr. 18:5-9, ECF 285-2, Ex. E; ECF 295–2, ¶ 12.)

Mr. Dawson submitted monthly invoices for his work to Dr. Khoury's counsel. (ECF 285-2, Exs. C & D.) From those invoices, Dr. Khoury's counsel understood that Mr. Dawson spent at least 27 hours over numerous days in March and April performing independent research on the issues in the case. (ECF 295–2, ¶ 13.)

Following Mr. Dawson's initial research, Dr. Khoury's counsel held a conference with Mr. Dawson in late March to discuss the scope of the report he was intending to prepare. (ECF 295–2, ¶ 14; ECF 295–1, ¶ 8.) Mr. Dawson ultimately billed more than 101 hours drafting his expert report, the large majority in the last half of April. (ECF 295–2, ¶ 14.) He seemed to have spent ample time researching and writing his report. (*Id.* ¶ 21.)

Mr. Dawson also billed Dr. Khoury's counsel more than 23 hours for "[e]diting and revis[ing]" his draft report, including specifically for "citation insertions" and

"documentation language." (ECF 295–2, ¶ 22; ECF 285-2, Exs. C & D.) This included thousands of dollars (7.5 hours) for performing "QA"—or quality assurance—on his draft report. (ECF 295–2, ¶ 22.)

Dr. Khoury's counsel reviewed several drafts of Mr. Dawson's expert report, providing feedback about its scope, length, and duplication of certain points. (ECF 295–2, ¶¶ 23–28; ECF 295–1, ¶¶ 11–13.) Ultimately, the report was narrowed from nearly 50 pages to just 25 pages in the final revisions, resulting in some formatting irregularities and typographical errors in the process. (ECF 295–2, ¶ 32; ECF 295–1, ¶ 13.)

Mr. Dawson's expert report voluntarily included an "Expert Declaration," stating

> under penalty of perjury under the laws of the United States of America that the foregoing report is true and correct to the best of my knowledge, and that all opinions expressed herein are based on my professional expertise in federal and state healthcare program regulation, reimbursement policy, and public payer compliance standards.

(ECF 282-3 at 29.) Mr. Dawson included this certification in his report without request from Dr. Khoury's counsel. It is not required by any rule.

### C. <u>**Dr. Khoury's counsel did not know or have reason to know Mr. Dawson had used AI to prepare parts of his report.**</u>

Mr. Dawson never disclosed to Dr. Khoury's counsel prior to his deposition that he had used generative AI for any part of his work in this case. (ECF 295–2, ¶ 33; ECF 295–1, ¶ 16; Dawson Dep. Tr. 65:16–21, ECF 285-2, Ex. E.)

In their review of drafts of Mr. Dawson's expert report, nothing stood out to Dr. Khoury's counsel about its content to raise red flags about possible AI hallucinations. (ECF 295–2, ¶¶ 26, 29–30, 37–38; ECF 295–1, ¶¶ 13–14; ECF 285–1, Appendix A.) For example, the made-up testimony that Mr. Dawson's report attributed to CMS's witness is "a substantively correct statement and as such it never jumped out as being a fabrication." (ECF 295–1,

¶¶ 13–14.) Likewise, the supposed joint policy statement that Mr. Dawson's report fabricated from two real organizations was similar to other statements the groups had made. (ECF 295–2, ¶¶ 37–38.)

Furthermore, given all the time Mr. Dawson had billed for editing and performing quality assurance, Dr. Khoury's counsel believed Mr. Dawson "had thoroughly doublechecked his own work." (ECF 295–2, ¶ 31.)

### D. <u>Defendants rehash historical issues already considered and resolved by the Court that have nothing to do with the matter presently before the Court.</u>

In aid of their motion, Defendants attempt to relitigate issues that the Court has already heard and resolved and which have nothing to do with the present issues regarding Mr. Dawson's use of AI to prepare his expert report.

First, Defendants claim that Dr. Khoury's counsel misled the Court about the need to obtain Defendants' PED data before deposing CMS. But Mr. Griffith's Rule 56(d) declaration specifically noted that Dr. Khoury did *not* expect CMS's witness to be able to testify about the PED data in detail because neither CMS nor Noridian examined any of Defendants' PED data. (ECF 147-3, ¶¶ 22, 24). And that is *exactly* how Dr. Capehart testified. (2025 Capehart Dep. Tr. 62:13–64:1, excerpts attached as Exhibit A.) Moreover, the Court already addressed this criticism, noting that Dr. Khoury's counsel had valid reasons for wanting to review Defendants' PED data before deposing CMS again. (ECF 207 at 7–8 (noting Dr. Khoury's "plans to depose CMS once Dr. Khoury receives the Defendants' PED data" and that he had valid reasons for waiting to "take depositions until he receives a meaningful production of the PED data.").

Second, Defendants argue that Mr. Mark misled the Court about CMS's consent to a second deposition. Despite Defendants' repeated accusations that Mr. Mark misrepresented

CMS's position, the Court already found Defendants' accusations to be baseless. (ECF 207 at 14 ("Dr. Khoury provided the court with a copy of the email he referred to in his affidavit. . . . As Dr. Khoury asserted, the government did indicate" what Mr. Mark represented to the Court).)

Lastly, Defendants argue that counsel misled the Court concerning the scope of the second CMS deposition. However, as the Court is aware, Dr. Khoury believed that when the Court granted his request for Rule 56(d) relief (ECF 166), it was permitting a deposition on the topics set forth in counsel's Rule 56(d) declaration. (ECF 147-3, ¶¶ 7–34.) When Dr. Khoury later served his deposition topics, they closely tracked the substance of counsel's declaration, which is what Dr. Khoury reasonably believed the Court had permitted. (ECF 238.) Although the Court later narrowed the topics for that deposition based on Defendants' motion (ECF 253), Dr. Khoury's counsel in no way misled the Court about the issue. Rather, there was a reasonable misunderstanding about the scope of the topics the Court had allowed.

### E. Dr. Khoury and his counsel have achieved relative success so far in the litigation—following the completion of expert discovery, the case is ready for trial.

To say Defendants have vigorously contested this case is an understatement. To get the case to this point, Dr. Khoury's counsel has overcome a motion to dismiss (ECF 89), a motion to certify that ruling for immediate appeal (ECF 97), a motion for summary judgment (ECF 166), and motion for reconsideration of that ruling (ECF 207). Not only has Dr. Khoury's counsel successfully defeated multiple dispositive motions, they have—despite Defendants' abject lack of cooperation—managed to successfully complete fact discovery, which included numerous successful motions to compel discovery from Defendants. (*See, e.g.*, ECF

115; ECF 207.) Dr. Khoury's counsel also recently finished numerous party depositions on a short timeline in multiple locations. (ECF 295–2, ¶ 15.)

Mr. Dawson was only one of four expert witnesses designated by Dr. Khoury. (ECF 266.) The testimony of Dr. Khoury's other three experts addresses the specific factual issues in the case—whether Defendants' actions violated the accepted standards of medical practice applicable to anesthesiologists, which are a precondition of payment by Medicare and Medicaid—rather than the more general regulatory background applicable to all cases, as Mr. Dawson's report was intended to address.

Dr. Khoury's other experts are (1) Dr. Peter Papadakos, who literally "wrote the book" on the relevant subject, *Distracted Doctoring: Returning to Patient-Centered Care in the Digital Age*, the second edition of which was recently published, (2) Dr. Van Norman, who conducted a comprehensive, statistically valid analysis of Defendants' personal electronic device (PED) data (ECF 275), (3) and Ted Tatos, who has performed statistical analyses in numerous similar cases (ECF 274).

Defendants' PED data revealed that, while being paid to care for Medicare and Medicaid patients in a medically induced coma, Defendants were instead busy working on other sources of income (e.g., DJ gigs, ketamine clinics, stock trading), social events (e.g., party planning), and countless other personal activities. The data established definitively that Defendants' PED use significantly and dangerously deviated from accepted standards of medical practice. (*See, e.g.*, ECF 275; ECF 280–1 at 7–10 (unredacted).)

Dr. Van Norman worked closely with Mr. Tatos to perform a rigorous, statistically valid review of Defendants' PED data covering hundreds of separate anesthesia services performed by the five defendant anesthesiologists. (ECF 275.) Dr. Van Norman's conclusion was

that the proportion of cases where Defendants' use of PEDs rendered their services below established professional standards "were 80.6% for Dr. Debenham, 81.5% for Dr. Nelson, 89.5% for Dr. Evans, 100% for Dr. Larson, and 91.7% for Dr. Miner." (ECF 275 at 18 (sealed); ECF 280-1 at 19 (unredacted).)

Finally, the testimony of Mr. Dawson (or a replacement expert) is not necessary for Dr. Khoury to succeed at trial (or at summary judgment). The testimony that Mr. Dawson (or a substitute expert) was expected to provide could instead be elicited from a CMS witness. *United States ex rel. Griffis v. EOD Tech., Inc.*, No. 3:10-CV-204, 2024 WL 4920598, at *2 (E.D. Tenn. Sept. 13, 2024) ("Under the FCA, the Court can compel attendance at trial of any witness subpoenaed and served within the United States . . . ." (citing 31 U.S.C. § 3731(a)). Although Dr. Khoury's counsel elected to engage an expert witness to provide that testimony to avoid having to call a CMS witness at trial (ECF 295–2, ¶ 5), an expert's testimony on these topics is not strictly necessary since the evidence can be elicited in other ways.

### F. <u>After learning about what happened, Dr. Khoury nonetheless desires to continue his representation with the challenged law firms.</u>

Dr. Khoury, after having been informed of the relevant facts and circumstances, remains confident in his attorneys and desires to keep them as his counsel. (Declaration of Dr. Michael Khoury ¶¶ 6–8, submitted herewith.) It would be a tremendous burden on Dr. Khoury to identify additional counsel to associate with the unchallenged counsel and have that counsel brought up to speed in a case that has been pending for more than five years. (*Id.* ¶¶ 5, 9–10.)

## ARGUMENT

### I. DISQUALIFICATION IS A DRASTIC REMEDY.

Because this Court is "mindful that a party in a civil case has an interest in being able to retain counsel of its choice," it views motions to disqualify "with extreme caution, recognizing the possible unfair advantage that may result." *Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 WL 648545, at *6 (D. Utah Mar. 10, 2008) (cleaned up). The Court has noted that disqualification "'is a drastic measure and a court should hesitate to impose it except when necessary.'" *Capana Swiss Advisors AG v. Rymark, Inc.*, No. 2:23-CV-00467-TS-CMR, 2025 WL 1650570, at *1 (D. Utah June 11, 2025) (quoting *Flying J Inc.*, 2008 WL 648545, at *6). Courts have described as "goal-defeating" the "[d]isqualification [of attorneys] in spasm reaction to every situation capable of appearing improper." *In re Blinder, Robinson & Co., Inc.*, 123 B.R. 900, 907 (Bankr. D. Colo. 1991) (internal quotation marks omitted).

"Motions to disqualify are governed by the local rules of the court in which the attorneys appear and by applying standards developed under federal law." *Capana Swiss Advisors AG*, 2025 WL 1650570, at *1. "Even assuming the court [finds] a violation of the ethical rules, a motion to disqualify should be viewed with 'extreme caution.'" *Hewlett v. Utah State Univ.*, No. 2:16:CV-01141-DN, 2019 WL 1486693, at *4 (D. Utah Mar. 29, 2019) (other internal quotation marks omitted).

Rather, this Court "has applied a 'functional analysis' to determine whether disqualification is appropriate," "carefully consider[ing] the facts of the particular case, the nature of the violation, and its impact on trial proceedings." *Flying J Inc.*, 2008 WL 648545, at *6 (footnotes omitted). "Factors to be considered include (1) the egregiousness of the violation, (2) the presence or absence of prejudice to the other side, (3) whether and to what extent there

has been a diminution of effectiveness of counsel, (4) hardship to the other side, and (5) the stage of trial proceedings." *Id*. "The essential issue to be determined in the context of litigation is whether the alleged misconduct taints the lawsuit." *Capana Swiss Advisors AG*, 2025 WL 1650570, at *2 (internal quotation marks omitted).

"[T]he party seeking disqualification must carry a 'heavy burden' . . . and meet a 'high standard of proof.'" *In re Blinder, Robinson & Co., Inc.*, 123 B.R. at 907 (citations omitted).

### A. Defendants have failed to establish an egregious violation of an ethical rule.

#### 1. Defendants have failed to identify a specific ethical rule Dr. Khoury's counsel has violated.

A glaring omission from Defendant's request to disqualify Dr. Khoury's counsel is the identification of a Rule of Professional Conduct that Dr. Khoury's counsel supposedly violated. Nowhere in Defendants' overlength motion do they bother to identify the particular ethical violation that is so grave as to warrant disqualification.[3]

Rather than identify a purported violation of an ethical rule, Defendants cite an Ohio court's discussion of its earlier minute entry in *United States ex rel. USN4U, LLC v. Wolf Creek*

---

[3] Dr. Khoury's counsels' conduct does not implicate either Rules 3.3 or 3.4 of the Utah Rules of Professional Conduct, the two with potentially the most applicability. Rule 3.3 requires an attorney "who knows that a person intends to engage, is engaging, or has engaged in . . . fraudulent conduct related to [an adjudicative] proceeding [to] take reasonable remedial measures, including, if necessary, disclosure to the tribunal." Here, by withdrawing Mr. Dawson as a witness, among other things, Dr. Khoury has done precisely what the rule requires—taken "reasonable remedial measures."

Meanwhile, Rule 3.4, which prohibits an attorney from "falsify[ing] evidence" or "counsel[ing] or assist[ing] a witness to testify falsely," also does not apply since Dr. Khoury's counsel did not participate in—or even know about—the false information in Mr. Dawson's expert report.

Nor do the requirements of Rule 11 or Rule 26 apply. *See* Fed. R. Civ. P. 11(d) (excluding discovery-related "disclosures" under Rule 26 from its reach); Fed. R. Civ. P. 26(g) (imposing obligations on attorneys who sign discovery disclosures); Fed. R. Civ. P. 26(a)(2)(B) (requiring expert reports to be "prepared and signed by the witness").

*Fed. Services* regarding the court's "serious concerns as to whether the Relator should continue to act as a representative for the U.S. in this lawsuit." No. 1:17-CV-0558, 2023 WL 8480085, at *1 (N.D. Ohio Dec. 7, 2023). But a review of that minute entry reveals that the court's concern stemmed from "testimony from the relator and two other witnesses on the alleged violation of [the] qui tam seal," not about engaging an expert who used AI or anything similar to this case. *See* Oct. 4, 2023, minute entry, Docket 1:17-cv-00558-DAP (N.D. Ohio). Defendants fail to explain how the case has any relevance here: They never show that Dr. Khoury made a false statement, instructed anybody else to do so, knew that anybody else had done so, or otherwise engaged in any misconduct whatsoever. And the same is true of Dr. Khoury's counsel. *See Capana Swiss Advisors AG*, 2025 WL 1650570, at *3 (denying motion to disqualify because "there is no controlling case law to support" it, and the primary case cited by the moving party "has some important factual dissimilarities to the present matter").

To be fair, Defendants also cite a series of cases addressing documents prepared and submitted by lawyers containing AI hallucinations. But in each of those cases, the courts stressed the individual responsibility of the lawyers on the filings based on the principles expressed in Rule 11 and similar rules. *See, e.g.*, *Johnson v. Dunn*, No. 2:21-CV-1701-AMM, 2025 WL 2086116, at *12 (N.D. Ala. July 23, 2025) (discussing Rule 11 and Rule of Professional Conduct 3.3 in connection with AI use by lawyers to prepare a motion filed in court); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489, 499 (D. Wyo. 2025) (imposing fines as sanctions under Rule 11 for AI hallucinations in motion filed in court); *Dehghani v. Castro*, No. 2:25-CV-0052 MIS-DLM, 2025 WL 988009, at *6 (D.N.M. Apr. 2, 2025) (imposing sanctions short of disqualification under Rule 11 for numerous AI hallucinations in brief filed in court); *Garner v. Kadince, Inc.*, 571 P.3d 812, 816 (Utah Ct. App. 2025) (imposing monetary sanctions

under the appellate equivalent of Rule 11 (Utah R. App. P. 40) for AI hallucinations in petition filed in court).

Filings submitted under an attorney's name are very different territory from reports prepared by an expert witness. While courts will *never* question a lawyer's revisions to a motion filed under his or her name, they *often* ask whether an attorney has had too much influence on an expert's report—under penalty of the expert's exclusion if the attorney is found to have overstepped the sometimes less-than-clear boundaries elucidated in judicial decisions. *See, e.g.*, *Marek v. Moore*, 171 F.R.D. 298, 300 (D. Kan. 1997) (noting that any revisions suggested by an attorney to the "substance of the expert opinions and conclusions, as well as their underlying bases and reasons" risk "closer scrutiny" by the court and the exclusion of the expert); *Rodgers v. Beechcraft Corp.*, No. 15-CV-129, 2016 WL 7888002, at *3–4 (N.D. Okla. Oct. 27, 2016) (observing that an attorney's role is to "merely 'fine-tune'" an expert's disclosure).

Not surprisingly, Defendants offer no authority for the proposition that Rule 11-like standards apply to an attorney's review of an expert's report.[4] *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993) (holding that "[a]s long as reliance is reasonable under the

---

[4] Notably, even rules adopted by other federal courts about AI would not have placed Dr. Khoury's counsel on notice they were required to guard against its use by an expert on pain of disqualification. For example, Judge Iain Jonhston of the Northern District of Illinois has adopted procedures for cases pending before him related to AI use. (*See* https://www.ilnd.uscourts.gov/judge_display.php?LastName=Johnston.) But those procedures apply to "[a]nyone—counsel and unrepresented parties alike—*using AI in connection* with the filing of a pleading, motion, or paper in this Court or the serving/delivering of a request, response, or objection to discovery" (emphasis added). The rule, quite reasonably, focuses on the *knowing* use of AI. It does not, for example, impose affirmative obligations on those who *did not use* AI to inquire of others about their possible use of AI. Although Dr. Khoury's counsel will certainly adopt that procedure going forward, particularly with experts, he had no reason to suspect that he had to do that before this regrettable incident.

circumstances, the court must allow parties and their attorneys to rely on their experts without fear of punishment for any errors in judgment made by the expert"); *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995) ("[F]orcing lawyers to second-guess their experts . . . would effectively eliminate the legitimate role experts play . . . .").

Since Defendants have "not established a violation of ethical rules here, . . . the first factor weighs against disqualification." *Hewlett v*, 2019 WL 1486693, at *4; *see also Capana Swiss Advisors AG*, 2025 WL 1650570, at *3 (noting that "merely ma[king an] argument of an" ethical violation is not the same as "demonstrat[ing] there has been an" ethical violation).

**2. Even if Dr. Khoury's counsel violated an ethical standard, they did so inadvertently, briefly, and immediately corrected the problem.**

Even though Defendants fail to identify a particular ethical rule that Dr. Khoury's counsel supposedly violated, to the extent they have violated one, the violation was excusable. Mitigating factors include whether (1) the lawyer "inadvertently engaged" in the conduct, (2) "upon learning of the ethical issue, the lawyer took prompt and appropriate steps to resolve or mitigate the issue," and (3) it was "a brief or technical violation" instead of a "lengthy, planned, or repeated violation." Swisher, Kieth; *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 93 (Winter 2014).

Here, there is no suggestion that Dr. Khoury's counsel engaged in any conduct knowingly or intentionally. Mr. Dawson failed to disclose his use of AI to Dr. Khoury's counsel, and Dr. Khoury's counsel did not have reason to suspect its use. Such conduct is the textbook definition of inadvertent.

As for the second mitigation factor, immediately after learning of Mr. Dawson's use of AI, Dr. Khoury's counsel took steps to try to understand what had happened. (ECF 295-2, ¶¶ 34–36.) Unfortunately, counsel's inquiry of Mr. Dawson only led to further unanswered

questions and to answers that appeared unreliable. (*Id.*)[5] As a result, Dr. Khoury has withdrawn Mr. Dawson as an expert, which the Court has permitted. (*Id.*) All of this occurred less than three weeks after Mr. Dawson's deposition.

Finally, regarding the third mitigation factor—the length and severity of the violation—Dr. Khoury's counsel took immediate steps to rectify the problems, including ultimately withdrawing Mr. Dawson as an expert. Dr. Khoury's counsel had no knowledge of Mr. Dawson's use of AI, and the problem will not be repeated. In short, the issue, although serious, was short-lived and isolated. Accordingly, if Dr. Khoury's counsel violated some as-yet-identified ethical standard, the violation was brief, unintentional, and rectified promptly—all hallmarks of successful mitigation.

Because Defendants have failed to identify any ethical rule violated by Dr. Khoury's counsel and failed to establish that if there was a violation of an ethical standard, the violation was egregious, the first disqualification factor weighs against Defendants' request.

**B. <u>Prejudice to Defendants can be largely mitigated.</u>**

As Dr. Khoury acknowledged in connection with his motion to substitute Mr. Dawson for another expert, Defendants have suffered prejudice from Mr. Dawson's use of AI in the form of attorneys' fees and costs associated with reviewing Mr. Dawson's report and taking his deposition. Dr. Khoury's counsel already voluntarily offered to reimburse Defendants' counsel for those expenses in connection with substituting Mr. Dawson. Although Dr.

---

[5] Defendants criticize Dr. Khoury's counsel for the time that elapsed after the deposition, but Defendants filed their motion to disqualify him just four days after the deposition. Dr. Khoury's counsel required time to investigate what happened and determine the best course of action, which was ultimately made more difficult and slowed by Mr. Dawson's inability to provide information about how AI had caused the errors that counsel considered reliable. (ECF 295-2, ¶¶ 34–36.)

Khoury acknowledges there are additional intangible costs that everyone involved have incurred—the Court, the parties, and counsel—from having to address Mr. Dawson's AI use, the prejudice is not so severe as to justify the "extreme sanction" of disqualification, especially because Dr. Khoury's counsel stand ready to mitigate it to the extent possible. *Weeks v. Indep. Sch. Dist. No. I-89 of Oklahoma Cnty., OK., Bd. of Educ.*, 230 F.3d 1201, 1206 (10th Cir. 2000). Indeed, it appears that a far more significant burden will stem from litigating and adjudicating *this motion* seeking drastic and unwarranted relief.

**C. <u>Dr. Khoury's counsel are no less effective because of Mr. Dawson's poor judgment.</u>**

Defendants offer no reason to believe that Dr. Khoury's counsel has suddenly become ineffective. This event—while certainly not counsel's best day and an experience that will change counsel's approach with expert witnesses in the future, particularly with regard to disclosure of AI use—must be viewed in context and with reasonable perspective.

Apart from this event, counsel has successfully navigated the case to the brink of trial despite fierce headwinds of opposition from Defendants and their counsel at every step. If counsel was that ineffective, there would have never been an opportunity to reach this stage.

Relatedly, Defendants seem to contend that without Mr. Dawson or another expert on these topics, Dr. Khoury's case is subject to summary judgment. (ECF 291 at 19.)[6] Not so.

---

[6] Defendants also seem to suggest that they will obtain summary judgment because CMS's witness supposedly did not change her testimony at her second deposition. Although Dr. Khoury never expected the witness to "change her testimony," he did expect the witness to provide more fulsome testimony on certain important issues, which is what happened. For example, regarding PED use by anesthesiologists, Dr. Capehart explained it "is speculation" to conclude that CMS and Noridian did not consider claims submitted to be false due to PED use because "we do not have any way of looking at that. . . . [T]hat's not something that's on a claim form and Noridian looks at the claim." (2025 Capehart Dep. Tr. 101:13-23, Ex. A.) She also confirmed that if CMS later determines services were not reasonable and necessary after payment, Medicare can recover those payments. (*Id*. at 84:23–85:2.)

As noted above, if the Court declines to allow Dr. Khoury to substitute an expert witness for Mr. Dawson, Dr. Khoury always has the option to subpoena a knowledgeable witness from CMS to testify at trial about these subjects. *See, e.g.*, *Griffis*, 2024 WL 4920598, at *2 (nationwide service of process for trial witnesses in False Claims Act cases).[7]

Because there is no reason to believe Dr. Khoury's counsel has suddenly become ineffective due to Mr. Dawson's use of AI to prepare his report, this factor also weighs against disqualification.

**D. <u>Dr. Khoury will face substantial hardship if he is forced to find new counsel.</u>**

This Court has recognized that a client would face "significant" hardship from having to replace counsel that had "handled numerous [similar] cases across the country," represented the party "since the inception of th[e] case over two years," and "handled discovery and motion practice to date." *Hewlett*, 2019 WL 1486693, at *4; *see also Capana Swiss Advisors AG*, 2025 WL 1650570, at *4 (finding this factor weighed against disqualification where the "case has been litigated heavily, much discovery conducted, and" counsel had been with the case since the beginning).

Here, challenged counsel has substantial experience with False Claims Act cases, has been with the case since the beginning (more than five years), and has handled all the fact and expert discovery and the bulk of the motion practice so far. Additionally, Dr. Khoury has expressed that having to replace counsel now, at this late stage, would significantly disadvantage him. (Khoury Decl. ¶¶ 9–10.) This factor therefore also tips the scales against disqualification.

---

[7] Notably, Defendants have contended that all the testimony Dr. Khoury intends to elicit from this expert is legal in nature. (ECF 282 at 7–9.) If that is the case, then such an expert cannot be required for Dr. Khoury to prevail since the Court will instruct the jury on such issues.

### E. The proceedings are at an advanced stage.

The final factor also weighs firmly against disqualification. This case has been pending for more than five years and has been actively litigated during most of that time. All that remains is completing expert discovery—largely depositions—and then trial. Although the parties may seek summary judgment, this case is effectively ready for trial after many hard-fought years of discovery and related matters.

Disqualifying opposing counsel under these circumstances is certainly ideal from Defendants' perspective—relieving your opponent of their trusted, knowledgeable counsel who have worked up the entire case just before trial would be ideal. But given the advanced stage of these proceedings, this factor also weighs against disqualification.

* * *

When all the factors the Court must consider are weighed together, it is evident that the sanction of disqualifying Dr. Khoury's attorneys would be disproportional and far beyond what is necessary to address the issue. Because disqualification is not appropriate when "the facts in support of th[e] Motion are not clear or . . . straightforward," Defendants have failed to establish that the continuation of challenged counsel would so taint the proceedings with ethical violations that disqualification is necessary. *Capana Swiss Advisors AG*, 2025 WL 1650570, at *3. The Court has other available remedies short of disqualification to address the circumstances.

The argument to disqualify Dr. Khoury himself is frivolous. Defendants identify no rule anywhere requiring a lay client to police the content of expert witness reports.[8] Absent

---

[8] Even if the Court dismisses Mr. Griffith, Mr. Mark, and their firms, Dr. Khoury will still be represented by counsel of record (Lynn Adam, Tejinder Singh, and their respective law firms) who never worked with the expert witnesses, particularly Mr. Dawson, and did not participate

some showing that Dr. Khoury himself engaged in litigation misconduct—and no such showing is possible on this record—any suggestion that Dr. Khoury is an improper plaintiff to maintain this action is meritless.

## II. DEFENDANTS' MOTION IS UNTIMELY.

"[D]isqualification motions must be diligently pursued to avoid waiver and may not be used as strategic litigation tactics." *Hewlett*, 2019 WL 1486693, at *5; *D.J. Inv. Grp., L.L.C. v. DAE/Westbrook, L.L.C.*, 113 P.3d 1022, 1024 (Utah Ct. App. 2005) ("A motion to disqualify counsel is untimely when it is not immediately filed and *diligently pursued as soon as the party becomes aware* of the basis for disqualification." (internal quotation marks omitted; emphasis in original)).

Defendants' counsel claims that the issues were so open and obvious that by May 21, 2025 (ECF 291-2 ¶ 4), they had "identified the myriad fabricated quotations and sources upon initial reviews of the report and concluded that Mr. Dawson likely used AI to draft it." (ECF 291 at 10.) At that point, Defendants' counsel did not raise the issues with Dr. Khoury's counsel or provide any notice of them. *Cf.* Fed. R. Civ. P. 11(c)(2) (no motion for sanctions may be filed "if the challenged paper . . . is withdrawn or appropriately corrected within 21 days"). Instead, they kept quiet and waited over a month (until June 30) before contacting Dr. Khoury's counsel to schedule Mr. Dawson's deposition, even though they could have taken it at any point after May 21. (ECF 269 at 13 (noting "Defendants have done *nothing* to advance depositions of Dr. Khoury's experts"). Then, Defendants waited another three and a half weeks after that deposition—until August 13—to file a motion to disqualify counsel.

---

in the challenged conduct whatsoever. Defendants offer nothing to suggest that a qui tam relator should be relieved of that role despite continuing representation by counsel that is nationally recognized in the field.

Almost three months elapsed between Defendants' counsel discovering the issue and suspecting AI use (May 21) and Defendants' motion for sanctions (August 13).

In *Capana Swiss Advisors*, this Court found that the moving party "did not diligently pursue disqualification" because it could "not explain why it took four additional months" after learning of the issue to file the motion. 2025 WL 1650570, at *3; *Zions First Nat. Bank v. Barbara Jensen Interiors, Inc.*, 781 P.2d 478, 481 (Utah Ct. App. 1989) (finding motion to disqualify untimely because it was "filed three months" after party learned of potential basis). Here, Defendants took almost three months to file and offer no plausible reason why they did not alert Dr. Khoury's counsel to the issue earlier, although strategic considerations seem probable. *See id*. ("A motion to disqualify counsel . . . may not be used as a manipulative litigation tactic." (citing, e.g., *Smith v. Whatcott,* 757 F.2d 1098, 1099–1100 (10th Cir.1985); *Redd v. Shell Oil Co.,* 518 F.2d 311, 315 (10th Cir.1975))).

To the extent Defendants contend that they needed to wait for Mr. Dawson's deposition, not only could they have taken it much earlier, but this Court in *Capana Swiss Advisors* criticized the moving party's "'wait and see' approach . . . given the requirement to pursue such motions with diligence." 2025 WL 1650570, at *4. If Defendants genuinely believed that Dr. Khoury's counsels' conduct was so egregious as to require disqualification, they should have pursued that relief directly, specifically, and immediately. That they did not means they should be found to have waived the issue.

## **CONCLUSION**

Based on the foregoing, Dr. Khoury respectfully requests that this Court deny the motion to disqualify Dr. Khoury or any of his counsel and to enter an order awarding only Defendants their costs for reviewing Mr. Dawson's expert report and taking his deposition.

Respectfully submitted this 27th day of August 2025.

/s/ Brandon J. Mark
Brandon J. Mark (10439)
Hannah J. Ector (17980)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
BMark@parsonsbehle.com
HEctor@parsonsbehle.com

Lynn M. Adam (Admitted Pro Hac Vice)
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Ave, Suite 225
Decatur, Georgia 30030
Telephone: (404) 324-3582
ladam@lynnadamlaw.com

Robert A. Griffith (Admitted Pro Hac Vice)
75 State Street, Suite 100, PMB 5890
Boston, MA 02109
Telephone: (617) 752-3807
robert@ragriffithlaw.com

Tejinder Singh (Admitted Pro Hac Vice)
SPARACINO PLLC
1920 L Street NW, Suite 825
Washington, DC 20036
Telephone: (202) 629-3530
Facsimile: (202) 629.3658
tejinder.singh@sparacinopllc.com

*Attorneys for Relator Michael D. Khoury, M.D.*

## CERTIFICATE OF SERVICE

On this 27th day of August 2025, I hereby certify that I electronically filed the foregoing **RELATOR MICHAEL D. KHOURY'S RESPONSE TO MOTION FOR SANCTIONS** with the Clerk of Court using the CM/ECF system that will send an electronic notification to counsel of record for all of the parties.

/s/ Brandon J. Mark